**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **CARLOS TURNER** | : | |
| **265 WOODSTREAM DRIVE** | | |
| **SPRINGBORO, OH 45066** | : | **JUDGE: RICE/GENTRY** |
| | | **CASE NO.: 3:23-cv-00371** |
| **and** | : | |
| | | |
| **DIANA DAVOLI-TURNER** | : | |
| **265 WOODSTREAM DRIVE** | | |
| **SPRINGBORO, OH 45066** | : | |
| | | |
| **and** | : | |
| | | |
| **MIAMI VALLEY FAIR HOUSING** | : | |
| **CENTER, INC.** | | |
| **505 RIVERSIDE DRIVE** | : | |
| **DAYTON, OH 45406** | | |
| | : | |
| **Plaintiffs,** | | |
| | : | |
| **v.** | | |
| | : | |
| **HENLEY APPRAISALS, LLC** | | |
| **ATTN: US CORP. OF AGENTS** | : | |
| **1991 CROCKER ROAD, #600-755** | | |
| **WESTLAKE, OH 44145** | : | |
| | | |
| **and** | : | |
| | | |
| **KEVIN D. HENLEY** | : | |
| **1818 ASHLEY DRIVE** | | |
| **MIAMISBURG, OH 45342** | : | |
| | | |
| **and** | : | |
| | | |
| **U.S. BANCORP, INC. D/B/A** | : | **AMENDED COMPLAINT** |
| **U.S. BANK** | | **JURY TRIAL DEMANDED** |
| **800 NICOLLET MALL** | : | |
| **MINNEAPOLIS, MN 55402** | | |
| | : | |
| **and** | | |
| | : | |

1

| | |
|---|---|
| **U.S. BANK NATIONAL ASSOCIATION** | : |
| **ATTN: CT Corporation System** | : |
| **4400 EASTON COMMONS WAY, SUITE #125** | : |
| **COLUMBUS, OH 43219** | |
| | : |
| **Defendants.** | |

---

## COMPLAINT

Now come Plaintiffs, Carlos Turner, Diana Davoli-Turner, and the Miami Valley Fair Housing Center, Inc. (collectively the "Plaintiffs"), by and through counsel, and for their *AMENDED COMPLAINT*[1] state as follows:

## INTRODUCTION

1. Plaintiffs bring this civil action for damages, injunctive relief, and declaratory relief against Defendants, Henley Appraisals, LLC, Kevin D. Henley, U.S. Bancorp, Inc. d/b/a U.S. Bank, and U.S. Bank National Association (collectively the "Defendants"), to seek redress for violations of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*., the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*., the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, the Ohio Fair Housing Act, Ohio Rev. Code § 4112.01, *et seq.,* and Ohio tort law.

2. Defendants, Henley Appraisals, LLC, and Kevin Henley, discriminated against Plaintiffs, Carlos Turner and Diana Davoli-Turner, by dramatically undervaluing their home in an appraisal because of the race of Plaintiff Carlos Turner and national origin of Plaintiff Diana Davoli-Turner.

3. Plaintiff Carlos Turner is a Black, African-American male. Plaintiff Diana Davoli-Turner is a Canadian citizen with permanent residency in the United States.

---

[1] This Amended Complaint is timely filed pursuant to Fed. R. Civ. P. 15(a)(1).

4. Defendants, U.S. Bancorp, Inc. d/b/a U.S. Bank, and U.S. Bank National Association (collectively referred to as "U.S. Bank"), discriminated against Plaintiffs, Carlos Turner and Diana Davoli-Turner, by knowingly relying on the discriminatory appraisal to deny Plaintiffs lending and financing opportunities, and by failing to maintain any supervision or review process over appraisals when discrimination complaints are made.

5. Defendant U.S. Bank further discriminated against Carlos Turner because of his race and Diana Davoli-Turner because of her national origin when they offered unfavorable terms and conditions in applying for and extending credit to the Turner Plaintiffs.

6. Defendant U.S. Bank further discriminated against Plaintiffs by asking inappropriate questions and making unlawful statements to Plaintiff Diana Davoli-Turner regarding her citizenship status prior to the appraisal process.

7. Plaintiff Diana Davoli Turner visited a branch and discussed at length her national origin and the race of Plaintiff Carlos Turner which resulted in discriminatory treatment throughout the loan process. Additionally, U.S. Bank created unlawful barriers for the Turner Plaintiffs to refinance their home, which resulted in significant delay and further harmed Plaintiffs.

8. Defendants' discriminatory misconduct frustrates the mission of Plaintiff, the Miami Valley Fair Housing Center, and forced them to divert their scarce resources to counteract the discrimination.

9. Plaintiffs, Diana Davoli-Turner, owns real property at 265 Woodstream Drive, Springboro, OH 45066 (the "Subject Property" or "residence"). Plaintiff, Carlos Turner, resides at the Subject Property. The Subject Property in Springboro is a large home, with nearly 4,000 SQ FT of living area with a 2-car attached garage. Springboro, as well as the Turner Plaintiffs' neighborhood, is predominantly white, with the Black population making up less than 2%

of the town's total population. The Turner Plaintiffs purchased their home in November 2020 for $442,000 and made substantial alterations and improvements to the property after that time.

10. Defendants, Henley Appraisals, LLC, and Kevin D. Henley violated the federal and state Fair Housing Act, the Civil Rights Act of 1866, and state tort law when they dramatically undervalued the Subject Property. Defendant Henley Appraisals, LLC knew or should have known that the significant undervaluing of the Subject Property would result in adverse credit decisions by the lender, U.S. Bank.

11. Defendant, U.S. Bank, violated the federal and state Fair Housing Act, the Civil Rights Act of 1866, the Equal Credit Opportunity Act, and state tort law when they denied the Turner Plaintiffs' refinance loan and home equity loan applications for pretextual reasons. Defendant, U.S. Bank, further violated the state and federal Fair Housing Act when they imposed unfavorable terms and conditions on the Turner Plaintiffs and offered them a less favorable Home Equity Line of Credit ("HELOC") at 60% Loan to Value (LtV) with a variable interest rate rather than a fixed interest rate.

12. U.S. Bank, by and through its employees and loan officers, stated that they could not do 80% LtV, which is U.S. Bank's standard practice, because of Diana Davoli-Turner's national origin.

13. Defendant, U.S. Bank, ignored critical civil rights protections for consumers when they failed to supervise or audit Defendant Henley Appraisals, LLC's appraisal of the Subject Property, and failed to offer an appeals process to Plaintiffs to protect them from Henley's discriminatory appraisal.

14. Defendants' appraisal and interactions with the Turner Plaintiffs are consistent with a pattern of discriminatorily undervaluing homes and offering unfavorable loan terms to minorities. As a resident, Carlos Turner was discriminated against in housing because of his race and Diana Davoli Turner, as the owner of the residence, was treated less favorably in the appraisal and lending process because of her national origin.

15. The Turner Plaintiffs informed Defendant, U.S. Bank that Defendant, Henley Appraisals, LLC's appraisal was riddled with errors and omissions. Central to the complaints to U.S. Bank was that the Henley Defendants' appraisal was biased and prejudiced against them because of Carlos Turner's race and Diana Davoli Turner's national origin. Despite Plaintiffs' complaints, U.S. Bank failed to offer an independent appraisal of the Subject Property or offer any type of appeals process. This fact is made particularly egregious when considering that an exterior only appraisal that did not take into account the recently finished basement arrived at a value in excess of Henley's discriminatory appraisal. U.S. Bank failed to take any substantive action to remedy or correct Henley's wrongdoing.

16. Plaintiffs later conducted a "whitewashed" appraisal with an independent appraiser. Plaintiffs whitewashed the Subject Property by removing all family photographs and artwork that would be associated with Black or Canadian culture.

17. The independent appraiser valued the Subject Property at $655,000, more than 39% percent higher than that of Defendant Kevin Henley of Henley Appraisals, LLC. That value far outpaces the year over year increase in property values in Springboro and the Turner Plaintiffs' neighborhood. There is no legitimate justification for the Henley Defendants' appraisal to come back 39% percent less than the Whitewashed Appraisal. Had U.S. Bank performed this reappraisal a year earlier, the Turner Plaintiffs would have secured a loan

that would meet both their short-term and long-term goals, and the loan process would not have been influenced by the discriminatory motivations of the Henley Defendants.

18. The final home appraisal (the "Whitewashed Appraisal") was more consistent with the real estate market in the area.

19. Defendants' unlawful actions resulted in harm to Plaintiffs. The Turner Plaintiffs lost the opportunity to refinance their home with an interest rate of 4%. The Turner Plaintiffs also lost the opportunity to obtain a home equity loan at 5.9%. They had to obtain a HELOC at a variable rate which is now over 10%. Furthermore, the HELOC had significantly worse terms and conditions compared to the original refinance loan for which they applied and that was advertised and available to other applicants of U.S. Bank at the same time.

20. Upon information and belief, the Henley appraisal would have been closer in line to the Whitewashed Appraisal and U.S. Bank would not have endorsed the discriminatory appraisal but for Carlos Turner being a Black, African-American male, and Diana Davoli Turner being Canadian.

21. During the period that the Turner Plaintiffs pursued a loan with U.S. Bank and attempted to overcome various barriers created by U.S. Bank's actions and discriminatory LtV policies, refinance rates in the Cincinnati market increased by approximately 2%.

22. As a result of Defendants' unlawful actions, the Turner Plaintiffs contacted the Plaintiff, Miami Valley Fair Housing Center, Inc., to see what their rights were. Plaintiff, Miami Valley Fair Housing Center ("MVFHC"), launched an investigation into the alleged lending and financing discrimination. Defendants' discriminatory misconduct forced MVFHC to drain their limited resources. Defendants' unlawful actions impaired MVFHC's ability to operate as a fair housing organization.

23. Plaintiffs suffered concrete and particularized harm and injury as a result of Defendants' unlawful actions as described herein.

24. Now come Plaintiffs seeking injunctive relief, damages, and any other relief that they are entitled to in this action.

### JURISDICTION AND VENUE

25. Jurisdiction is appropriate in that this civil action is brought under the Federal Fair Housing Act ("FHA"), Federal Fair Housing Amendments Act ("FHAA"), 42 U.S.C. §§ 3601, *et seq.*, the Equal Credit Opportunity Act, and the Civil Rights Act of 1866.

26. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the complaint raises federal questions under the FHA, FHAA, the Equal Credit Opportunity Act, and the Civil Rights Act of 1866. Additionally, this Court has supplemental jurisdiction over related state law claims, Ohio Rev. Code § 4112.01, *et seq.* (the "Ohio Fair Housing Act"), and Plaintiffs' Ohio tort law claims, under 28 U.S.C. § 1367.

27. The Defendants are subject to the jurisdiction of this Court as they are "Persons" under the FHA and Ohio Fair Housing Act, and the acts described herein occurred primarily in Springboro, Ohio.

28. Defendants conduct business across Ohio, including in Warren County, Ohio. Each Defendant conducts substantial business in the greater Miami Valley region.

29. Venue is proper in this Court in that the discriminatory acts occurred primarily in Springboro, Ohio.

30. Wherefore, Plaintiff respectfully requests that this Court take jurisdiction of this Complaint and award such relief as is appropriate under the federal and state fair housing laws.

## PARTIES

31. Plaintiff, Carlos Turner ("Plaintiff Turner"), is a Springboro, Ohio resident. Plaintiff Turner is a Black, African-American male. Plaintiff Turner resides at the Subject Property with Plaintiff Diana Davoli-Turner. Plaintiff Turner is collectively referred to as the "Turner Plaintiffs" throughout this Complaint along with Plaintiff, Diana Davoli-Turner.

32. Plaintiff, Diana Davoli-Turner ("Plaintiff Davoli-Turner"), is a Springboro, Ohio resident. Plaintiff Davoli-Turner is a Canadian citizen and permanent resident of the United States. Plaintiff, Diana Davoli-Turner, is collectively referred to as the "Turner Plaintiffs" throughout this Complaint along with Plaintiff, Carlos Turner.

33. Plaintiff, Miami Valley Fair Housing Center, Inc. ("MVFHC"), is a private, non-profit corporation, organized under the laws of the State of Ohio. MVFHC is governed by a volunteer board of directors and has a principal place of business in Dayton, Montgomery County, Ohio. The mission of MVFHC is to eliminate housing discrimination and ensure equal housing opportunity for all people in the region, the State of Ohio, and nationally.

34. Defendant, Henley Appraisals, LLC, is an Ohio corporation. Upon information and belief, Kevin D. Henley is a licensed appraiser and the owner of Henley Appraisals, LLC. Defendant maintains a principal place of business at 1818 Ashley Drive Miamisburg, OH 45342. Throughout the Complaint, this Defendant is collectively referred to as "Defendant Henley" or the "Henley Defendants" along with Defendant, Kevin D. Henley.

35. Defendant, Kevin D. Henley, is a Miamisburg, Ohio resident. Defendant Kevin Henley owns, operates, and manages Defendant, Henley Appraisals, LLC. Throughout the Complaint, this Defendant is collectively referred to as "Defendant Henley" or the "Henley Defendants" along with Defendant, Henley Appraisals, LLC.

36. Defendant, U.S. Bancorp, Inc. (hereinafter "U.S. Bank"), is an American bank holding company based in Minneapolis, Minnesota, and incorporated in Delaware. It is the parent company of U.S. Bank National Association, and it is the fifth largest banking institution in the United States. Defendant, U.S. Bank does business across the United States, including in the State of Ohio, and the Miami Valley region.

37. Defendant, U.S. Bank National Association (collectively referred to as "U.S. Bank" along with its parent company, U.S. Bancorp, Inc.) is a large bank that offers a range of services and products. The U.S. Bank National Association provides banking and lending services throughout the United States. This Defendant does business across the united States, including the State of Ohio, and the Miami Valley region.

38. Defendant, U.S. Bank's, business is subject to laws that regulate the method by which appraisals are ordered and reviewed. These laws also regulate its interactions with appraisers.

39. In acting or omitting to act as alleged herein, each Defendant acted through its employees, officers, and/or agents and is liable on the basis of the acts and omissions of its employees, officers, and/or agents.

40. In acting or omitting to act as alleged herein, each employee, officer, or agent of each Defendant was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent was subsequently ratified and adopted by one or more Defendants as principal.

**FACTS**

41. Plaintiffs reallege and restate each and every allegation contained in Paragraphs 1 through 40 as if fully restated herein.

42. Plaintiff Turner is a Black, African-American male and therefore protected from discrimination on the basis of race. Plaintiff Turner resides at the Subject Property with Plaintiff Davoli-Turner. Plaintiff Turner is also a guarantor and mortgagor on the Turner Plaintiffs' mortgages.

43. Plaintiff Turner and Plaintiff Davoli-Turner are an "aggrieved person" under 42 U.S.C. 3602(i).[2] Plaintiff Turner was injured by a discriminatory practice on the basis of his race as a Black, African-American male, and his wife, Plaintiff Davoli-Turner, was injured by a discriminatory practice because of her national origin.

44. Plaintiff Davoli-Turner is a Canadian citizen with permanent residency in the United States. She is protected from discrimination on the basis of national origin. Plaintiff Davoli-Turner handled most of the communications with Defendants because she is the owner and co-mortgagor of the Subject Property and more familiar with credit transactions. Plaintiff Davoli-Turner shares the residence with her family, including Plaintiff Turner and their children.

45. The Turner Plaintiffs' residence (i.e., the Subject Property) is a large home built in 2012. It has nearly 4,000 square feet of living space with 4 bedrooms and 2.5 bathrooms. Prior to the Turner Plaintiffs' purchasing the Subject Property, it had an unfinished basement.

46. The Turner Plaintiffs purchased the Subject Property in November 2020 for approximately $442,000.00 when interest rates were at a historic low. The Turner Plaintiffs are both guarantors and mortgagors.

---

[2] An "aggrieved person" under the FHA includes any person who is (1) injured by a discriminatory housing practice; or (2) believes that such a person will be injured by a discriminatory housing practice that is about to occur. 42 U.S.C. 3602(i). The Supreme Court has repeatedly written that the FHA's definition of person "aggrieved" reflects a congressional intent to confer standing broadly. *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 197 (2017).

47. After taking possession of the Subject Property, the Turner Plaintiffs made substantial improvements to the Subject Property. The improvements included, but were not limited to, finishing the basement to increase the livable space at the Subject Property and providing general maintenance and upgrades to the residence. The cost to refinish the basement was in excess of $30,000.00. Since rates were beginning to rise, the Turner Plaintiffs thought this was the right time to refinance their home to pay off debts they incurred in renovating and improving the Subject Property.

48. The Turner Plaintiffs knew they would need an appraisal to determine the value of the Subject Property. Obtaining a real estate appraisal is generally a necessary step on the path to obtaining a mortgage or refinancing the mortgage of a house in the United States. Mortgage lenders require appraisals – defined by the Uniform Standards of Professional Appraisal Practice (USPAP) as professional, reasoned, and credible assessments of a property's value as of a given date – before approving loans. With few exceptions, home buyers and borrowers cannot obtain a mortgage, and homeowners and borrowers cannot refinance a mortgage, without submitting to an appraisal. Because the vast majority of home sales in the United States require mortgage financing, the vast majority of home sales require the use of a professional appraiser to generate an appraisal report of value.

49. The Turner Plaintiffs first contacted their lender at the time about refinancing. The Turner Plaintiffs obtained an appraisal that came back with a value of $520,000.00 in March 2022. This appraisal was conducted by Jeff Newsom of Appraisal Ohio, LLC. This appraisal is attached as Plaintiffs' Exhibit #1.

50. The Turner Plaintiffs failed to lock in the interest rate with their lender at the time and rates began increasing while they shopped. Since their lender's rate looked higher than others, the Turner Plaintiffs began looking elsewhere for better rates and terms.

51. In March or April 2022, the Turner Plaintiffs observed advertisements to refinance at 4% by Defendant, U.S. Bank.

52. Plaintiff Davoli-Turner then began communicating with U.S. Bank in order to refinance and cash out approximately $60,000.00. Plaintiff Davoli-Turner had a pre-existing relationship with U.S. Bank and thought they would be a good long-term partner. Plaintiff Turner also was familiar with U.S. Bank dating back to 2004 when he was required to sign loan paperwork to release his dower rights in a mortgage transaction. Plaintiff Turner also believed that U.S. Bank would be a good partner.

53. The Turner Plaintiffs then completed an online loan application with Defendant U.S. Bank, in April 2022. The Turner Plaintiffs were denied after a hard credit check. The Turner Plaintiffs were unaware of any major delinquencies, so this prompted Plaintiff Davoli-Turner to visit U.S. Bank at a local branch, located 20 N Main St, Springboro, OH 45066.

54. During that visit, Plaintiff Davoli-Turner was steered toward a home equity loan by a U.S. Bank employee named Stephanie. This occurred after a review of the Turner Plaintiffs' credit history. Defendant, U.S. Bank, provided a loan disclosure statement for a home equity loan of $55,000 at 5.9% interest, and a 20-year term. Plaintiff Davoli-Turner was told that approval of their home equity loan would not be an issue.

55. Upon information and belief, Plaintiff Davoli-Turner went forward with that application as interest rates were beginning to steadily rise. Plaintiff Turner also knew that he would likely have to co-sign and guarantor any loan that was approved. As such, Plaintiff Turner and

Plaintiff Davoli-Turner worked collaboratively to participate and cooperate with U.S. Bank in obtaining credit.

56. During the application phase, Plaintiff Davoli-Turner notified U.S. Bank that her family, including Plaintiff Turner resided at the residence. This disclosure put U.S. Bank on notice that multiple persons resided at the Subject Property and that its loan decisions would affect more than just Plaintiff Davoli-Turner.

57. After a review of their application, Defendant, U.S. Bank, issued a second denial to the Turner Plaintiffs. Upon information and belief, there were no legitimate reasons for the denial.

58. After a few days of communicating back and forth with Defendant, U.S. Bank, the Turner Plaintiffs received a new offer for a $15,000.00 home equity loan (the "Second Home Equity Loan"). This offer came with a 6.25% interest rate and 20-year term. Plaintiff Davoli-Turner confirmed there would not be an additional hard pull on their credit report. That representation was material to Plaintiff Davoli-Turner agreeing to move forward.

59. A second hard credit check was made despite U.S. Bank's promise not to do so. This represented a material misrepresentation in that it resulted in a new hard inquiry on Plaintiff Davoli-Turner's credit report which further reduced her score and the chances of securing a fair loan.

60. The Second Home Equity Loan was denied a few days later. The pretextual reasons given by Defendant U.S. Bank were (1) denial based on collateral; and (2) denial based on history of delinquency. Upon information and belief, these pretextual reasons were baseless as there was no significant history of delinquency, and their collateral was more than sufficient for the loan requested, as evidenced by Newsom's earlier appraisal.

61. After extensive discussions, Plaintiff Davoli-Turner texted a U.S. Bank loan officer named Stephanie. Plaintiff Davoli-Turner also emailed Stephanie's supervisor named Bruce. These communications were prompted by a prior verbal conversation with U.S Bank that they would be unable to do up to 80% Loan-to-Value Ratio (LtV) because of Plaintiff Davoli-Turner's status as a Canadian.

62. The U.S. Bank loan officer stated she could not confirm internal company policy. However, the Turner Plaintiffs and Plaintiff, MVFHC, later confirmed through the U.S. Bank website and U.S. Bank chat feature, that 80% LtV was the standard for U.S. Bank for their home equity loans.

63. The MVFHC investigation demonstrated that 80% LtV for loans is the standard at U.S. Bank so long as you are from the United States, unlike Plaintiff Davoli-Turner, and not a Black, African-American male, unlike Plaintiff Turner.

64. After this, in April 2022, Defendant U.S. Bank, requested that Plaintiff Davoli-Turner email U.S. Bank her green card as evidence of her Permanent Resident status. Although Plaintiff Davoli-Turner questioned the legitimacy and reason for the request, she provided the requested information to U.S. Bank.

65. This request, along with the discussion about the change in LtV policy, placed Plaintiff Davoli-Turner on high alert of potential lending and financing discrimination from U.S. Bank.

66. After providing the requested paperwork, the Turner Plaintiffs were told by U.S. Bank that a Home Equity Line of Credit (HELOC) could be approved. The Turner Plaintiffs completed yet another application with Defendant U.S. Bank. U.S. Bank, for the first time,

ordered an appraisal of the Subject Property even though it had been appraised just 27 days before in March 2022.

67. As referenced in this Complaint, the first appraisal came back and valued the Subject Property at $520,000. The Turner Plaintiffs were told first by Defendant U.S. Bank that the appraisal had to have occurred within thirty (30) days. When Plaintiff Davoli-Turner questioned why the appraisal from 27 days prior was not valid, U.S. Bank altered its rationale and instead stated that they preferred to use their own appraisers. As such, a new appraisal initiated by U.S. Bank was ordered.

68. The second appraisal was an external, drive-by appraisal, conducted by Thomas Augspurger of Residential Equity Specialists. The second drive-by appraisal valued the Subject Property at $485,000. That appraisal did not consider the improvements to the interior, including the recently finished basement and increased living space. This appraisal is attached as Plaintiffs' Exhibit #2.

69. Plaintiff Davoli-Turner initially questioned the Defendant, U.S. Bank about the appraisal, as it did not include a review of the interior of the residence. Defendant, U.S. Bank, and its loan officer, Stephanie, said they would work on overriding the second appraisal as it was unreliable.

70. Defendant, Henley Appraisals, LLC, was then assigned to appraise the Subject Property on behalf of Defendant, U.S. Bank. Upon information and belief, Defendant Kevin Henley, owner of Defendant Henley Appraisals, LLC, visited the Subject Property when the Turner Plaintiffs were home. The sole purpose of the visit was to appraise the Subject Property on behalf of U.S. Bank.

71. The Henley Defendants: intentionally failed to measure, or incorrectly measured, inside the Subject Property; questioned why the Turners sent their children to a private Catholic school for athletics rather than Springboro High School; and failed to consider all other improvements and upgrades made by the Turner Plaintiffs at the Subject Property. The Henley Defendants' appraisal is attached as Plaintiffs' Exhibit #3.

72. To appraise the Turner Plaintiff's home, Defendant Henley used the sales comparison approach. In this common appraisal method, an appraiser assesses the value of a home by identifying recent sales prices of similar homes in the area, called "comparables" or "comps." The rationale underlying this approach is that the sales prices of comparable properties from the same neighborhood from a similar time period are considered the best indicator of value. However, it simultaneously presents significant fair lending risks, as appraisers have broad discretion in selecting comps and establishing neighborhood boundaries, which opens the door for discrimination.

73. As explained herein, the Henley Defendants' undervaluation of the Turner Plaintiffs' home reflected Defendant Henley's belief that, because Plaintiff Turner is Black, and Plaintiff Davoli-Turner is not a U.S. citizen, but rather is from Canada, that they did not belong in Springboro, a predominantly white city made up primarily of affluent United States residents.

74. Because of his discriminatory beliefs, Defendant Henley did not follow proper and well-established appraisal standards including searching for and selecting similar homes throughout the neighborhood to use as comps or measuring the interior of the property. Instead, Defendant Henley arbitrarily and without justification restricted the area from which he selected comps, selected ill-suited homes with low values as comps, intentionally

failed to accurately measure inside the residence, and further improperly devalued the comps he selected.

75. Defendant, Henley Appraisals, LLC, undervalued the Subject Property at $470,000. This appraisal was riddled with errors, omissions, and intentional inaccuracies. For example:

   A. the square footage on the Turner Plaintiff's home was incorrect,

   B. Defendant utilized older comps,

   C. the square footage inaccuracies inflated the square foot value of those comps,

   D. Defendant's appraisal was $15,000 less than the second appraisal, which did not even include information about the recently finished basement or interior of the residence, and

   E. Defendant used one comp that was nineteen (19) months before the Turner Plaintiffs' appraisal when the real estate market was substantially different and even pre-dated the Turner Plaintiff's purchase of the Subject Property. The 266 Woodstream comp may have been appropriate at the time of purchase, but it was not reliable 19 months later.

76. After receiving this appraisal, Plaintiff Davoli-Turner questioned Defendant U.S. Bank on its veracity and inquired about her options to appeal the valuation. She requested reconsideration of the appraisal as there would be no rationale for this appraisal to come back over $50,000 less than the first appraisal, nor was there any legitimate reason that an appraisal of the entire property would come back $15,000 less than the second appraisal, which was merely a drive-by appraisal that did not take into consideration the recently finished basement and increased living space.

77. Plaintiff Davoli-Turner notified U.S. Bank that she suspected the appraisal was discriminatory in nature and infected with the Henley Defendants' bias and prejudice. Rather than investigate the claims or offer the Turner Plaintiffs the opportunity to secure a new appraisal, U.S. Bank make an intentional and reckless decision to double down on their endorsement of Henley's discriminatory appraisal by offering him a second opportunity to analyze the value of the Turner residence.

78. Defendant, U.S. Bank then stated there would be no further reconsideration or appeals process and they would be utilizing Defendant Henley's appraisal. Defendant, U.S. Bank, ignored the realities that the appraisal was flawed, riddled with errors and intentional inaccuracies, and came with an indication of bias because of the Turner-Henley conversations that Plaintiff Davoli-Turner reported to U.S. Bank.

79. Bruce from U.S. Bank communicated with Plaintiff Davoli-Turner and acknowledged the errors and omissions in the Henley Defendants' appraisal, yet he failed to take any substantive action to prevent the discriminatory appraisal from influencing U.S. Bank's loan decision.

80. In June 2022, Defendant, U.S. Bank offered a home equity line of credit (the "HELOC") with a credit limit of $34,363.00 for 30-year term with a variable interest rate. This offer was made pursuant to the appraisal by Defendant, Henley Appraisals, LLC. The Turner Plaintiffs, having recognized that the real estate market was drastically changing, were forced to accept this offer due to changing market conditions and the discriminatory appraisal conducted by the Henley Defendants and endorsed by U.S. Bank. At U.S. Bank's request, both Carlos Turner and Diana Davoli-Turner signed and executed the U.S. Bank loan paperwork.

81. U.S. Bank did not offer any appeals process for challenging the discriminatory appraisal. Furthermore, U.S. Bank went back to the Henley Defendants, who were already accused of discrimination by Plaintiff Davoli-Turner, just to obtain his second opinion, which was just as much affected by his discriminatory views as his initial appraisal. U.S. Bank can proffer no legitimate justification for such a decision *after* receiving complaints about Henley's performance, demeanor, and potential bias and prejudicial views aimed at the Turner Plaintiffs and their children.

82. U.S. Bank failed to properly train and supervise Bruce, Stephanie, and other employees who are unknown at this time, regarding: (1) how to analyze and evaluate loan applications; (2) how to process an appraisal appeal when discrimination is suspected; (3) how to audit or supervise the work of a contracted appraiser; and (4) how to underwrite a loan where appraisal discrimination has been suspected or reported.

83. U.S. Bank had knowledge of the incompetence because U.S. Bank employees were notified by Plaintiff Davoli-Turner that there were several issues with the appraisal, and that discrimination was suspected, yet they took no meaningful action other than to ask the wrongdoer for a second opinion.

84. Upon information and belief, U.S. Bank failed to train the employees referenced herein and then retained those employees to continue endorsing discriminatory appraisals. Upon information and belief, U.S. Bank also continued utilizing the Henley Defendants for appraisals after the Plaintiff Davoli-Turner's complaints. Such negligence on the part of U.S. Bank and its employees caused significant injury to the Turner Plaintiffs and MVFHC.

85. Because of the discriminatory appraisal, terms of the HELOC were drastically different than the original offers made by Defendant, U.S. Bank. The Turner Plaintiffs are now

paying variable interest, which is currently over 10% per month on the HELOC. A default would cause substantial harm to both Plaintiff Turner and Plaintiff Davoli-Turner as they both signed the loan paperwork that U.S. Bank required in order to become borrowers.

86. The Henley Defendants intentionally discriminated against the Turner Plaintiffs in the provision of their appraisal services because of Plaintiff Turner's race and Plaintiff Davoli-Turner's national origin.

87. The Henley Defendants treated Plaintiff Turner and Plaintiff Davoli-Turner differently in evaluating the Subject Property because of his beliefs that the Turner Plaintiffs did not belong in an affluent and primarily white community.

88. U.S. Bank was made aware of this treatment during the loan process, yet they failed to act and instead endorsed the discriminatory treatment that the Turner Plaintiffs experienced.

89. U.S. Bank intentionally discriminated against the Turner Plaintiffs by (1) endorsing the discriminatory appraisal; (2) offering Henley a second opportunity to negatively influence the lending process with his discriminatory views; (3) applying a new LtV standard after learning that Plaintiff Davoli-Turner was Canadian and residing with a Black, African-American male; (4) failing to initiate an appeals process for the Turner Plaintiffs whereby they could obtain an appraisal not infected with discriminatory animus towards them and their family; and (5) failing to properly train its staff on how to respond to an appraisal complaint.

90. U.S. Bank's policy of reducing the LtV from 80% for White, American citizens to 60% for applicants like the Turner Plaintiffs results in a severe financing and lending disparities for minorities, immigrants, and persons of color, such as the Turner Plaintiffs.

91. U.S. Bank's policy of not permitting appraisal appeals when discrimination is suspected caused severe and substantial injury to minorities, immigrants, and persons of color, such as the Turner Plaintiffs, who could benefit from an independent appraisal to determine the true value of their home.

92. The U.S. Bank policy of not permitting appraisal appeals when discrimination is suspected will undoubtably cause severe and substantial injury to minorities, immigrants, and persons of color, who will not be able to fully enjoy the true value of their home because of U.S. Bank's continued reliance on discriminatory appraisals.

93. The actions of the Defendants in this matter resulted in the Turner Plaintiffs losing access to much-needed capital at a fair and reasonable rate. The Turner Plaintiffs would have qualified for more favorable loan conditions but for Plaintiff Turner's race and Plaintiff Davoli-Turner's national origin.

94. Because of this discriminatory treatment, the Turner Plaintiffs sought guidance from Plaintiff, MVFHC, regarding their rights.

**MVFHC INVESTIGATION AND WHITEWASHED APPRAISAL**

95. After speaking with the Turner Plaintiffs, Plaintiff, MVFHC launched an investigation into Defendant, U.S. Bank's policy and procedures with respect to lending and refinancing. MVFHC also investigated Defendant Henley's appraisal.

96. Suspecting bias in the lending and appraisal process, Plaintiff, MVFHC, along with the Turner Plaintiffs decided to test a whitewashed appraisal. This was the fourth appraisal conducted on the Subject Property and was conducted after Defendant Henley's appraisal. The Whitewashed Appraisal is attached as Plaintiffs' Exhibit #4.

97. "Whitewashing" is where a Black homeowner removes markers of Black identity, such as family photographs, from their home and enlists a white person to stand in as the homeowner when an appraiser is present, thereby making it seem to the appraiser that the house is owned by white people. Black homeowners regularly see valuations of their homes increase appreciably under whitewashing tests compared to regular market conditions. The increased prevalence of whitewashing is responsible for raising awareness of appraisal discrimination.

98. Before the Whitewashed Appraisal, Plaintiffs removed family photographs and other markers of Black and Canadian identity from their home.

99. The Turner Plaintiffs felt embarrassed, humiliated, and angered that they had to carry out this experiment.

100. The Turner Plaintiffs and their children also lost the opportunity to fully use and enjoy their residence which resulted in further embarrassment and humiliation.

101. The Whitewashed Appraisal was conducted on or around May 15, 2023. By all appearances, Plaintiffs' home was owned by a white family from the United States.

102. The Whitewashed Appraisal came back with a value of $655,000. This valuation far outpaces the increase in property values in the Springboro housing market year over year. As such, there is no legitimate justification for Henley's appraisal of $470,000 one year earlier.

103. In fact, it defies all logic and reason that the Turners' residence would appreciate at a rate of nearly 40% in one year without any substantial upgrades or improvements to the residence or surrounding area. The local housing market supports an increase of

approximately 11% year over year, yet the Whitewashed Appraisal far exceeded that number.

104. Plaintiffs made no significant improvements in their home in the interim, and although median home prices had increased, the movement from Defendant Henley's appraisal of $470,000 to the Whitewashed Appraisal of $655,000 represented a 39.4% increase in value, which far exceeds the expected value increase on an annual basis in the Springboro housing market.

105. The first appraisal and Whitewashed Appraisal confirm that Defendant Henley's appraisal was grossly inconsistent with appraisal guidelines and principles and that their excuses for devaluing the Turner Plaintiffs' home were intentional, invalid, and pretextual.

106. Despite being made aware of the intentional misconduct of the Henley Defendants, U.S. Bank failed to act and intentionally endorsed the discriminatory appraisal which resulted in injury to the Turner Plaintiffs.

## INJURY TO PLAINTIFFS

107. The harm caused by appraisal discrimination to minority families and society at large is staggering. This discrimination prevents people and families of color from being able to purchase homes and access the equity in the homes they already own, thus preventing them from building generational wealth via homeownership, as so many Americans have done. This contributes to the nation's widening racial wealth gap.

108. Plaintiffs have suffered similar harm due to the appraisal and lending discrimination caused by Defendants, U.S. Bank, Kevin Henley, and Henley Appraisals, LLC.

109. Defendant Henley intentionally engaged in discriminatory practices in appraising the Turner Plaintiffs' home, by (1) arbitrarily selecting comps, which were in effect, not true

"comps"; (2) failing to measure and intentionally miscalculating the square footage and increased living space, including the finished basement; and (3) further depressing the appraisal by making unjustifiable adjustments that further devalued the Turner Plaintiffs home.

110. The Henley Defendants did so because of their beliefs that Plaintiff Turner and Plaintiff Davoli-Turner, a mixed-race couple, did not belong in Springboro, an attractive and predominantly affluent, white town. Henley's undervaluation also reflected their belief that the Turner Plaintiffs' home is worth less than other homes in Springboro because the homeowners are a mixed-race couple, consisting of an African-American male, Canadian female, and their children.

111. Additionally, Defendant Henley made disparaging comments during the appraisal process about the Turner Plaintiffs sending their children to a private school for sports rather than contributing to Springboro High School athletics. The Turner Plaintiffs construed these comments as racially motivated.

112. Despite complaints to U.S. Bank about Henley's biased and prejudicial statements and conduct, Defendant U.S. Bank not only went forward with accepting the appraisal but also endorsed it by offering an opportunity for Henley to provide a second biased opinion of the value of the Turner Plaintiffs' residence.

113. The Henley Defendants' discrimination prevented the Turner Plaintiffs from realizing the benefit of their home's true value with U.S. Bank. As a result of Defendant Henley's discriminatory appraisal, and his second opinion which was just as biased as his initial appraisal, the Turner Plaintiffs' borrowing limit for the HELOC was substantially lower than they needed and came with unfavorable terms and conditions. For example, U.S.

Bank, upon learning that Plaintiff Davoli-Turner was Canadian, stated that they could no longer do an 80% LtV on any loan that she was included on as an applicant.

114. Plaintiff Turner was additionally harmed because he was forced to co-sign and guarantee the U.S. Bank HELOC, which was the result of U.S. Bank endorsing a discriminatory appraisal. The U.S. Bank loan paperwork is attached as Plaintiffs' Exhibit #5.

115. Defendant Henley's actions also caused the Turner Plaintiffs and their children significant emotional distress, including humiliation and embarrassment, arising from being subject to discrimination and having to whitewash their own home.

116. The Whitewashed Appraisal resulted in the Turner Plaintiffs not being able to fully use and enjoy their residence as they had to remove their family photographs and markers of Black and Canadian identity.

117. U.S. Bank's loan decision to endorse the unlawful and discriminatory appraisal has both short-term and long-term effects on the ability of Plaintiff Davoli-Turner to own the residence and make upgrades and improvements. This decision also results in direct harm to Plaintiff Turner who is a resident of the property and co-mortgagor.

118. U.S. Bank's loan decision to endorse the unlawful and discriminatory appraisal affects Plaintiff Turner's ability to use and enjoy the premises, and to inherit, purchase, lease, sell, hold, and convey real and personal property. Plaintiff Turner is now obligated to abide by the unfavorable terms and conditions of the U.S. Bank HELOC as co-mortgagor along with Plaintiff Davoli-Turner.

119. Defendant U.S. Bank injured Plaintiffs by relying on Defendant Henley's discriminatory appraisal to deny the Turner Plaintiffs' loan despite the fact that it knew or should have known that the appraisal was racially discriminatory—it was an obvious and egregious

undervaluation of the Springboro home, and the Turner Plaintiffs notified their loan officer at U.S. Bank that they understood the valuation to be caused by some type of bias or unlawful motive on the basis of their protected characteristics and status as a mixed-race couple in a predominately white community.

120. This injury was compounded by U.S. Bank's refusal to meaningfully investigate or respond to the Turner Plaintiffs' reconsideration request of the appraisal. Instead, U.S. Bank handled the Turner Plaintiffs' reconsideration request by stating they would not pay for another appraisal, rather than rightly recognizing that the Henley Defendants' appraisal was infected by discrimination and sending it to a new appraiser for a second opinion.

121. In fact, U.S. Bank endorsed the discriminatory appraisal by offering Henley a second opportunity to evaluate the Subject Property *after* U.S. Bank was notified of his intentional wrongdoing and motivations to reduce the value of their home. As a result, the Turner Plaintiffs were unable to realize the benefit of their home's true value.

122. The Turner Plaintiffs were further steered toward a different type of financing with U.S. Bank, the HELOC, which came with a variable interest rate, for which the Turner Plaintiffs are now being charged double in interest what they would have received if U.S. Bank did not deny their earlier applications for loans with better terms because of Plaintiff Davoli-Turner's national origin and immigration status and Plaintiff Turner's race.

123. Defendant U.S. Bank further injured the Turner Plaintiffs and their children by causing them significant emotional distress, including humiliation and embarrassment, arising from being subjected to discrimination and having to erase themselves from their home to assess whether they were the basis of the lower valuation. Defendants' actions as described herein were willful and/or taken in reckless disregard of the civil right protections of the Plaintiffs.

**124.** As a direct, proximate, and foreseeable result of Defendants' actions as described herein, Plaintiff, MVFHC, has suffered, continues to suffer, and will suffer in the future substantial, particularized, and concrete injuries.

**125.** Defendants' unlawful conduct, policies, and practices as described herein have frustrated and impaired MVFHC's mission and purpose, forced them to drain their limited and scarce resources, and interfered with their ability to operate as a Fair Housing Initiatives Program.

**126.** Defendants' unlawful conduct, policies, and practices as described herein frustrated MVFHC's mission by interfering with their mission-related activities, impairing their ability to achieve their goals of ensuring equal and fair access to housing and lending opportunities, and harming their community.

**127.** Defendants' discriminatory conduct has forced and required MVFHC to engage in numerous activities to identify and counteract the Defendants' unlawful conduct, policies, and practices, in order to protect residents from unlawful housing discrimination.

**128.** Plaintiff, MVFHC, has conducted extensive investigations of race and national origin-related issues now for over a year to determine if this is a pattern or practice of the Defendants.

**129.** The investigations included research, whitewashing the Subject Property, education and outreach, post-testing research, and extensive discussions with experts and staff to resolve and ameliorate the discriminatory housing policies, practices, and services of Defendants.

**130.** MVFHC's diversion of time and resources to address Defendant's discriminatory conduct forced MVFHC to suspend, cancel, or postpone other projects that would have furthered its mission, including: conducting training sessions; investigating other housing providers, lenders, and appraisers; missing speaking engagements; missing grant opportunities

including ARPA funding; delaying its Analysis of Impediments to Fair Housing Study in Montgomery County, Ohio; and other testing-related activity.

**131.** Defendants' unlawful conduct, policies, and practices as described herein have frustrated MVFHC's mission and its ability to achieve its mission was perceptibly impaired by the race and national origin discrimination of the Defendants.

**132.** MVFHC will continue to divert its scarce resources and have its mission frustrated until Defendants' egregious discriminatory conduct ceases and the harms caused by Defendants on residents and prospective applicants are remedied and resolved.

## COUNT I – VIOLATION OF THE FAIR HOUSING ACT

### (All Plaintiffs v. All Defendants)

### 42 U.S.C. § 3601, *et seq.*

**133.** Plaintiffs restate and reallege each and every allegation contained in Paragraphs 1 through 132 as if fully restated herein.

**134.** Defendants' conduct, policies, and practices, as alleged herein, violate multiple provisions of the Fair Housing Act. Defendants injured Plaintiffs because of Plaintiff Davoli-Turner's national origin and Plaintiff Turner's race in violation of the Fair Housing Act by committing the following discriminatory practices:

    **A.** Discrimination in the terms, conditions, or privileges of a sale of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, or national origin, in violation of 42 U.S.C. § 3604(b);

    **B.** Discrimination in making available a residential real estate-related transaction, or in the terms or conditions of such a transaction, because of race, color, or national origin, in violation of 42 U.S.C. § 3605;

**C.** Interfering with any person in the exercise or enjoyment of any right granted or protected by the Fair Housing Act, including 42 U.S.C. §§ 3604, 3605, 3606, in violation of 42 U.S.C. § 3617;

**D.** Making or printing a statement with respect to the sale of a dwelling that indicates preference, limitation, or discrimination based on race, or an intention to make such a preference, limitation or discrimination, in violation of 42 U.S.C. § 3604(c).

135. Accordingly, Plaintiffs are aggrieved persons under 42 U.S.C. § 3602, who are entitled to relief. 42 U.S.C. § 3613 (c).

136. Wherefore, Plaintiffs request compensatory and punitive damages in excess of $25,000, together with costs and reasonable attorney fees, in an amount to be determined at trial.

## COUNT II – VIOLATION OF THE CIVIL RIGHTS ACT OF 1866

### (Plaintiff Carlos Turner v. All Defendants)

137. Plaintiffs restate and reallege each and every allegation contained in Paragraphs 1 through 136 as if fully restated herein.

138. In acting as alleged herein, Defendants have injured Plaintiff Turner by making him a mortgagor on a HELOC with discriminatory terms and conditions and (1) impairing his right to make and enforce contracts and to the full and equal benefit of the laws for security of property as is enjoyed by white citizens, in violation of 42 U.S.C. §§ 1981 and 1982; (2) impairing his right to inherit, purchase, lease, sell, hold, and convey real and personal property, in violation of 42 U.S.C. § 1982; and (3) impairing his right to use and enjoy his residential property, in violation of 42 U.S.C. 1982.

139. Accordingly, Plaintiff Turner is entitled to relief under 42 U.S.C. §§ 1981,1982 and 1988(a).

29

**140.** Wherefore, Plaintiffs request compensatory and punitive damages in excess of $25,000, together with costs and reasonable attorney fees, in an amount to be determined at trial.

**COUNT III – VIOLATION OF THE OHIO FAIR HOUSING ACT**

**(All Plaintiffs v. All Defendants)**

**Ohio Rev. Code § 4112.01, *et seq.***

**141.** Plaintiffs restate and reallege each and every allegation contained in Paragraphs 1 through 140 as if fully restated herein.

**142.** Defendants' conduct, policies, and practices, as alleged herein, violate multiple provisions of the Ohio Fair Housing Act. Defendants injured Plaintiffs because of Plaintiff Davoli-Turner's national origin and Plaintiff Turner's race in violation of the Ohio Fair Housing Act by committing the following discriminatory practices:

    **A.** Discrimination in the terms, conditions, or privileges of a sale of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, or national origin, in violation of Ohio Rev. Code § 4112.02(H)(4).

    **B.** Discrimination in making available a residential real estate-related transaction, or in the terms or conditions of such a transaction, because of race, color, or national origin, in violation of Ohio Rev. Code § 4112.02(H).

    **C.** Interfering with any person in the exercise or enjoyment of any right granted or protected by the Fair Housing Act, including Ohio Rev. Code § 4112.02(H)(12).

    **D.** Making or printing a statement with respect to the sale of a dwelling that indicates preference, limitation, or discrimination based on race, or an intention to make such a preference, limitation or discrimination, in violation of Ohio Rev. Code § 4112.02(H)(7).

**143.** Accordingly, Plaintiffs are aggrieved persons under Ohio Rev. Code § 4112.01(A)(23) and are entitled to relief under the Ohio Fair Housing Act.

**144.** Wherefore, Plaintiffs request compensatory and punitive damages in excess of $25,000, together with costs and reasonable attorney fees, in an amount to be determined at trial.

**COUNT IV - Violation of the Equal Credit Opportunity Act**

**(The Turner Plaintiffs v. U.S. BANK)**

**15 U.S.C. § 1691, et seq.**

**145.** Plaintiffs restate and reallege each and every allegation contained in Paragraphs 1 through 144 as if fully restated herein.

**146.** Defendant U.S. Bank is a "creditor" within the meaning of 15 U.S.C.§ 1691a(e).

**147.** Defendant U.S. Bank's conduct, as alleged herein, constitutes discrimination with respect to aspects of a credit transaction on the basis of race and national origin, in violation of 15 U.S.C. § 1691(a)(1).

**148.** Defendant U.S. Bank required Plaintiff Turner and Plaintiff Davoli-Turner to sign as co-borrowers and mortgagors as a condition for the extension of credit. U.S. Bank as a creditor can enforce their discriminatory terms and conditions against both Plaintiff Turner and Plaintiff Davoli-Turner.

**149.** Accordingly, The Turner Plaintiffs are aggrieved applicants and entitled to relief under 15 U.S.C. § 1691(a)(1).

**150.** Wherefore, Plaintiffs request compensatory and punitive damages in excess of $25,000, together with costs and reasonable attorney fees, in an amount to be determined at trial.

## COUNT V – NEGLIGENT MISREPRESENTATION

### (The Turner Plaintiffs v. Henley Defendants)

**151.** Plaintiffs restate and reallege each and every allegation contained in Paragraphs 1 through 150 as if fully restated herein.

**152.** The Henley Defendants owed a duty to Plaintiffs to provide an unbiased appraisal of the Subject Property based on all available information.

**153.** The Henley Defendants claimed that they were providing an unbiased appraisal of the Subject Property.

**154.** The Henley Defendants' representations in their appraisal were untrue and unsupported by reliable data. Thus, Defendant Henley supplied false information including unreliable comps and an unsupported valuation of the Subject Property.

**155.** Plaintiffs reasonably relied on Defendant Henley's representations in order to obtain credit from Defendant U.S. Bank.

**156.** Defendant Henley's misrepresentations resulted in pecuniary loss to Plaintiffs, as Plaintiffs obtained a HELOC from Defendant, U.S. Bank which came with a higher interest rate and a reduced borrowing capacity due to Defendant Henley's discriminatory appraisal and negligent misrepresentations. The HELOC was obtained because refinance and home equity loans were no longer an option due to the low appraisal and arbitrary U.S. Bank policy of 60% LtV due to Plaintiff Davoli-Turner's national origin as described herein.

**157.** Wherefore, Plaintiffs request compensatory and punitive damages in excess of $25,000, together with costs and reasonable attorney fees, in an amount to be determined at trial.

## COUNT VI – NEGLIGENT HIRING, TRAINING, AND SUPERVISION

### (The Turner Plaintiffs v. All Defendants)

158. Plaintiffs restate and reallege each and every allegation contained in Paragraphs 1 through 157 as if fully restated herein.

159. The Henley Defendants are in the business of real estate appraisals.

160. Defendant, U.S. Bank, is in the business of lending and financing for real estate transactions.

161. Defendants owe a duty of reasonable care to hire, train, and supervise employees, agents, and contractors with respect to all applicable laws and regulations.

162. Defendants breached their duty by failing to hire, properly train, and supervise employees, agents, and contractors with respect to appraisals and residential lending transactions.

163. As a direct and proximate result of Defendants' negligent hiring, training, and supervision of the Henley Defendants and U.S. Bank employees, including Stephanie, Bruce, and currently unknown underwriters and other U.S. Bank employees, Plaintiffs were harmed and therefore entitled to relief.

164. Wherefore, Plaintiffs request compensatory and punitive damages in excess of $25,000, together with costs and reasonable attorney fees, in an amount to be determined at trial.

**WHEREFORE**, due to Defendants' discriminatory conduct, policies, and practices, as described herein, Plaintiffs respectfully requests that this Court grant judgment in its favor, and against Defendants, as follows:

    A. Declaring that Defendants' actions violate the Federal Fair Housing Act, 42 U.S.C. § 3601.01, *et seq*., Ohio Rev. Code § 4112.01, *et seq.*, the Civil Rights Act of 1866, the Equal Credit Opportunity Act, and state tort law;

    B. Permanently enjoining Defendants from engaging in the conduct described herein and directing Defendants to take all affirmative steps necessary to remedy the

effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

**C.** Awarding compensatory and punitive damages in an amount in excess of $25,000.00, together with costs and reasonable attorney fees pursuant to 42 U.S.C. § 3613(c) and other applicable laws and regulations.

**D.** Mandate that the Defendants and all of their agents and employees receive training on fair housing laws; and

**E.** Grant such additional legal and equitable relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury on all issues triable as of right.

Respectfully submitted,

*/s/ C. Jacob Davis*
_____
C. Jacob Davis (#0101745)
Nalls Davis
33 White Allen Avenue
Dayton, Ohio 45405
Phone: (937) 813-3003
Fax: (937) 660-4400
Jacob.Davis@nallslaw.com

*Attorney for Plaintiffs, The Miami Valley*
*Fair Housing Center, Inc., Carlos Turner, and*
*Diana Davoli-Turner*

**DATED:** February 26, 2024

## CERTIFICATE OF SERVICE

I hereby certify that service is being made upon Defendants in accordance with the Federal Rules of Civil Procedure. Defendant, U.S. Bancorp, Inc. d/b/a U.S. Bank, having already filed a notice of appearance, will receive an electronic notice of this filing via PACER. U.S. Bank and its counsel will be able to access this filing by utilizing the Court's E-filing system. Defendants U.S. Bank National Association, Kevin D. Henley, and Henley Appraisals, LLC, will be served in accordance with the Federal Rules of Civil Procedure, by certified mail, return receipt requested, or another method under the Federal Rules of Civil Procedure.

Respectfully submitted,

*/s/ C. Jacob Davis*

_____
C. Jacob Davis (#0101745)
*Attorney for Plaintiffs, The Miami Valley*
*Fair Housing Center, Inc., Carlos Turner, and*
*Diana Davoli-Turner*

**EXHIBIT #1 – First Appraisal**

| FHA/VA Case No. | Page # 1 of 37 |
|---|---|

# SUMMARY OF SALIENT FEATURES

**SUBJECT INFORMATION**

| Subject Address | **265 Woodstream Dr** |
|---|---|
| Legal Description | **SPRINGS 3 LOT: 88** |
| City | **Springboro** |
| County | **Warren** |
| State | **OH** |
| Zip Code | **45066** |
| Census Tract | **0309.01** |
| Map Reference | **17140** |

**SALES PRICE**

| Sale Price | $ |
|---|---|
| Date of Sale | |

**CLIENT**

| Borrower/Client | **Diana Davoli-Turner** |
|---|---|
| Lender | **Union Home Mortgage** |

**DESCRIPTION OF IMPROVEMENTS**

| Size (Square Feet) | **3,988** |
|---|---|
| Price per Square Foot | $ |
| Location | **N;Res;** |
| Age | **10** |
| Condition | **C3** |
| Total Rooms | **10** |
| Bedrooms | **4** |
| Baths | **2.1** |

**APPRAISER**

| Appraiser | **Jeff Newsom** |
|---|---|
| Date of Appraised Value | **03/29/2022** |

**VALUE**

| Opinion of Value | **$ 520,000** |
|---|---|

ACCUPRAISAL OHIO LLC



# APPRAISAL OF REAL PROPERTY

### LOCATED AT:
**265 Woodstream Dr**
**SPRINGS 3 LOT: 88**
**Springboro, OH 45066**

### FOR:
**Union Home Mortgage**
**8241 Dow Circle**
**Strongsville, OH  44136**

### AS OF:
**03/29/2022**

### BY:
**Jeff Newsom**
**Accupraisal Ohio LLC**
**PO Box 883**
**Springboro, OH  45066**
**513-260-8700**
**www.accupraisalohio.com**

FHA/VA Case No.

| Borrower/Client | Diana Davoli-Turner | | | File No. | 0322035 | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |

# TABLE OF CONTENTS

Summary of Salient Features ................................................................................................................. 1
Cover Page ........................................................................................................................................ 2
URAR ............................................................................................................................................... 3
Additional Comparables 4-6 ............................................................................................................... 9
Subject Photos .................................................................................................................................. 10
Photograph Addendum ....................................................................................................................... 11
Photograph Addendum ....................................................................................................................... 12
Photograph Addendum ....................................................................................................................... 13
Photograph Addendum ....................................................................................................................... 14
Photograph Addendum ....................................................................................................................... 15
Photograph Addendum ....................................................................................................................... 16
Photograph Addendum ....................................................................................................................... 17
Photograph Addendum ....................................................................................................................... 18
Photograph Addendum ....................................................................................................................... 19
Comparable Photos 1-3 ...................................................................................................................... 20
Comparable Photos 4-6 ...................................................................................................................... 21
Building Sketch .................................................................................................................................. 22
Flood Map ......................................................................................................................................... 23
Location Map ..................................................................................................................................... 24
Accupraisal Addendum ....................................................................................................................... 25
Appraiser Independence Certification .................................................................................................. 29
Statement of Limiting Conditions ....................................................................................................... 30
Limited License Agreement ................................................................................................................ 31
Appraiser Disclosure Statement ......................................................................................................... 32
UAD Definitions Addendum ................................................................................................................ 33
License ............................................................................................................................................. 36
Insur 22-23 ....................................................................................................................................... 37

Accupraisal Ohio, LLC

| | FHA/VA Case No. | | Page # 3 of 37 |

## Uniform Residential Appraisal Report

**812170**
File # **0322035**

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | | | |
|---|---|---|---|
| Property Address **265 Woodstream Dr** | City **Springboro** | State **OH** | Zip Code **45066** |

Borrower **Diana Davoli-Turner**  Owner of Public Record **Diana Davoli-Turner**  County **Warren**

Legal Description **SPRINGS 3 LOT: 88**

Assessor's Parcel # **0403173004**  Tax Year **2021**  R.E. Taxes $ **6,010**

Neighborhood Name **Springs/ Springboro**  Map Reference **17140**  Census Tract **0309.01**

Occupant ☒ Owner ☐ Tenant ☐ Vacant  Special Assessments $ **0**  ☐ PUD  HOA $ **900**  ☒ per year  ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☒ Refinance Transaction ☐ Other (describe)

Lender/Client **Union Home Mortgage**  Address **8241 Dow Circle, Strongsville, OH 44136**

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s). **Dayton MLS search.**

**CONTRACT**

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ **0**  Date of Contract  Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | | PRICE | AGE | One-Unit | **100** % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | $ (000) | (yrs) | 2-4 Unit | % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | | Marketing Time ☒ Under 3 mths ☐ 3-6 mths ☐ Over 6 mths | | | **379** Low | **1** | Multi-Family | % |
| Neighborhood Boundaries **Route 741 west, Yankee east, Lytle Five Pts south, Austin Pike nort.** | | | | | | **674** High | **30** | Commercial | % |
| | | | | | | **450** Pred. | **15** | Other | % |

Neighborhood Description **Shopping, schools, employment, and other such amenities within 2 miles of subject.**

Market Conditions (including support for the above conclusions) **Conventional financing is prevalant, though FHA, VA, and alternate programs are readily available.**

**SITE**

Dimensions **Slightly irregular**  Area **10019 sf**  Shape **Fairly rect**  View **N;Res;**

Specific Zoning Classification **PUD**  Zoning Description **SFR**

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street **Asphalt** | ☒ | ☐ |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley **None** | ☐ | ☐ |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone **X**  FEMA Map # **39165C0030E**  FEMA Map Date **12/17/2010**

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No  If Yes, describe

**No illegal or non-conforming uses noted.**

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☐ Concrete Slab ☐ Crawl Space | | Foundation Walls | **Conc/ Avg** | Floors | **WdCptVnlLVT/Avg** |
| # of Stories **2** | | ☒ Full Basement ☐ Partial Basement | | Exterior Walls | **BrkStnSid/avg** | Walls | **Drywall/ Avg** |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area **1,857** sq.ft. | | Roof Surface | **Asph Shingles/ Avg** | Trim/Finish | **WdComp/Avg** |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Basement Finish **95** % | | Gutters & Downspouts | **Metal/Avg** | Bath Floor | **VnlCT/Avg** |
| Design (Style) **Neo eclectic** | | ☐ Outside Entry/Exit ☒ Sump Pump | | Window Type | **Therm/Avg** | Bath Wainscot | **FbrglsCT/Avg** |
| Year Built **2012** | | Evidence of ☐ Infestation | | Storm Sash/Insulated | **Therm/Avg** | Car Storage | ☐ None |
| Effective Age (Yrs) **5** | | ☐ Dampness ☐ Settlement | | Screens | **Yes/Avg** | ☒ Driveway | # of Cars **2** |
| Attic ☐ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | Amenities | | Driveway Surface | **Conc/Avg** |
| ☐ Drop Stair ☐ Stairs | | ☐ Other  Fuel **Nat gas** | | ☒ Fireplace(s) # **2** ☒ Fence **Rear** | | ☒ Garage | # of Cars **2** |
| ☐ Floor ☐ Scuttle | | Cooling ☒ Central Air Conditioning | | ☒ Patio/Deck **Dk** ☐ Porch **Stoop** | | ☐ Carport | # of Cars **0** |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | ☐ Pool **None** ☒ Other **Conc pad** | | ☐ Att. ☐ Det. ☐ Built-in |
| Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☐ Microwave ☒ Washer/Dryer ☐ Other (describe) | | | | | | | |

Finished area **above** grade contains: **10** Rooms **4** Bedrooms **2.1** Bath(s) **3,988** Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). **Fin bsmt (rec rm, theater, bonus rm).**

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). **C3;No updates in the prior 15 years;A well-built and adequately maintained dwelling which projects average appeal. Functional utility is average, with adequately sized rooms, ample closet space, and an efficient layout. This dwelling meets functional and aesthetic expectations of purchasers in this price range.**

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No  If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe

| | | FHA/VA Case No. | | Page # 4 of 37 |
|---|---|---|---|---|

## Uniform Residential Appraisal Report

812170
File # 0322035

| There are | 6 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | 410,000 | to $ | 584,900 | . |
|---|---|---|---|---|---|---|
| There are | 45 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | 379,900 | to $ | 673,500 | . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 265 Woodstream Dr | 21 Stanton Dr | | 30 Willow Grove Dr | | 80 Millard Ct | |
| | Springboro, OH 45066 | Springboro, OH 45066 | | Springboro, OH 45066 | | Springboro, OH 45066 | |
| Proximity to Subject | | 0.31 miles W | | 0.15 miles NW | | 0.77 miles W | |
| Sale Price | $ 0 | | $ 495,000 | | $ 489,900 | | $ 530,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 136.93 sq.ft. | | $ 160.52 sq.ft. | | $ 159.73 sq.ft. | |
| Data Source(s) | | Day MLS 847097;DOM 53 | | Day MLS 845921;DOM 35 | | Day MLS 847588;DOM 47 | |
| Verification Source(s) | | Aud MLS | | Aud MLS | | Aud MLS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Conv;0 | | Conv;0 | | VA;0 | |
| Date of Sale/Time | | s10/21;Unk | | s09/21;Unk | | s10/21;Unk | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 10019 sf | 12319 sf | 0 | 11500 sf | 0 | 15464 sf | 0 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT2;neo eclecti | DT2;neo eclecti | | DT2;neo eclecti | | DT2;neo eclecti | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 10 | 17 | 0 | 7 | 0 | 21 | 0 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths |
| Room Count | 10 | 4 | 2.1 | 10 | 4 | 2.1 | 10 | 4 | 2.1 | 11 | 4 | 2.1 | |
| Gross Living Area | 3,988 sq.ft. | 3,615 sq.ft. | +13,055 | 3,052 sq.ft. | +32,760 | 3,318 sq.ft. | +23,450 |
| Basement & Finished | 1857sf1764sfin | 1904sf1050sfin | +2,500 | 1314sf1764sfin | 0 | 1747sf750sfin | 0 |
| Rooms Below Grade | 1rr0br0.0ba2o | 1rr0br0.0ba1o | 0 | 1rr1br1.0ba0o | 0 | 1rr0br1.0ba0o | 0 |
| Functional Utility | Average | Avg assumed | 0 | Avg assumed | 0 | Avg assumed | 0 |
| Heating/Cooling | Cent/ Cent | Cent/ Cent | | Cent/ Cent | | Cent/ Cent | |
| Energy Efficient Items | Therm win | Therm win | | Therm win | | Therm win | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | 3ga3dw | -10,000 |
| Porch/Patio/Deck | Stp, lg deck | Pch, pat, dk | 0 | Pch, pat | 0 | Patio,Porch | 0 |
| Misc. | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 15,555 | ☒ + ☐ - | $ 32,760 | ☒ + ☐ - | $ 13,450 |
| Adjusted Sale Price | | Net Adj. 3.1 % | | Net Adj. 6.7 % | | Net Adj. 2.5 % | |
| of Comparables | | Gross Adj. 3.1 % | $ 510,555 | Gross Adj. 6.7 % | $ 522,660 | Gross Adj. 6.3 % | $ 543,450 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) **Aud/ Wlkthrgh/ Owner**
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s) **Auditor, public record, MLS**
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 11/09/2020 | | | |
| Price of Prior Sale/Transfer | $442,000 | | | |
| Data Source(s) | Aud Wlkthrgh Owner | Aud MLS | Aud MLS | Aud MLS |
| Effective Date of Data Source(s) | 03/29/2022 | 03/29/2022 | 03/29/2022 | 03/29/2022 |

Analysis of prior sale or transfer history of the subject property and comparable sales **Sales appear to be arms-length transactions (open-market, unrelated, etc).**

Summary of Sales Comparison Approach **Since not every subject can be compared to "ideal" comparable sales, the appraiser has chosen the best available sales from a market search which meets the investor underwriting standards. Every effort has been made to conform to FNMA guidelines, and, in most cases, an even stricter interpretation which is common to most investors has been used.**

**Unable to bracket subject GLA with above ground square footage. It is not an overimprovement/ oversized for the market, but this typically leads to a lower price/ sf thus the price/ sf is adjusted accordinly on the grid.**

**All seven properties are in the Settlers Walk development.**

Indicated Value by Sales Comparison Approach $ **520,000**

| Indicated Value by: Sales Comparison Approach $ 520,000 | Cost Approach (if developed) $ | Income Approach (if developed) $ |
|---|---|---|

**See addendum.**

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: **No warranty of the subject is given or implied. No liability is assumed for the structural or mechanical elements of the property.**

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ **520,000** , as of **03/29/2022** , which is the date of inspection and the effective date of this appraisal.

Form 1004UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

*SALES COMPARISON APPROACH*
*RECONCILIATION*

FHA/VA Case No. | Page # 5 of 37

## Uniform Residential Appraisal Report

812170
File # 0322035

**ADDITIONAL COMMENTS**

Blank
See addendum

---

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value) **Not required by FNMA. The cost approach is not completed because no weight would be placed on it (especially for a house of this age). Weight in this report is on the Sales Comparison approach.**

| COST APPROACH | | | |
|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | =$ **47,200** |
| Source of cost data | DWELLING | Sq.Ft. @ $ | =$ |
| Quality rating from cost service Effective date of cost data | | Sq.Ft. @ $ | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | =$ |
| **Site value is per county auditor. Neither this value, nor any** | Garage/Carport | Sq.Ft. @ $ | =$ |
| **derivative of it, should be used for insurance purposes.** | Total Estimate of Cost-New | | =$ |
| **Established neighborhood/ market with no vacant land sales** | Less Physical Functional External | | |
| **found.** | Depreciation | | =$( ) |
| | Depreciated Cost of Improvements | | =$ |
| **If the site value is >30% of the appraised value, this is an** | "As-is" Value of Site Improvements | | =$ |
| **underwriting issue, not an appraisal issue.** | | | |
| Estimated Remaining Economic Life (HUD and VA only) **45** Years | INDICATED VALUE BY COST APPROACH | | =$ |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| INCOME | | | |
|---|---|---|---|
| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
| Summary of Income Approach (including support for market rent and GRM) | **NA Owner occupied.** | | |

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☒ No Unit type(s) ☒ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| **PUD INFORMATION** | | | |
|---|---|---|---|
| Total number of phases | Total number of units | Total number of units sold | |
| Total number of units rented | Total number of units for sale | Data source(s) | |
| Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No If Yes, date of conversion. | | | |
| Does the project contain any multi-dwelling units? ☐ Yes ☐ No Data Source | | | |
| Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No If No, describe the status of completion. | | | |
| Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No If Yes, describe the rental terms and options. | | | |
| Describe common elements and recreational facilities. | | | |

Form 1004UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

# Uniform Residential Appraisal Report

**812170**
File # **0322035**

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

## Uniform Residential Appraisal Report

**812170**
**File # 0322035**

APPRAISER'S CERTIFICATION:    The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

## Uniform Residential Appraisal Report

**812170**
**File # 0322035**

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:   The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| **Jeff Newsom** | |
| Signature | Signature |
| Name   **Jeff Newsom** | Name |
| Company Name   **Accupraisal Ohio, LLC** | Company Name |
| Company Address   **PO Box 883** | Company Address |
| **Springboro, OH 45066** | |
| Telephone Number   **(513) 260-8700** | Telephone Number |
| Email Address   **accuohio@yahoo.com** | Email Address |
| Date of Signature and Report   **03/30/2022** | Date of Signature |
| Effective Date of Appraisal   **03/29/2022** | State Certification # |
| State Certification #   **2007000035** | or State License # |
| or State License # | State |
| or Other (describe)                State # | Expiration Date of Certification or License |
| State   **OH** | |
| Expiration Date of Certification or License   **03/30/2023** | SUBJECT PROPERTY |

ADDRESS OF PROPERTY APPRAISED
**265 Woodstream Dr**
**Springboro, OH 45066**
APPRAISED VALUE OF SUBJECT PROPERTY $         **520,000**
LENDER/CLIENT
Name   **No AMC**
Company Name   **Union Home Mortgage**
Company Address   **8241 Dow Circle, Strongsville, OH 44136**

Email Address

SUBJECT PROPERTY
☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
     Date of Inspection
☐ Did inspect interior and exterior of subject property
     Date of Inspection

COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
     Date of Inspection

Form 1004UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Uniform Residential Appraisal Report

812170
File # 0322035

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 265 Woodstream Dr | 445 Woodstream Dr | | 148 Winding Creek Dr | | 50 Tyler Ct | |
| | Springboro, OH 45066 | Springboro, OH 45066 | | Springboro, OH 45066 | | Springboro, OH 45066 | |
| Proximity to Subject | | 0.13 miles E | | 0.21 miles SE | | 0.40 miles NW | |
| Sale Price | $ 0 | | $ 465,000 | | $ 449,900 | | $ 461,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 187.27 sq.ft. | | $ 159.65 sq.ft. | | $ 151.94 sq.ft. | |
| Data Source(s) | | Day MLS 841029;DOM 29 | | Day MLS 852969;DOM 42 | | Day MLS 856268;DOM 44 | |
| Verification Source(s) | | Aud MLS | | Aud MLS | | Aud MLS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Unknown;0 | | Cash;0 | | Conv;0 | |
| Date of Sale/Time | | s07/21;c06/21 | | s01/22;Unk | | s03/22;Unk | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 10019 sf | 8756 sf | 0 | 9932 sf | 0 | 11108 sf | 0 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT2;neo eclecti | DT1.5;Cape cod | 0 | DT1.5;CapeCod | 0 | DT2;neo eclecti | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 10 | 17 | 0 | 17 | 0 | 20 | 0 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total | Bdrms. | Baths | Total | Bdrms. | Baths | -4,000 | Total | Bdrms. | Baths | -4,000 | Total | Bdrms. | Baths | |
| Room Count | 10 | 4 | 2.1 | 7 | 2 | 3.0 | 0 | 8 | 3 | 3.0 | 0 | 10 | 4 | 2.1 | |
| Gross Living Area | 3,988 sq.ft. | 2,483 sq.ft. | +52,675 | 2,818 sq.ft. | +40,950 | 3,034 sq.ft. | +33,390 |
| Basement & Finished | 1857sf1764sfin | 1929sf1418sfin | 0 | 0sf | +20,000 | 1708sf0sfin | 0 |
| Rooms Below Grade | 1rr0br0.0ba2o | 1rr1br1.0ba1o | 0 | | +10,000 | | +10,000 |
| Functional Utility | Average | Avg assumed | 0 | Avg assumed | 0 | Avg assumed | 0 |
| Heating/Cooling | Cent/ Cent | Cent/ Cent | | Cent/ Cent | | Cent/ Cent | |
| Energy Efficient Items | Therm win | Therm win | | Therm win | | Therm win | |
| Garage/Carport | 2ga2dw | 3ga2dw | -10,000 | 2ga2dw | | 2ga2dw | |
| Porch/Patio/Deck | Stp, lg deck | Stp, pat, encl | 0 | Patio,Porch | 0 | Stp, pat | +5,000 |
| Misc. | | | | | | | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 38,675 | ☒ + ☐ - | $ 66,950 | ☒ + ☐ - | $ 48,390 |
| Adjusted Sale Price | | Net Adj. 8.3 % | | Net Adj. 14.9 % | | Net Adj. 10.5 % | |
| of Comparables | | Gross Adj. 14.3 % | $ 503,675 | Gross Adj. 16.7 % | $ 516,850 | Gross Adj. 10.5 % | $ 509,390 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 11/09/2020 | | | |
| Price of Prior Sale/Transfer | $442,000 | | | |
| Data Source(s) | Aud Wlkthrgh Owner | Aud MLS | Aud MLS | Aud MLS |
| Effective Date of Data Source(s) | 03/29/2022 | 03/29/2022 | 03/29/2022 | 03/29/2022 |

Analysis of prior sale or transfer history of the subject property and comparable sales **See main form(s).**

Analysis/Comments **See main form(s).**

Freddie Mac Form 70 March 2005     UAD Version 9/2011     Fannie Mae Form 1004 March 2005

Form 1004UAD.(AC) - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Subject Photo Page

| Borrower/Client | Diana Davoli-Turner | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code 45066 |
| Lender | Union Home Mortgage | | | | | |



**Subject Front**

**265 Woodstream Dr**

| | |
|---|---|
| Sales Price | 0 |
| Gross Living Area | 3,988 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 10019 sf |
| Quality | Q3 |
| Age | 10 |



**Subject Rear**



**Subject Street**

| FHA/VA Case No. | Page # 11 of 37 |

## Photograph Addendum

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |

Front / side



Front/ side



Rear alt



## Photograph Addendum

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |



**View to rear**



**Liv**



**Din**

## Photograph Addendum

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |



**Lav**



**Util**



**Util**

FHA/VA Case No. | Page # 14 of 37

## Photograph Addendum

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |

Kit din



Fam



Study



## Photograph Addendum

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |

**Blank**



**Gar**



**Bed**



## Photograph Addendum

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |

**Bath**



**Bed**



**Bed**



## Photograph Addendum

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |



Bed



En suite



en suite alt

## Photograph Addendum

| | |
|---|---|
| Borrower/Client | **Diana Davoli-Turner** |
| Property Address | **265 Woodstream Dr** |
| City | **Springboro** County **Warren** State **OH** Zip Code **45066** |
| Lender | **Union Home Mortgage** |

**Bath**



**Bsmt**



**Bsmt**



## Photograph Addendum

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |



Bsmt



Util

Blank

FHA/VA Case No. | Page # 20 of 37

## Comparable Photo Page

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |



### Comparable 1
**21 Stanton Dr**

| | |
|---|---|
| Prox. to Subject | **0.31 miles W** |
| Sale Price | **495,000** |
| Gross Living Area | **3,615** |
| Total Rooms | **10** |
| Total Bedrooms | **4** |
| Total Bathrooms | **2.1** |
| Location | **N;Res;** |
| View | **N;Res;** |
| Site | **12319 sf** |
| Quality | **Q3** |
| Age | **17** |



### Comparable 2
**30 Willow Grove Dr**

| | |
|---|---|
| Prox. to Subject | **0.15 miles NW** |
| Sale Price | **489,900** |
| Gross Living Area | **3,052** |
| Total Rooms | **10** |
| Total Bedrooms | **4** |
| Total Bathrooms | **2.1** |
| Location | **N;Res;** |
| View | **N;Res;** |
| Site | **11500 sf** |
| Quality | **Q3** |
| Age | **7** |



### Comparable 3
**80 Millard Ct**

| | |
|---|---|
| Prox. to Subject | **0.77 miles W** |
| Sale Price | **530,000** |
| Gross Living Area | **3,318** |
| Total Rooms | **11** |
| Total Bedrooms | **4** |
| Total Bathrooms | **2.1** |
| Location | **N;Res;** |
| View | **N;Res;** |
| Site | **15464 sf** |
| Quality | **Q3** |
| Age | **21** |

## Comparable Photo Page

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |



### Comparable 4

**445 Woodstream Dr**

| | |
|---|---|
| Prox. to Subject | 0.13 miles E |
| Sale Price | 465,000 |
| Gross Living Area | 2,483 |
| Total Rooms | 7 |
| Total Bedrooms | 2 |
| Total Bathrooms | 3.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 8756 sf |
| Quality | Q3 |
| Age | 17 |



### Comparable 5

**148 Winding Creek Dr**

| | |
|---|---|
| Prox. to Subject | 0.21 miles SE |
| Sale Price | 449,900 |
| Gross Living Area | 2,818 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 9932 sf |
| Quality | Q3 |
| Age | 17 |



### Comparable 6

**50 Tyler Ct**

| | |
|---|---|
| Prox. to Subject | 0.40 miles NW |
| Sale Price | 461,000 |
| Gross Living Area | 3,034 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 11108 sf |
| Quality | Q3 |
| Age | 20 |

FHA/VA Case No. | Page # 22 of 37

## Building Sketch

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower/Client | **Diana Davoli-Turner** | | | | | |
| Property Address | **265 Woodstream Dr** | | | | | |
| City | **Springboro** | County | **Warren** | State **OH** | Zip Code | **45066** |
| Lender | **Union Home Mortgage** | | | | | |



TOTAL Sketch by a la mode, inc.

### Area Calculations Summary

| Living Area | | Calculation Details | | |
|---|---|---|---|---|
| First Floor | 1857 Sq ft | 44 × 26 | = | 1144 |
| | | 22 × 29 | = | 638 |
| | | 21 × 1 | = | 21 |
| | | 15 × 3 | = | 45 |
| | | 0.5 × 3 × 3 | = | 4.5 |
| | | 0.5 × 3 × 3 | = | 4.5 |
| Second Floor | 2131.25 Sq ft | 21 × 9 | = | 189 |
| | | 15 × 8 | = | 120 |
| | | 36 × 27 | = | 972 |
| | | 21.5 × 37 | = | 795.5 |
| | | 15 × 3 | = | 45 |
| | | 0.5 × 3 × 3.5 | = | 5.25 |
| | | 0.5 × 3 × 3 | = | 4.5 |
| **Total Living Area (Rounded):** | **3988 Sq ft** | | | |
| Non-living Area | | | | |
| 2 Car Attached | 572 Sq ft | 22 × 25 | = | 550 |
| | | 2 × 11 | = | 22 |

FHA/VA Case No. | Page # 23 of 37

# Flood Map

| Borrower/Client | Diana Davoli-Turner | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code 45066 |
| Lender | Union Home Mortgage | | | | | |



FHA/VA Case No. | Page # 24 of 37

## Location Map

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage | | | | | | |



## Accupraisal Addendum

File No. **0322035**

| | |
|---|---|
| Borrower/Client | **Diana Davoli-Turner** |
| Property Address | **265 Woodstream Dr** |
| City | **Springboro** County **Warren** State **OH** Zip Code **45066** |
| Lender | **Union Home Mortgage** |

# <u>Scope of Work</u>

I personally made a field inspection (when applicable) of the subject property unless otherwise noted.

The property being appraised and the comparable sales relied upon in making this appraisal were as represented in the appraisal.

To the best of my knowledge and belief the statements contained in the appraisal herein set forth are true, and the information upon which the opinions expressed therein are based is correct; subject to the limiting conditions therein set forth.

I understand that such appraisal may be used in connection with the acquisition of property for a project utilizing U.S. Department of Housing and Urban Development funds.

This appraisal has been made in conformity with appropriate laws, regulations, and policies and procedures applicable to appraisal of property for such purposes; and that to the best of my knowledge no portion of the value assigned to such property consists of items which are noncompensable under the established law of said State.

Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the project for which such property is acquired, or by the likelihood that the property would be acquired for such project, other than that due to physical deterioration within the reasonable control of the owner, was disregarded in determining the compensation for the property.

Neither my employment nor my compensation for making this appraisal and report are in any way contingent upon the values reported herein.

I have no direct or indirect present or contemplated future personal interest in such property or in any benefit from the acquisition of such property appraised.

I have not revealed the findings and results of such appraisal to anyone other than the proper officials of the acquiring agency or officials of the U.S. Department of Housing and Urban Development and I will not do so until so authorized by said officials, or until I am required to do so by due process of law, or until I am released from this obligation by having publicly testified as to such findings.

I have not given consideration to, or included in my appraisal, any allowance for relocation assistance benefits.

End

## Accupraisal Addendum

File No. **0322035**

| Borrower/Client | Diana Davoli-Turner | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | **Springboro** | County | **Warren** | | State | **OH** | Zip Code **45066** |
| Lender | **Union Home Mortgage** | | | | | | |

# Accupraisal Ohio General Addendum/ Notes

**This is a Appraisal Report.**

**The intended user of this report is limited solely to the identified client. The rationale for how the appraiser arrived at the opinions and conclusions set forth in the report may not be understood properly without additional information in the appraisers workfile.**

**Unless otherwise noted, no one provided significant real property appraisal assistance to the person signing this certification. If any individuals did provide significant real property appraisal assistance they are identified here along with a summary of the extent of the assistance provided in the report.**

The appraisal report is prepared for the sole and exclusive use of the appraiser's client. No third parties are authorized to rely upon this report without the express written consent of the appraiser and the appraiser's client. The client may not be the same party as the lender.
Those parties listed in Paragraph 23 of page 6, as well as possible others, may rely on this report as stated. However, the Scope of Work for the appraisal and the level of detail provided in the report were based solely on the requirements of the intended user specifically stated.

No employee, director, officer or agent of the lender, or any other third party acting as a joint venture partner, independent contractor, appraisal management company, or partner on behalf of the lender has influenced or attempted to influence the development, reporting, result or review of this assignment through coercion, extortion, collusion, compensation, instruction, inducement, intimidation, bribery or in any other manner.

I have not been contacted by anyone other than the intended user (lender/client as identified on the first page of the report), borrower, or designated contact to make an appointment to enter the property.

The source of definitions in this appraisal is FNMA.

The appraisal is NOT a home inspection.   The appraiser conducted only a visual observation of readily accessible areas.  The appraisal cannot be relied upon to disclose nor reveal conditions and/ or defects in the property.

**The value estimated in this appraisal is based upon the following assumptions:**
**-that there is an adequate supply of safe water.**
**-that the sanitary waste is disposed of by a properly functioning system, either public or private.**
**-that the subject property is free of soil contamination.  That any above-ground or under-ground storage tanks are not leaking and are properly registered and, if abandoned, are free from contamination and were properly drained, filled and sealed.**
**-that there are no hazardous waste sites on or nearby the subject property which could/ would negatively effect the value or safety of the property.**
**-that there is no uncontained friable asbestos or other hazardous material on the property.**
**-that there are no uncontained PCB's on or nearby the property.**
**-that the radon level is at or below EPA recommended levels.**
**-that there is no significant area formaldehyde insulation or material on the property.**

**When any of the environmental assumptions made in this addendum are not correct, the estimated value in this appraisal may not be valid.**

_**The appraiser is  not a home inspector.**_ **The appraiser provides an opinion of value. The appraisal does not guarantee that the property is free of defects or environmental problems. The appraiser performs an inspection of visible and accessible areas only. Mold or other issues may be present in areas the appraiser cannot see. A professional home inspection or environmental inspection is recommended if there are concerns about these issues.**

**Fees:  The fee invoiced and billed for this report is for this report only.  It does not include any other services, information, or appearances.  If further services are requested or required, such as further research, testimony, court appearances, depositions, or similar, additional fees will be billed, and that invoice (or invoices) will be due within 30 days of the performed service.  The person,**

## Accupraisal Addendum

File No. **0322035**

| | |
|---|---|
| Borrower/Client | Diana Davoli-Turner |
| Property Address | 265 Woodstream Dr |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | Union Home Mortgage |

organization, or company which requests the service will be responsible for the invoice and payment.

Accupraisal Ohio LLC uses electronic/digital signatures and photo imaging on all appraisals. The electronic signature used is the appraisers original signature. This technology is now the industry standard, and fully accepted.

Valuation methodology:  The valuation of residential property considers three approaches to value (Cost Approach, Sales Comparison Approach, and Income Approach).  Though considered for all properties, not all three approaches apply to every property.  Each approach utilizes data that is gathered from the marketplace.  The Cost Approach is no longer required by FNMA, Freddie Mac, nor FHA except for Manufactured Homes.   The income approach is only completed for non-owner-occupied properties.

No warranty of the subject is given or implied. No liability is assumed for the structural or mechanical elements of the property.   See above re: "not an inspector".

Site notes:  a site plan was not provided by the Client, nor was a survey of the subject site.  The site dimensions included here (when applicable and available) are per the respective county auditor, and typically via their website.  If there is any discrepancy between the actual vs. reported dimensions, totals, or acreage, the auditor should be notified.   The information provided by the auditor is assumed to be accurate and correct.

I do not have any present nor perceived future interest in the appraised property.

No personal property is included in the appraised value.

Neighborhood section, "Growth" refers to new construction/ expansion.

Land use:  "Other" land use encompasses green spaces, parks, places of worship, government buildings, etc.  Things which don't fit cleanly into the other categories.

If sold comps older than six months are used, they are included here in order to convey a better snapshot of the market and activity.

The appraised value should not be viewed as the absolute value of the subject property.  Any property has a range of value.  The purpose of this appraisal is to assist the client/ lender in making a loan decision, and is used to show that a price/ cost is (or is not) reasonable for the area/ market.  The value noted herein should be viewed as an estimate of what the property could be worth as of the date of the appraisal based on available sales in the market.

Effective age:  In order to obtain a credible opinion of effective age for the subject property, the Cost Approach to value would need to be completed.  As the Cost Approach was not completed here (see above), a supported effective age could not be completed.

The source of the definition of market value is obtained in HUD Handbook 4150.2, Paragraph 4-1A.  See attached definition of market value contained in Fannie Mae Form 1004.

Intended users:  If applicable, FNMA and HUD are intended users.

Housing trends: Demand/ supply vs. Marketing time:  This isn't correlational, and neither number indicates the other.  Demand supply is determined by a review of Actives vs Solds from the past year, and is exhibited above the Sales 1-3 grid in the URAR.   Marketing time is per the 1004mc, and is taken from a larger sample of the market, per its instructions.   Both numbers change independently.

The GLA noted in this report is based upon the appraisers measurement of the building which may include interior and/ or exterior methods.  The measurements are intended to give an idea of the square footage/ size, and should not be viewed as exact.  Irregularities may occur due to sloping, obstructions, distance measured from the dwelling, and/or ground imperfections.  No guarantee is given nor implied as to the

FHA/VA Case No. | Page # 28 of 37

## Accupraisal Addendum

File No. **0322035**

| Borrower/Client | Diana Davoli-Turner | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code 45066 |
| Lender | Union Home Mortgage | | | | | |

actual square footage of the house.  The square footage estimated herein was calculated from physical measurements taken by the appraiser.  See attached sketch.  The appraiser does not, and cannot, guarantee the square footage.

An estimated <span style="color:red">exposure time</span> for the subject is 47 days.  There is no valid way to predict when a property will sell.

I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of the of this report within the three-year period immediately preceding acceptance of this assignment.

*The subject is a legally permissible use based on its current zoning. Also, the lot size, shape and land-to-building ratio allow the present structure and indicate a good utilization of the improvements.*
*Based on current market conditions, the existing structure as a single family residence is its financially feasible and maximally productive use. The highest and best use, as if vacant, would be to construct a single family residence.*

**NOTE:  If, after the submission of the initial appraisal report to the lender, there is a request from the client or any other party to consider "alternate" or different properties as comparables, there will be a limit of three "alternates" to be researched and fee of $100 will be added to the invoice.**

Median value/ "predominant value":  Median number is just the one value which happens to be in the middle if all values are lined up from lowest to highest.  Being below or above this number means nothing at all.  I'm often asked if the subject is an "under improved property" if its lower than the median, or an "overimprovement" if its higher.  Its neither.  If subject is lower than the lowest value for the neighborhood, or higher than the highest, then its an under- or over-improvement.

The appraiser does not guarantee that the property is free from defects.  The appraisal establishes the value of the property for mortgage purposes only.

Utilities were "on" at the time of my walkthrough.   See photos.

# Appraiser Independence Certification

I do hereby certify, I have followed the appraiser independence safeguards in compliance with Appraisal Independence and any applicable state laws I may be required to comply with. This includes but is not limited to the following:

- I am currently licensed and/or certified by the state in which the property to be appraised is located My license is the appropriate license for the appraisal assignment(s) and is reflected on the appraisal report.
- I certify that there have been no sanctions against me for any reason that would impair my ability to perform appraisals pursuant to the required guidelines.

I assert that no employee, director, officer, or agent of _____ **Union Home Mortgage** _____ , or any other third party acting as joint venture partner, independent contractor, appraisal management company, or partner on behalf of _____ **Union Home Mortgage** _____ , influenced, or attempted to influence the development, reporting, result, or review of my appraisal through coercion, extortion, collusion, compensation, inducement, intimidation, bribery, or in any other manner.

I further assert that _____ **Union Home Mortgage** _____ has never participated in any of the following prohibited behavior in our business relationship:

1) Withholding or threatening to withhold timely payment or partial payment for an appraisal report;

2) Withholding or threatening to withhold future business with me, or demoting or terminating or threatening to demote or terminate me;

3) Expressly or impliedly promising future business, promotions, or increased compensation for myself;

4) Conditioning the ordering of my appraisal report or the payment of my appraisal fee or salary or bonus on the opinion, conclusion, or valuation to be reached, or on a preliminary value estimate requested from me;

5) Requesting that I provide an estimated, predetermined, or desired valuation in an appraisal report prior to the completion of the appraisal report, or requesting that I provide estimated values or comparable sales at any time prior to my completion of an appraisal report;

6) Provided me an anticipated, estimated, encouraged, or desired value for a subject property or a proposed or target amount to be loaned to the borrower, except that a copy of the sales contract for purchase transactions may be provided;

7) Provided to me, or my appraisal company, or any entity or person related to me as appraiser, appraisal company, stock or other financial or non-financial benefits;

8) Any other act or practice that impairs or attempts to impair my independence, objectivity, or impartiality or violates law or regulation, including, but not limited to, the Truth in Lending Act (TILA) and Regulation Z, or the USPAP.

---

| | |
|---|---|
| _(signature)_ | **03/30/2022** |
| Signature | Date |
| **Jeff Newsom** | **2007000035** |
| Appraiser's Name | State License or Certification # |
| | **03/30/2023** **OH** |
| State Title or Designation | Expiration Date of License or Certification State |

**265 Woodstream Dr, Springboro, OH 45066**
Address of Property Appraised

05/13

812170

File No. 0322035

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what they considers their own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Source: FDIC Interagency Appraisal and Evaluation Guidelines, October 27, 1994.)

**SCOPE OF REVIEW:** The scope of this review is limited to the information being provided by the original appraiser, and is to form an opinion as to the apparent adequacy and relevance of the data and the propriety of any adjustments to the data; form an opinion as to the appropriateness of the appraisal methods and techniques used and develop the reasons for any disagreement; form an opinion as to whether the analyses, opinions, and conclusions in the report under review are appropriate and reasonable, and develop the reasons for any disagreement.

## CERTIFICATION AND STATEMENT OF LIMITING CONDITIONS

**CERTIFICATION:** The reviewer certifies and agrees that, to the best of his/her knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of the work under review and no personal interest with respect to the parties involved.

4. Unless otherwise indicated, I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of the work under review within the three-year period immediately preceding acceptance of this assignment.

5. I have no bias with respect to the property that is the subject of the work under review or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in this review or from its use.

8. My compensation for completing this assignment is not contingent upon the development or reporting of predetermined assignment results or assignment results that favors the cause of the client, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal review.

9. My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

10. Unless otherwise indicated, I have not made a personal inspection of the subject of the work under review.

11. Unless otherwise indicated, no one provided significant appraisal, appraisal review, or appraisal consulting assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

**CONTINGENT AND LIMITING CONDITIONS:** The certification of the Reviewer appearing in the review report is subject to the following conditions and to such other specific and limiting conditions as are set forth by the Reviewer in the review report.

1. The Reviewer assumes no responsibility for matters of a legal nature affecting the property which is the subject of this review or the title thereto, nor does the Reviewer render any opinion as to the title, which is assumed to be good and marketable.

2. The Reviewer will not give testimony or appear in court because he or she reviewed an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

3. The Reviewer assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The Reviewer assumes no responsibility for such conditions, or for engineering which might be required to discover such factors. This review report must not be considered an environmental assessment of the subject property.

4. Information, estimates, and opinions furnished to the Reviewer, and contained in the review report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished to the Reviewer can be assumed by the Reviewer.

5. Disclosure of the contents of the report is governed by the Uniform Standards of Professional Appraisal Practice, the Bylaws and Regulations of the professional appraisal organizations with which the Reviewer is associated, and any applicable federal, state or local laws.

6. Neither all, nor any part of the content of the review report, or copy thereof (including the conclusions of the review, the identity of the Reviewer, professional designations, reference to any professional appraisal organizations, or the firm with which the Reviewer is connected), shall be used for any purpose by anyone but the client specified in the review report, its successors and assigns, professional appraisal organizations, any state or federally approved financial institution, any department, agency, or instrumentality of the United States or any state or the District of Columbia, without the previous written consent and approval of the Reviewer.

7. No change of any item in the review report shall be made by anyone other than the Reviewer and the Reviewer shall have no responsibility for any such unauthorized change.

**APPRAISER:**

Signature:

Name: **Jeff Newsom**

Title:

State Certification #: **2007000035**

or State License #:

State: **OH**   Expiration Date of Certification or License: **03/30/2023**

Date Signed: **03/30/2022**

**SUPERVISORY or CO-APPRAISER (if applicable):**

Signature:

Name:

Title:

State Certification #:

or State License #:

State:   Expiration Date of Certification or License:

Date Signed:

Page 1 of 1

0322035

# UNLIMITED USE LICENSE AGREEMENT

This Unlimited Use License Agreement ("LICENSE") is a legal agreement between you (either an individual or a single entity, also referred to as ("LICENSEE") and me, the creator ("OWNER") of this work. This LICENSE is granted to you in consideration of payment of the LICENSE fee and upon condition that you accept the terms of this LICENSE.

**By purchasing this LICENSE, you are granted a non-exclusive, non-transferable LICENSE as follows:**

\B\U\IUnlimited Use.\i\u\b LICENSEE to use and copy the WORK solely or any derivative thereof out of your organization for any purpose.

\B\UFee.\u\b An additional fee will be applied

\B\UNotice.\u\b LICENSEE shall include the copyright notice on every copy of the WORK. Unauthori use, including copying of this WORK is expressly prohibited unless an Unlimited Use LICENSE is obtained.

\B\UWarranties.\u\b OWNER WARRANTS THAT IT OWNS OR HAS THE FULL RIGHT AND AUTHORITY TO LICENSE THE WORK.

This LICENSE represents the entire understanding between the parties with respect to its subject matter.

YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, THAT YOU UNDERSTAND THIS AGREEMENT, AND UNDERSTAND THAT BY ACCEPTING THIS, BY LOADING, OR BY PLACING OR COPYING THE WORK ONTO YOUR COMPUTER HARD DRIVE, YOU AGREE TO BE BOUND BY THIS AGREEMENT'S TERMS AND CONDITIONS. FURTHER AGREE THAT, THIS AGREEMENT IS A COMPLETE AND EXCLUSIVE STATEMENT OF THE RIGHTS AND LIABILITIES OF THE PARTIES.

ALL RIGHTS NOT SPECIFICALLY GRANTED BY THIS LICENSE ARE RESERVED BY OWNER.

*By not purchasing this LICENSE, you shall receive a Restricted Use License ("RESTRICTED USE") to use my WORK at no additional fee.*

*\URESTRICTED Use\u - to use and copy the WORK solely for purposes of managing the loan associated with this WORK. The lender/client specified in this appraisal report may distribute the report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns for servicing said loan; and/or to all lenders in your organization to use the WORK and to sell said WORK as a package with the loan as intended.*

*Limitations on Restricted Use*
*LICENSEE shall use the WORK only for the purposes set forth in Section above. LICENSEE shall not*
　　*Reproduce the WORK in copies or electronic form;*
　　*Prepare a Derivative work based upon the WORK;*
　　*Distribute copies of the WORK by sale or other transfer of ownership, or by rental, lease, or lending;*
　　*in any form electronic, paper, or otherwise. This includes Internet application or Software*
　　*application unless specified in this Agreement, including in any third party proprietary format,*
　　*unless provided for in this Agreement;*
　　*Allow endusers to resell the WORK or a derivation, or to resell data or services which are derived*
　　*from the WORK.*

## APPRAISER DISCLOSURE STATEMENT
In Compliance with Ohio Revised Code Section 4763.12(C)

**812170**
File No.  **0322035**

Name of Appraiser:  **Jeff Newsom**

Class of Certification/Licensure:

- ☐ Certified General
- ☒ Certified Residential
- ☐ Licensed Residential
- ☐ Temporary    ☐ General    ☐ Licensed

Certification/Licensure Number:  **2007000035**

Scope: This Report  ☒ is within the scope of my Certification or License
  ☐ is not within the scope of my Certification or License

Service Provided by:  ☒ Disinterested & Unbiased Third Party
  ☐ Interested & Biased Third Party
  ☐ Interested Third Party on Contingent Fee Basis

Signature of person preparing and reporting the Appraisal:

This form must be included in conjunction with all appraisal assignments or specialized services performed by a state-certified or state-licensed real estate appraiser

State of Ohio
Department of Commerce
Division of Real Estate Appraiser Section
Cleveland (216) 787-3100

812170

File No. 0322035

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
### (Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Condition Ratings and Definitions

C1

The improvements have been very recently constructed and have not previously been occupied. The entire structure and all components are new and the dwelling features no physical depreciation.*

*Note: Newly constructed improvements that feature recycled materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100% new foundation and the recycled materials and the recycled components have been rehabilitated/re-manufactured into like-new condition. Recently constructed improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (i.e., newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

C2

The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

C3

The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

C4

The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

C5

The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

C6

The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

Quality Ratings and Definitions

Q1

Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2

Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Q3

Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4

Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
### (Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Quality Ratings and Definitions (continued)

Q5

Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6

Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure

Definitions of Not Updated, Updated, and Remodeled

Not Updated

> Little or no updating or modernization. This description includes, but is not limited to, new homes.

> Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

Updated

> The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.

> An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled

> Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.

> A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

Explanation of Bathroom Count

> Three-quarter baths are counted as a full bath in all cases. Quarter baths (baths that feature only a toilet) are not included in the bathroom count. The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

> Example:
> 3.2 indicates three full baths and two half baths.

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
### (Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| A | Adverse | Location & View |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| B | Beneficial | Location & View |
| Cash | Cash | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| Comm | Commercial Influence | Location |
| c | Contracted Date | Date of Sale/Time |
| Conv | Conventional | Sale or Financing Concessions |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| DOM | Days On Market | Data Sources |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| Ind | Industrial | Location & View |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| Listing | Listing | Sale or Financing Concessions |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| BsyRd | Busy Road | Location |
| o | Other | Basement & Finished Rooms Below Grade |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA - Rural Housing | Sale or Financing Concessions |
| s | Settlement Date | Date of Sale/Time |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| WtrFr | Water Frontage | Location |
| Wtr | Water View | View |
| Woods | Woods View | View |

Other Appraiser-Defined Abbreviations

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**License**

**AN APPRAISER LICENSE/CERTIFICATE**
has been issued under ORC Chapter 4763 to:

NAME:
Jeffrey D Newsom

LIC/CERT NUMBER:
2007000035

LIC LEVEL:
Certified Residential Real Estate Appraiser

Ohio | Department
of Commerce

Division of Real Estate
& Professional Licensing

CURRENT ISSUE DATE:
01/13/2022
EXPIRATION DATE:
03/30/2023
USPAP DUE DATE:
03/30/2023

**Insur 22-23**



**GREATAMERICAN®**
INSURANCE GROUP

301 E. Fourth Street, Cincinnati, OH 45202

**DECLARATIONS**
for
**REAL ESTATE APPRAISERS**
**ERRORS & OMISSIONS INSURANCE POLICY**

## THIS IS BOTH A CLAIMS MADE AND REPORTED INSURANCE POLICY.

**THIS POLICY APPLIES TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED**
**AND REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD.**

Insurance is afforded by the company indicated below: (A capital stock corporation)

☒ Great American Assurance Company

Note: The Insurance Company selected above shall herein be referred to as the **Company**.

Policy Number: **RAP3668441-22**     Renewal of: **RAP3668441-21**

Program Administrator:     **Herbert H. Landy Insurance Agency Inc.**
**100 River Ridge Drive, Suite 301 Norwood, MA 02062**

Item 1. **Named Insured**:     **Jeffrey D. Newsom**

Item 2. **Address**:     **PO Box 883**

City, State, Zip Code:     **Springboro, OH 45066**

Item 3. **Policy Period**: From  **03/17/2022**  To  **03/17/2023**
*(Month, Day, Year)*   *(Month, Day, Year)*
(Both dates at 12:01 a.m. Standard Time at the address of the **Named Insured** as stated in Item 2.)

Item 4. **Limits of Liability**:

A. $ **500,000**     **Damages** Limit of Liability – Each **Claim**

B. $ **500,000**     **Claim Expenses** Limit of Liability – Each **Claim**

C. $ **1,000,000**     **Damages** Limit of Liability – Policy Aggregate

D. $ **1,000,000**     **Claim Expenses** Limit of Liability – Policy Aggregate

Item 5. **Deductible** (Inclusive of **Claim Expenses**):

A. $ **0.00**     Each **Claim**

B. $ **0.00**     Aggregate

Item 6. **Premium**: $  **573.00**

Item 7. **Retroactive Date** (if applicable):     **03/17/2005**

Item 8. **Forms, Notices and Endorsements attached**:
**D42100 (03/15)  D42300 OH (05/13)  IL7324 (07/21)**
**D42402 (05/13)  D42408 (05/13)  D42412 (03/17)  D42413 (06/17)**
**D42414 (08/19)**

*Betsy a. magnuson*
Authorized Representative

D42101 (03/15)     Page 1 of 1

**EXHIBIT #2 – Second Appraisal**

**Solidifi FLEX Appraisal Report**

20221031140104

File No. OR7297437
Loan No. 20221031140104

## CLIENT AND PROPERTY IDENTIFICATION

Intended Purpose: [ ] Portfolio Evaluation [ ] Purchase [X] Junior Lien [ ] Refinance [ ] Other: _____
Data/Verification Source(s) Used: [X] Tax Record [ ] Appraiser Files [ ] MLS [X] Other: Exterior Inspection
Interest: [X] Fee Simple [ ] Leasehold

## CLIENT AND PROPERTY IDENTIFICATION

Client/Lender: U.S. Bank, N.A.  Address: 200 S 6th Street, Minneapolis, MN 55402
Borrower/Applicant: Diana Davoli-Turner  Owner of Public Record: Turner, Diana Davoli
Property Address: 265 Woodstream Dr  City: Springboro  State: OH  ZIP: 45066
Legal Description: Lot 88 Springs 3  APN: 0403173004  Census Tract: 0309.01  County: Warren
Property Type: [X] SFR [ ] Condo [ ] Attached/SFR [ ] Vacant Lot [ ] Other: _____ [ ] PUD HOA $ _____ [ ]per month[ ]per year
Specific Zoning Classification: R-1  Zoning Description: Residential Use

## MARKET AREA AND COMPARABLES

Market Value Trend : [ ] Increasing [X] Stable [ ] Declining  Typical Market Price Range: $ 395,000 to $ 489,900
Market Predominant Occupancy: [ ] Tenant [X] Owner  Typical Market Property Age: 1 yrs to 65 yrs
Location: [ ] Urban [X] Suburban [ ] Rural  Estimated marketing time for the subject property: [X] Under 3 months [ ] 3-6 months [ ] Over 6 months
Is the highest and best use of the subject property as improved (based on the improvements description provided by the various data sources available)
the present use?: [X] Yes [ ] No
Summarize HBU Analysis  Based on inspection of the immediate area, neighborhood chacteristics, single family residential has been determined as the highest/best use.

| FEATURE | SUBJECT | COMPARABLE #1 | COMPARABLE #2 | COMPARABLE #3 |
|---|---|---|---|---|
| Address | 265 Woodstream Dr Springboro, OH 45066 | 45 Willow Grove Dr Springboro, OH 45066 | 285 Woodstream Dr Springboro, OH 45066 | 30 Willow Grove Dr Springboro, OH 45066 |
| Proximity to Subject | | 0.20 miles NW | 0.02 miles E | 0.15 miles NW |
| Sales Price | $ | $ 471,000 | $ 451,000 | $ 489,900 |
| Price/Gross Liv. Area | $/SF | $/SF 159.72 | $/SF 167.28 | $/SF 160.52 |
| Data Sources | | Pub Rec DAYMLS#856989 | Pub Rec DAYMLS#851491 | Pub Rec DAYMLS#845921 |
| Sales/Fin. Concessions | | | | |
| Date of Sale (MM/DD/YY) | | 03/24/2022 | 11/17/2021 | 08/31/2021 |
| Location | Suburban | Suburban | Suburban | Suburban |
| Site | 9600 sf | 11690 sf | 8910 sf | 11573 sf |
| View | | | | |
| Design (Style) | DT2;Traditional | DT2;Traditional | DT2;Traditional | DT2;Traditional |
| Quality (UAD) | | | | |
| Actual Age | 10 | 4 | 10 | 7 |
| Condition (UAD) | C3 | C3 | C3 | C3 |

| Above Grade | Total | Bdrms | Baths | Total | Bdrms | Baths | Total | Bdrms | Baths | Total | Bdrms | Baths |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Room Count | 8 | 4 | 2.1 | 8 | 4 | 2.1 | 9 | 4 | 2.1 | 9 | 4 | 2.1 |

| FEATURE | SUBJECT | COMPARABLE #1 | | COMPARABLE #2 | | COMPARABLE #3 | |
|---|---|---|---|---|---|---|---|
| Gross Living Area (GLA) | 3,898 sq. ft. | 2,949 sq. ft. | +31,317 | 2,696 sq. ft. | +39,666 | 3,052 sq. ft. | +27,918 |
| Basement & Finished | Full | Full | | Full | | Full | |
| Rooms Below Grade | Unfinished | Unfinished | | Part Finished | -10,500 | Part Finished | -10,500 |
| Functional Utility | | | | | | | |
| Heating/Cooling | | | | | | | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | 2ga2dw | |
| | 1 Fireplace | 1 Fireplace | | 1 Fireplace | | 1 Fireplace | |
| | | | | | | | |
| Net Adjustment (Total) | | [X] + [ ] - $ 31,317 | | [X] + [ ] - $ 29,166 | | [X] + [ ] - $ 17,418 | |
| Adjusted Sale Price of Comparables | | Net Adj. 6.6 % Gross Adj. 6.6 % $ 502,317 | | Net Adj. 6.5 % Gross Adj. 11.1 % $ 480,166 | | Net Adj. 3.6 % Gross Adj. 7.8 % $ 507,318 | |

## EVALUATION SUMMARY

Analysis of Prior Sale or Transfer History of the Subject Property or Comparable Sales:

The most recent transfer for the subject property appears to be arm length.

General Comments:

Comparable and competitive properties that were considered similar in location, design, age, GLA and other amenities were analyzed, the appraiser has presented what is considered the 3 best sales. Due to the limited number of sales available similar in age, the following conditions will exist.  The GLA could not be bracketed. The property is larger in GLA, similar in amenities for traditional properties within the market area, these features should not affect the marketing of the property.  The appraiser has considered all sales with more weight given to sale #1 as it shows the lowest overall adjustment percentage.

The Appraiser has researched the transfer and listing history of the subject property for the past 3 years and the comparable sales for the past 12 months.
Subject Property Is Currently Listed For Sale?  [ ] Yes [X] No  Data Source: DAYYMLS

| Current Listing History | List Date | List Price | Days on Market | Data Source |
|---|---|---|---|---|
| | N/A | $ N/A | N/A | N/A |

Subject Property has been Listed within the last 12 Months?  [ ] Yes [X] No  Data Source: DAMLS

| 12 Month Listing History | List Date | List Price | Days on Market | Data Source |
|---|---|---|---|---|
| | | $ | | |
| | | $ | | |

| Transfer History (if more than two, use comments section) | Subject in past 36 months: | Comp 1 in past 12 months: | Comp 2 in past 12 months: | Comp 3 in past 12 months: |
|---|---|---|---|---|
| | $ 442,000   11/09/2020 | $ N/A   N/A | $ N/A   N/A | $ N/A   N/A |
| | $ N/A   N/A | $ N/A   N/A | $ N/A   N/A | $ N/A   N/A |

**As Is Opinion of Market Value: $ 485,000   As of: 04/25/2022**

20221031140104

# Solidifi FLEX Appraisal Report

File No. OR7297437
Loan No. 20221031140104

☐ No inspection required per assignment
☒ I performed a visual inspection of the exterior only of the subject property from at least the street
☐ I performed a visual inspection of the readily available exterior and interior areas of the subject property
☐ FLEX Lite: I did not perform a visual inspection of the exterior or interior areas of the subject property. The appraiser obtained the information in the below Exterior Condition Inspection section (and Interior, if indicated below) from sources that he or she considers reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties. The below third party inspection information was provided by:
☐ Company: _____ ☐ Agent/Inspector: _____ License No. (If Applicable): _____
☐ Other: _____ Please Specify: _____

## EXTERIOR CONDITION INSPECTION

The subject could be sufficiently viewed to complete this inspection report ☒ Yes ☐ No

**Property Damage**
☒ No Visible Damage
☐ Doors ☐ Siding ☐ Foundation ☐ Roof ☐ Windows
☐ Driveway ☐ Other: _____

**Damage Type (if applicable)**
☐ Fire ☐ Wind ☐ Water ☐ Deferred Maintenance
☐ Other: _____
Damage Description: _____

**Property Condition**
☐ C1 ☐ C2 ☐ C3 ☐ C4 ☐ C5 ☐ C6 ☐ N/A

**Neighborhood Condition**
☐ Improving ☐ Declining ☒ Stable ☐ Unknown
Describe Above: _____

**Adverse Neighborhood Attributes**
☒ No Adverse Attributes
☐ High Tension Power Lines ☐ Boarded/Condemned Homes
☐ Suspicious Odors ☐ Vacant Lots ☐ Highway
☐ Airport/Flight Path ☐ Railroad Tracks ☐ Streets In Disrepair
☐ Commercial/Industrial Presence
☐ Other: _____
Describe Attributes: _____

**Beneficial Neighborhood Attributes**
☒ No Beneficial Attributes
☐ Golf Course Community ☐ Community Amenities (parks, pools, bike paths, etc.)
☐ Waterfront
☐ Other: _____
Describe Attributes: _____

**Property Type**
☒ Detached SFR ☐ Attached SFR/Townhouse ☐ Condo ☐ Duplex
☐ Manufactured/Modular Home ☐ Triplex ☐ Quadplex ☐ Vacant Lot
☐ Other: _____

For sale sign visible on the subject property
☐ Yes ☒ No

**Construction Design**
☐ 1 Story ☐ 1.5 Story ☒ 2 Story ☐ 3 Story ☐ Split Level

**Exterior Sheathing**
☐ Stucco ☒ Vinyl/Wood/Aluminum ☒ Brick/Veneers
☐ Other: _____

**Garage**   Indicate Type and Number of Bays
☐ None ☒ Attached ☐ Detached ☐ Carport
☐ 1 Car ☒ 2 Car ☐ 3 Car
☐ Other: _____

**Parking**
☒ Drive Way ☐ Street
☐ Other: _____

**General Inspection Comments:**

## INTERIOR CONDITION INSPECTION

Interior Inspection Performed ☐ Yes ☒ No

**Interior Features**
Window Type: ☐ Insulated ☐ DblHung ☐ Other: _____
Flooring: ☐ Hardwood ☐ Carpet ☐ Tile ☐ Vinyl/Laminate
☐ Other: _____
Walls: ☐ Dry Wall ☐ Plaster ☐ Other: _____
Trim/Finish: ☐ Wood ☐ Other: _____
Add'l Features:

**Kitchen**
Floor: ☐ Tile ☐ Hardwood ☐ Vinyl/Lam. ☐ Other: _____
Counter: ☐ Granite/Stone ☐ Laminate ☐ Other: _____
Appliances: ☐ Dishwasher ☐ Disposal ☐ Refrigerator
☐ Oven/Range ☐ Microwave ☐ Other: _____
Add'l Features:

**Bath(s)**
Floor: ☐ Tile ☐ Hardwood ☐ Vinyl/Lam. ☐ Other: _____
Bath Wainscot: ☐ Tile ☐ Fiberglass ☐ Other: _____
Add'l Features:

**Foundation/Basement**
Type: ☐ Full ☐ Partial ☐ Slab ☐ Crawl. ☐ Other: _____
Walls: ☐ Poured ☐ Conc. Block ☐ Other: _____
Basement Entry/Exit: ☐ Walk Out ☐ Walk Up ☐ Interior Only
Evidence of: ☐ Infestation ☐ Dampness ☐ Settlement
Other: _____
Add'l Features:

**Mechanicals**
Heat: ☐ FWA ☐ HWBB ☐ Elec. BB ☐ Radiant ☐ Other: _____
Fuel: ☐ GAS ☐ Electric ☐ Oil ☐ Other: _____
Cooling: ☐ Central Air ☐ Individual ☐ Other: _____
Electricity: ☐ Public ☐ Private     Water: ☐ Public ☐ Private
Gas: ☐ Public ☐ Private     Sewer: ☐ Public ☐ Private
Add'l Features:

**Presence of deferred maintenance or conditions that affect the livability, soundness or structural integrity of the property?**
☐ Yes ☐ No Describe: _____

## MARKETABILITY STATEMENTS

| | Yes | No | Unknown |
|---|---|---|---|
| Subject's style conforms to neighborhood | ☒ | ☐ | |
| Subject's current use conforms to the neighborhood | ☒ | ☐ | |
| Adverse easements or encroachments | ☐ | ☒ | ☐ |
| Commercial activity occurring on subject property | ☐ | ☒ | |
| Subject property is occupied | ☐ | ☐ | ☒ |
| Visible signs of construction or remodeling of subject | ☐ | ☒ | |
| Damages affect the subject's safety or habitability | ☐ | ☒ | |
| Presence of security bars on windows | ☐ | ☒ | |
| Presence of outbuildings other than common shed or detached garage | ☐ | ☒ | ☐ |
| Subject located in a current designated natural disaster area | ☐ | ☒ | ☐ |

20221031140104

**Solidifi FLEX Appraisal Report**

File No. OR7297437
Loan No. 20221031140104

| MARKETABILITY COMMENTS |
|---|
| |

| UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS |
|---|

(Source: Fannie Mae UAD Appendix D: UAD Field -Specific Standardization Requirements, updated 1/2014)
For full UAD Definitions Data Set please visit:
https://www.fanniemae.com/singlefamily/uniform-appraisal-dataset#

**Condition Ratings and Definitions**

**C1**     The improvements have been recently constructed and have not been previously occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

*Note: Newly constructed improvements that feature recycled or previously used materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100 percent new foundation and the recycled materials and the recycled components have been rehabilitated/remanufactured into like-new condition. Improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (that is, newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).*

**C2**     The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category are either almost new or have been recently completely renovated and are similar in condition to new construction.

*Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.*

**C3**     The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

*Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation .*

**C4**     The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

*Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.*

**C5**     The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

*Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.*

**C6**     The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

*Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.*

**Quality Ratings and Definitions**

**Q1**     Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

**Q2**     Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residences constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

**Q3**     Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

**Q4**     Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

**Q5**     Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

**Q6**     Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure.

**Definitions of Not Updated, Updated, and Remodeled**

    **Not Updated -** Little or no updating or modernization. This description includes, but is not limited to, new homes. Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

    **Updated -** The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost. An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations . Updates do not include significant alterations to the existing structure .

    **Remodeled -** Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion. A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of square footage). This would include a complete gutting and rebuild.

**Solidifi FLEX Appraisal Report**

File No.  OR7297437
Loan No. 20221031140104

**PURPOSE OF APPRAISAL:** The purpose of this appraisal is to form an "as is" opinion of the market value of the real property that is the subject of this report based upon a quantitative sales comparison analysis for use in the mortgage finance transaction.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and acting in what they consider their own best interests; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

**INTENDED USE:** This appraisal report is intended for use only by the client. The function of this appraisal is to help the client analyze the risk associated with making a loan on the subject property.

**INTENDED USER:** The intended user of this appraisal report is the lender/client identified.

**SCOPE OF THE APPRAISAL:** The scope of this appraisal consists of identifying the characteristics of the subject property that are relevant to the purpose and intended use of the appraisal, as previously addressed. For the subject, this is accomplished by reviewing public record data, prior appraisal files and/or other documentation from a disinterested source and which is considered reliable from the appraiser's perspective. The data sources for the comparable sales may include public record data services, multiple listing services, automated valuation models and/or other data sources that become available and are deemed to be reliable by the appraiser. The confirmation of comparable sale data (i.e., closed sale documentation and property characteristics) is via public data sources and multiple listing services, as appropriate. The appraiser has not viewed the sales in the field. The data is collected, verified and analyzed in accordance with set parameters as defined within this Scope and the Intended Use of the appraisal. Atypical variances of comparable sales in relation to the subject will be accounted for and detailed in this report.

In developing this appraisal report, the appraiser has incorporated only the Sales Comparison Approach unless otherwise noted in the addenda attached hereto. The appraiser has determined that the scope of this assignment does produce credible assignment results. The client agrees that the limited scope and presentation of the analysis is appropriate given the intended use.

If no inspection of the property is completed, the appraiser has made some basic assumptions, including the following:

• The subject property is assumed to be in average overall condition and generally conforms to the neighborhood in terms of style, condition, construction materials and in external and economic factors.
• There are no adverse environmental conditions (hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property.
• There are no significant discrepancies between the public record information or other data source and the existing site or improvements.

**ANALYSIS OF ANY CURRENT AGREEMENT OF SALE, PRIOR SALE WITHIN THREE YEARS AND RECONCILIATION:** Unless otherwise noted, the appraiser has no knowledge of any current agreement of sale or any current or past listing agreement. Prior sales of the subject property within three years of the effective date of this appraisal have been researched and reported on the appraisal report (in the Transfer History section) if available from MLS or public record sources. The appraiser has reconciled the quality and quantity of data available into an indication of Market Value, in accordance with the intended use and scope of the appraisal.

**STATEMENT OF CONTINGENT AND LIMITING CONDITIONS:** The Appraiser's Certification that appears in this report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect the subject property.
2. The appraiser assumes the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.
3. The appraiser will not give testimony or appear in court because he or she performed this appraisal unless specific arrangements to do so have been made beforehand.
4. Except as noted herein, the appraiser has not made an exterior or interior inspection of the subject property. The appraiser assumes that there are no adverse conditions associated with the improvements or the subject site. Unless otherwise stated in this report, the appraiser has no knowledge of any hidden or apparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) present in the improvements, on the site or in the immediate vicinity that would make the property more or less valuable, and has assumed that there are no such conditions. The appraiser makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report may not be considered an environmental assessment of the property.
5. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.
6. The appraiser will not disclose the content of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.
7. Unless otherwise noted, the appraiser has assumed that the subject real estate's zoning classification complies with local zoning code.
8. Unless otherwise noted in this report, my opinion of reasonable exposure time at the market value stated in this report is equal to the indicated marketing time noted on page 1 of this report.

**APPRAISER'S CERTIFICATION:** Unless otherwise noted in this report, the appraiser certifies, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
3. I have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.
4. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
5. My engagement in this assignment was not contingent upon developing or reporting predetermined results.
6. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
7. My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
8.I have not made a personal inspection of the comparable sales noted in this report.
9. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. I have identified all relied upon sources to develop this appraisal report and appraisal assignment. I have identified any individuals who provided significant assistance in developing the opinion of value, or preparation of the appraisal report, and have disclosed any tasks provided by such individuals on page 2 Condition Inspection page or attached addenda.
10. Unless otherwise noted in this report, I have performed NO services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

| APPRAISER | LENDER/CLIENT |
|---|---|
| Signature | Name (AMC)  Solidifi |
| | AMC # |
| Name  Thomas G Augspurger | Company Name  U.S. Bank, N.A. |
| Company Name  Residential Equity Specialists | Company Address 200 S 6th Street |
| Company Address 526 Sage Run Dr | Minneapolis , MN 55402 |
| Lebanon , OH 45036 | Email Address |
| Telephone Number (513) 423-5177 | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
| Email Address  gaugspurger@cinci.rr.com | Signature |
| Date of Signature and Report 05/03/2022 | Name |
| Effective Date of Appraisal 04/25/2022 | Company Name |
| State Certification # 392602 | Company Address |
| or State License # | |
| or Other (describe) State # | Telephone Number |
| State OH | Email Address |
| Expiration Date of Certification or License 03/01/2023 | Date of Signature |
| ADDRESS OF PROPERTY APPRAISED | State Certification # |
| 265 Woodstream Dr | or State License # |
| Springboro , OH 45066 | State |
| APPRAISED VALUE OF SUBJECT PROPERTY $ 485,000 | Expiration Date of Certification or License |

20221031140104

TEXT ADDENDUM

File #  OR7297437

| | |
|---|---|
| Borrower/Client | Diana Davoli-Turner |
| Property Address | 265 Woodstream Dr |
| City Springboro | County Warren | State OH | Zip Code 45066 |
| Lender | U.S. Bank, N.A. |

Supplemental Addendum [Single-page]
Comparable Search Criteria
 The appraiser has analyzed sales similar in design, age, site area and other amenities, and presented what are considered the best sales available.

 Defined Market area
 The neighborhood boundaries are th Montgomery county line to the north Settlers Walk to the west, Yankee to the east, Lytle Five Points to the south.

 This property is located within an acceptable distance from my office, 9 miles. I have spent sufficient time in this market and understand the nuances of the local market and the supply and demand factors relating to the specific property type and location involved.

 Due to the exterior only nature of the inspection, the interior features and the GLA for this property has been determined by figures provided by the Montgomery county auditor's office.  The appraiser cannot comment on figures provided by other sources.

 All photo's are original with the report.

 The intended user of this report is the listed client and its assignee's.

 The intended use of this report is market valuation.

 This assignment was performed within the scope of work as outlined on page 2 of this report.

 This appraisal report will contain an electronic signature, and digital photographs that are password protected and locked on transmission.  The electronic signature will be considered as authentic as an actual hand signature.

 I have reviewed and utilized the best available data sources in reporting the physical attributes of
the subject property and comparable sales available. Any discrepancies between the reported physical attributes and what is visible in the public domain is as follows.   None

 The sales presented are considered the best available, although certain features of the subject property are not bracketed, the sales used are the closest in range that were available.

 Based on the surrounding properties, and the current market conditions, the highest and best use of the subject property is single family residential.

 There were active or pending listings similar to the subject property available, due to this, a comparable listing cannot be provided.

20221031140104

# USPAP ADDENDUM

File No. OR7297437

| | |
|---|---|
| Borrower | Diana Davoli-Turner |
| Property Address | 265 Woodstream Dr |
| City Springboro | County Warren State OH Zip Code 45066 |
| Lender | U.S. Bank, N.A. |

## This report was prepared under the following USPAP reporting option:

☒ **Appraisal Report**  This report was prepared in accordance with USPAP Standards Rule 2-2(a).

☐ **Restricted Appraisal Report**  This report was prepared in accordance with USPAP Standards Rule 2-2(b).

## Reasonable Exposure Time

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is: 30 to 70 days

## Additional Certifications

I certify that, to the best of my knowledge and belief:

☒ I have **NOT** performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

☐ I **HAVE** performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.  Those services are described in the comments below.

— The statements of fact contained in this report are true and correct.
— The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
— Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no  personal interest with respect to the parties involved.
— I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
— My engagement in this assignment was not contingent upon developing or reporting predetermined results.
— My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
— My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
— Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
— Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

## Additional Comments

**APPRAISER:**

Signature:
Name:  Thomas G Augspurger
Date Signed:  05/03/2022
State Certification #:  392602
or State License #:
or Other (describe) _____ State # _____
State:  OH
Expiration Date of Certification or License:  03/01/2023
Effective Date of Appraisal:  04/25/2022

**SUPERVISORY APPRAISER: (only if required)**

Signature:
Name:
Date Signed:
State Certification #:
or State License #:
State:
Expiration Date of Certification or License:
Supervisory Appraiser Inspection of Subject Property:
☐ Did Not  ☐ Exterior-only from Street  ☐ Interior and Exterior

USPAP 2014                 AI Ready

20221031140104

## SUBJECT PHOTOGRAPH ADDENDUM

File # OR7297437

| | |
|---|---|
| Borrower/Client | Diana Davoli-Turner |
| Property Address | 265 Woodstream Dr |
| City Springboro | County Warren State OH Zip Code 45066 |
| Lender | U.S. Bank, N.A. |



**FRONT OF SUBJECT PROPERTY**

Subject Front

265 Woodstream Dr



**REAR OF SUBJECT PROPERTY**

Subject Rear

265 Woodstream Dr



**STREET SCENE**

Subject Street

265 Woodstream Dr

20221031140104

## SUBJECT PHOTOGRAPH ADDENDUM

File # OR7297437

| | |
|---|---|
| Borrower/Client | Diana Davoli-Turner |
| Property Address | 265 Woodstream Dr |
| City Springboro | County Warren State OH Zip Code 45066 |
| Lender | U.S. Bank, N.A. |



**ADDITIONAL SUBJECT PHOTO**

Subject Side



**ADDITIONAL SUBJECT PHOTO**

Subject Side



**ADDITIONAL SUBJECT PHOTO**

Address

LOCATION MAP ADDENDUM

20221031140104

File # OR7297437

| | |
|---|---|
| Borrower/Client | Diana Davoli-Turner |
| Property Address | 265 Woodstream Dr |
| City | Springboro County Warren State OH Zip Code 45066 |
| Lender | U.S. Bank, N.A. |



20221031140104

Location Map

| | |
|---|---|
| Borrower/Client | Diana Davoli-Turner |
| Property Address | 265 Woodstream Dr |
| City | Springboro |
| County | Warren |
| State | OH |
| Zip Code | 45066 |
| Lender | U.S. Bank, N.A. |

File #  OR7297437



| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | Diana Davoli-Turner | | | | File # OR7297437 |
| Property Address | 265 Woodstream Dr | | | | |
| City Springboro | | County Warren | | State OH | Zip Code 45066 |
| Lender U.S. Bank, N.A. | | | | | |



20221031140104
2022 E-O
File #   OR7297437

| | |
|---|---|
| Borrower/Client | Diana Davoli-Turner |
| Property Address | 265 Woodstream Dr |
| City Springboro | County Warren State OH Zip Code 45066 |
| Lender | U.S. Bank, N.A. |

NOTICE: DEFENSE EXPENSES ARE INCLUDED WITHIN AND ARE
STATED IN THE CERTIFICATE. PLEASE READ THE ENTIRE POLICY CAREFULLY.

NORMAN-SPENCER REAL ESTATE RISK PURCHASING GROUP INC dba
THE AMERICAN ACADEMY OF STATE CERTIFIED APPRAISERS
(A Delaware Corporation)

### CERTIFICATE DECLARATIONS

1. Name and Address of Certificate Holder:  **Thomas G. Augspurger d/b/a**
   **Residential Equity Specialists**
   **526 Sage Run Drive**
   **Lebanon          OH      45036**

2. Certificate Period:      **Effective Date:  9/21/2021    to Expiration Date:    9/21/2022**
   12:01 a.m. Standard Time at the Address of the Certificate Holder shown in item 1. above

2a. Retroactive Date:     **9/21/2007**
   12:01 a.m. Standard Time at the Address of the Certificate Holder shown in item 1. above

3. Limit of Liability:       $       **500,000 each claim**
                             $       **500,000 aggregate limit**

4. Deductible:             $          **- each claim**

5. Professional Covered Services insured by this policy are:  REAL ESTATE APPRAISAL SERVICES

6. Advance Certificate Holder Premium:        **$593.00**         Surplus Lines Tax                    29.65

7. Minimum Earned Premium:    **25% or**      **$148.00**
                                                           Risk Purchasing Group Fee          40.00
Forms and Endorsements:
See Attached Forms list                                    Total:
                                                                                   $  **69.65**

Agency Name and Address:       **Norman-Spencer Agency, LLC**
                               **8075 Washington Village Drive**
                               **Dayton, OH 45458**

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE CERTIFICATE HOLDER AGREES TO ALL TERMS AND CONDITIONS AS SET
FORTH IN THE ATTACHED MASTER POLICY.

20221031140104

AI Ready PDF Generated on 05/03/2022 11:45:38 AM

**EXHIBIT #3 – Henley Defendants' Appraisal**

## Uniform Residential Appraisal Report

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | | | | | |
|---|---|---|---|---|---|
| Property Address 265 Woodstream Dr | | City Springboro | | State OH | Zip Code 45066 |
| Borrower DIANA DAVOLI-TURNER | | Owner of Public Record DAVOLI-TURNER DIANA | | County Warren | |

Legal Description SPRINGS 3 LOT: 88, 0.228 ACRES

| Assessor's Parcel # 0403173004 | Tax Year 2021 | R.E. Taxes $ 6,010 |
|---|---|---|
| Neighborhood Name Springs | Map Reference 17140 | Census Tract 0309.01 |

Occupant ☒ Owner ☐ Tenant ☐ Vacant    Special Assessments $ 0    ☒ PUD    HOA $ 580    ☒ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Home Equity

Lender/Client U.S. Bank, N.A.    Address 1050 Woodward Avenue, Detroit, MI 48226

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s).
DayMLS

**CONTRACT**

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $    Date of Contract    Is the property seller the owner of public record? ☐ Yes ☐ No Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | | PRICE | AGE | One-Unit | 68 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | $(000) | (yrs) | 2-4 Unit | 1 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | Marketing Time ☒ Under 3 mths ☐ 3-6 mths ☐ Over 6 mths | | | 250 Low | | Multi-Family | 9 % |
| Neighborhood Boundaries | | | | | 550 High | 125 | Commercial | 15 % |
| East of 741, west of Bunnell Hill Rd, north of Central Ave, south of Austin Blvd. | | | | | 350 Pred. | 20 | Other | 7 % |

Neighborhood Description

The subject is within a typical suburban neighborhood of Warren County, in a PUD. All necessary amenities are within 5 miles. There is an average overall condition within the subject's neighborhood. There are many different styles and sizes of homes within the subject's neighborhood. Other land use is 6% parks, 1% undeveloped, not affecting market value or marketability.

Market Conditions (including support for the above conclusions)

Market studies from MLS, Pace and Court House Records indicate that the property values appear to be stable. This indicates an active absorption rate and general balance between supply and demand. There is no known prevalence of unusual seller financing concessions/buydowns that impact this market. Marketing time should not exceed 100 days if reasonably priced.

**SITE**

| Dimensions NA, irregular, see attached plat map | Area 9932 sf | Shape Irregular | View N;Res; |
|---|---|---|---|

Specific Zoning Classification PUD    Zoning Description Planned Unit Development District

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe.

| Utilities Public Other (describe) | | Public Other (describe) | | Off-site Improvements-Type | Public | Private |
|---|---|---|---|---|---|---|
| Electricity ☒ | | Water ☒ | | Street Asphalt | ☒ | ☐ |
| Gas ☒ | | Sanitary Sewer ☒ | | Alley None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No    FEMA Flood Zone X    FEMA Map # 39165C0030E    FEMA Map Date 12/17/2010

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe.

The site is average in size for the area and the subject improvements. There are no apparent adverse easements, encroachments or use changes presently or contemplated. The improvement on the property apparently conforms to current zoning regulations. If site dimensions are not listed above, they are not available from data source or during normal course of business. Dimensions may be taken from county engineer.

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description materials/condition | | Interior materials/condition | |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☐ Concrete Slab ☐ Crawl Space | | Foundation Walls Concrete/C3 | | Floors CarpetHrdWd/C3 | |
| # of Stories 2 | | ☒ Full Basement ☐ Partial Basement | | Exterior Walls ConbrdBrckStone/C3 | | Walls Drywall/C3 | |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area 1,816 sq. ft. | | Roof Surface AspShingle/C3 | | Trim/Finish Wood/C3 | |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Basement Finish 85 % | | Gutters & Downspouts Aluminum/C3 | | Bath Floor Viny/C3 | |
| Design (Style) Colonial | | ☐ Outside Entry/Exit ☒ Sump Pump | | Window Type VinDubHng/C3 | | Bath Wainscot FiberGl/C3 | |
| Year Built 2012 | | Evidence of ☐ Infestation | | Storm Sash/Insulated Metal/Insulate/C3 | | Car Storage ☐ None | |
| Effective Age (Yrs) 6 | | ☐ Dampness ☐ Settlement | | Screens Metal/half/C3 | | ☒ Driveway # of Cars 2 | |
| Attic ☐ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | Amenities ☐ WoodStove(s) # 0 | | Driveway Surface Concrete | |
| ☐ Drop Stair ☐ Stairs | | ☐ Other Fuel Gas | | ☒ Fireplace(s) # 2 ☒ Fence MetalFenc | | ☒ Garage # of Cars 2 | |
| ☐ Floor ☒ Scuttle | | Cooling ☒ Central Air Conditioning | | ☒ Patio/Deck Ludk ☒ Porch UpoLupat | | ☐ Carport # of Cars 0 | |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | ☐ Pool None ☐ Other None | | ☒ Att. ☐ Det. ☐ Built-in | |
| Appliances ☐ Refrigerator ☒ Range/Oven ☒ Dishwasher ☐ Disposal ☐ Microwave ☐ Washer/Dryer ☐ Other (describe) | | | | | | | |

Finished area above grade contains: 11 Rooms    4 Bedrooms    2.1 Bath(s)    3,818 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.)

UAD condition descriptions are for all items in the improvements section, just not overall condition.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).

C3;No updates in the prior 15 years;ago;Physical depreciation appears to be normal and expected for the age of the improvements, in average condition throughout. The subject's floor plan reflects adequate separation between work,recreational and sleeping areas. There is no functional obsolescence or deferred maintenance noted.Appliances only checked if real estate, not chattel.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe

## Uniform Residential Appraisal Report

2022103140104
File # USB-220506-02084-1

| | | | |
|---|---|---|---|
| There are 0 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 0 | | to $ 407,900 | |
| There are 11 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 407,900 | | to $ 530,000 | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 265 Woodstream Dr Springboro, OH 45066 | 21 Stanton Dr Springboro, OH 45066 | 190 Stanton Dr Springboro, OH 45066 | 266 Woodstream Dr Springboro, OH 45066 |
| Proximity to Subject | | 0.31 miles W | 0.34 miles NW | 0.04 miles S |
| Sale Price | $ | $ 495,000 | $ 450,000 | $ 427,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 136.93 sq.ft. | $ 132.35 sq.ft. | $ 116.57 sq.ft. |
| Data Source(s) | | DayMls#847097;DOM 53 | DayMls#836580;DOM 42 | DayMls#825178;DOM 57 |
| Verification Source(s) | | WarrnCountyAuditorPRC/Realtor | WarrnCountyAuditorPRC/Realtor | WarrnCountyAuditorPRC/Realtor |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Sale or Financing Concessions | | ArmLth Conv;0 | | ArmLth Conv;0 | | ArmLth Conv;0 | |
| Date of Sale/Time | | s10/21;c08/21 | | s05/21;c03/21 | | s10/20;c09/20 | +21,350 |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 9932 sf | 12319 sf | 0 | 13839 sf | 0 | 8973 sf | 0 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT2;Colonial | DT2;Colonial | | DT2;ContCapeCod | 0 | DT2;Colonial | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 10 | 16 | 0 | 16 | 0 | 8 | 0 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 11 / 4 / 2.1 | 11 / 4 / 2.1 | 0 | 10 / 4 / 2.1 | 0 | 10 / 4 / 2.1 | 0 |
| Gross Living Area | 3,818 sq.ft. | 3,615 sq.ft. | +4,872 | 3,400 sq.ft. | +10,032 | 3,663 sq.ft. | +3,720 |
| Basement & Finished Rooms Below Grade | 1816sf1544sfin 1rr1br0.0ba1o | 1904sf1428sfin 1r0br0.0ba1o | 0 / 0 | 2421sf1210sfin 1rr0br1.0ba2o | 0 / -4,000 | 1815sf0sfin 1r0br1.0ba2o | +8,000 / 0 |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FWA/CA | FWA/CA | | FWA/CA | | FWA/CA | |
| Energy Efficient Items | NoneNoted | NoneNoted | | NoneNoted | | NoneNoted | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | 2ga2dw | |
| Porch/Patio/Deck | UnPorLUdkLupt | UpoLrUpatUdk | +500 | UporLUptLudk | 0 | CovPorLrgUnPt | +500 |
| Exterior Materials | VinBrickStone | VinylBrick | 0 | VinylBrick | 0 | VinBrickStone | |
| Extra Amenities In/Out | 2FirplacFence | FireplaceFence | 0 | 2Fireplace | 0 | Fireplace | 0 |
| Updates/Dated/Upgrades | NoneNoted | 2UpdBaths | -8,000 | NoneNoted | | UpdKitchen | -6,000 |
| Net Adjustment (Total) | | [ ] + [X] - | -2,628 | [X] + [ ] - | 6,032 | [X] + [ ] - | 27,570 |
| Adjusted Sale Price of Comparables | | Net Adj. 0.5 % Gross Adj. 2.7 % | $ 492,372 | Net Adj. 1.3 % Gross Adj. 3.1 % | $ 456,032 | Net Adj. 6.5 % Gross Adj. 9.3 % | $ 454,570 |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [X] did [ ] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) Courthouse Records/DayMLS&CinMLS

My research [ ] did [ ] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) Courthouse Records/DayMLS&CinMLS

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 11/09/2020 | 08/18/2018 | 05/27/2005 | 08/28/2018 |
| Price of Prior Sale/Transfer | $442,000 | $380,000 | $338,838 | $386,000 |
| Data Source(s) | WarrenCountyAuditorWeb | WarrenCountyAuditorWeb | WarrenCountyAuditorWeb | WarrenCountyAuditorWeb |
| Effective Date of Data Source(s) | 05/14/2022 | 05/14/2022 | 05/14/2022 | 05/14/2022 |

Analysis of prior sale or transfer history of the subject property and comparable sales

Prior transfer of the subject is only listed on the auditor site and no further information is available during the normal course of business.No prior sales of the comparables within the past 12 months unless reported below or under Comps 4-6 page:

Summary of Sales Comparison Approach

My search included sales from the past year within the neighborhood boundaries, defined on previous page. My comparable search included sales and listings most similar to the subject and ones included in the report are believed to be the most similar. My search included all 2story dwellings,3218-4418 sf of GLA, 2-40 yrs old, C2-C4 condition and similar quality. Due to a lack of sales more similar to the subject, I used sales that sold over 90 days and 6 months ago, as well as over a 1/2 mile away. Comp1 is weighted heaviest and used for very similar GLA and finished basement area,limited updates,under 20 yrs old. Comp2 (sold 05/07/2021) is used and weighted 2nd for finished basement area and lack of updates, but not weighted heavier due to larger GLA difference. Comp3 is used and weighted 3rd for most similar GLA, same PUD as subject,limited update,but not weighted heavier due to unfinished basement and sold well over a year ago. It sold over a year ago, used for an extreme lack of similar sales from the subject's PUD, selling in the past year. APPRAISAL FEE IS $400, BUT A FEE IS CHARGED BACK TO ME.

Indicated Value by Sales Comparison Approach $ 470,000

Indicated Value by: Sales Comparison Approach $ 470,000    Cost Approach (if developed) $ 488,227    Income Approach (if developed) $

The Sales Comparison Approach was given the most weight in determining the final estimated value since it appears to be the most reliable indicator of the value in the current local market. The Cost Approach is not deemed reliable, due to the difficulty in estimating accrued depreciation and the constant fluctuation of costs for materials. The Income Approach was not requested, and subject is not a rental, thus not completed.

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

It is assumed that no major problems exist with the subject's integral components.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 470,000 as of 05/14/2022 , which is the date of inspection and the effective date of this appraisal.

## Uniform Residential Appraisal Report

20221031140104

File # USB-220506-02084-1

**ADDITIONAL COMMENTS**

I have two offices I work out of. One is 529 Ramsgate Dr., Dayton, OH 45430; the other is 7686 Cincinnati Dayton Rd, West Chester, OH
I USE LOCAL, RAPATONI MLS OF GREATER CINCINNATI, AND DAYTON MLS. I USE COUNTY AUDITOR SITE, LOCAL REALTORS, ZILLOW.COM, TRULIA.COM, AND LOCAL NEWSPAPER. THE SUBJECT IS WITHIN 20 MILES OF APPRAISER'S OFFICE OR HOME, AS THIS APPRAISER LIVES IN BEAVERCREEK, VERY CLOSE TO DAYTON, AND MY OFFICE IS IN CINCINNATI. I HAVE APPRAISED IN THE SUBJECT'S MARKET FOR OVER 22 YEARS, AND IN THE PAST YEAR I HAVE APPRAISED OVER 10 HOMES IN THE SUBJECT'S MARKET. DURING THE PAST 22 YEARS I HAVE HAD APPRAISAL OFFICES IN MONTGOMERY COUNTY, GREENE COUNTY, BUTLER COUNTY, AND HAMILTON COUNTY AND I AM VERY FAMILIAR WITH ALL MARKETS IN THOSE COUNTIES, AS WELL AS BORDERING COUNTIES.
I HAVE NOT PERFORMED ANY SERVICES ON THE SUBJECT PROPERTY IN THE PAST THREE YEARS.The market value is the value the subject should sell for, if listed today, within an exposure time of 60 days, preceding the date of this appraisal.

Some listings may have sold for many days below or above the marketing time noted. This is typically due to initial list price being too high or too low, or the season in which the property is listed .

No special assessments reported or known.  NO EXTERNAL OBSOLESCENCE IS NOTED. There is no gas or oil drilling or leased on the subject property.

Due to updates and upgrades over the years, the subject's effective age is much less than its actual age.

No personal property is included within the estimate value of the subject, and appraiser has no training in the valuation of personal property, whatsoever.

The subject is above predominant values due to its much larger GLA compared to all dwellings in the market.

CONDITION ADJUSTMENTS, WITHIN THE CONDITION FIELD ON THE GRID, ARE BASED ON THE DEFINITIONS PROVIDED WITHIN THIS REPORT. FURTHER ADJUSTMENTS, I MAY BELIEVE THAT GO BEYOND THESE STRICT AND MINIMAL RANGE OF DEFINITIONS, CAN BE FOUND AT THE BOTTOM OF THE GRID. THIS IS WHERE ADJUSTMENTS FOR UPGRADES, UPDATES, OR DATED MATERIALS ARE MADE. DATED EXAMPLES WOULD BE, BUT NOT LIMITED TO: WORN CARPET; WALLS WITH DAMAGE OR DISCOLORING; STAINS ON WALLS OR CARPETS; MISSING PIECES OF WAINSCOTT; OLDER KITCHEN CABINETS;  OLDER ROOF;  OUTDATED WALLPAPER,ETC.
 I avoided the use of REO homes and homes with limited exposure time.

THE SUBJECT'S PUD INCLUDES SHARED GREEN SPACES, EXERCISE ROOM, PLAY AREA,POOL, PROFESSIONAL MANAGEMENT.

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

Site value is based on extraction method.

| | | | | |
|---|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE ............................................. =$ | | | 110,000 |
| Source of cost data  Marshall and Swift Estimator | Dwelling  3,818 | Sq. Ft. @ $ 82.50 | ............ =$ | 314,985 |
| Quality rating from cost service  Aavg    Effective date of cost data  05/14/2022 | Baseme 1,816 | Sq. Ft. @ $ 35.00 | ............ =$ | 63,560 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | =$ | |
| The estimated remaining economical life of the property is 64 years | Garage/Carport  442 | Sq. Ft. @ $ 30.00 | ............ =$ | 13,260 |
| | Total Estimate of Cost-New .......................... =$ | | | 391,805 |

| Less | Physical | Functional | External | | |
|---|---|---|---|---|---|
| Depreciation | 33,578 | | | =$ ( | 33,578 ) |
| | Depreciated Cost of Improvements ................................ =$ | | | | 358,227 |
| | "As-is" Value of Site Improvements ................................ =$ | | | | 20,000 |
| Estimated Remaining Economic Life (HUD and VA only)          64 Years | Indicated Value by Cost Approach ................................ =$ | | | | 488,227 |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| | | | |
|---|---|---|---|
| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
| Summary of Income Approach (including support for market rent and GRM) | | | |

### PROJECT INFORMATION FOR PUDs (if applicable)

**PUD INFORMATION**

Is the developer/builder in control of the Homeowners' Association (HOA)?          ☐ Yes ☒ No    Unit type(s)  ☒ Detached  ☐ Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | | Total number of units | | Total number of units sold | |
|---|---|---|---|---|---|
| Total number of units rented | | Total number of units for sale | | Data source(s) | |

Was the project created by the conversion of existing building(s) into a PUD?          ☐ Yes   ☐ No  If Yes, date of conversion
Does the project contain any multi-dwelling units?          ☐ Yes   ☐ No  Data source(s)
Are the units, common elements, and recreation facilities complete?          ☐ Yes   ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?          ☐ Yes   ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities

20221031140104
20221031140104
File # USB-220506-02084-1

# Uniform Residential Appraisal Report

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK**: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**Uniform Residential Appraisal Report**

20221031140104
File # USB-220506-02084-1

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

## Uniform Residential Appraisal Report

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION**: The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name   Kevin Henley | Name |
| Company Name   Henley Appraisals | Company Name |
| Company Address   529 Ramsgate Dr | Company Address |
| Dayton , OH 45430 | , |
| Telephone Number   513-290-4400 | Telephone Number |
| Email Address   khenleyappraisals@gmail.com | Email Address |
| Date of Signature and Report   05/18/2022 | Date of Signature |
| Effective Date of Appraisal   05/14/2022 | State Certification # |
| State Certification #   2008004175 | or State License # |
| or State License # | State |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License |
| State   OH | |
| Expiration Date of Certification or License   06/01/2023 | SUBJECT PROPERTY |

ADDRESS OF PROPERTY APPRAISED

265 Woodstream Dr

Springboro , OH 45066

APPRAISED VALUE OF SUBJECT PROPERTY $   470,000

LENDER/CLIENT

Name   Red Sky Risk Services, LLC

Company Name   U.S. Bank, N.A.

Company Address   1050 Woodward Avenue

Detroit , MI 48226

Email Address

**SUBJECT PROPERTY**

☐ Did not inspect subject property

☐ Did inspect exterior of subject property from street

Date of Inspection

☐ Did inspect interior and exterior of subject property

Date of Inspection

**COMPARABLE SALES**

☐ Did not inspect exterior of comparable sales from street

☐ Did inspect exterior of comparable sales from street

Date of Inspection

## Uniform Residential Appraisal Report
20221031140104

File # USB-220506-02084-1

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 265 Woodstream Dr Springboro, OH 45066 | 8835 Winton Hills Ct Springboro, OH 45066 | | 8837 Glen Abby Ct Springboro, OH 45066 | | | |
| Proximity to Subject | | 0.66 miles SW | | 0.71 miles SW | | | |
| Sale Price | $ | $ | 503,000 | $ | 465,000 | $ | |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 155.44 sq.ft. | | $ 111.01 sq.ft. | | $ sq.ft. | |
| Data Source(s) | | DayMls#846736;DOM 54 | | DayMls#844324;DOM 44 | | | |
| Verification Source(s) | | WarrenCountyAuditorPRC/Realtor | | WarrenCountyAuditorPRC/Realtor | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sale or Financing | | ArmLth | | ArmLth | | | |
| Concessions | | Conv;0 | | Conv;0 | | | |
| Date of Sale/Time | | s10/21;c08/21 | | s08/21;c07/21 | | | |
| Location | N;Res; | N;Res; | | N;Res; | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | | |
| Site | 9932 sf | 2.75 ac | -14,000 | 27482 sf | -3,000 | | |
| View | N;Res; | B;ResWoods; | -12,000 | N;Res; | | | |
| Design (Style) | DT2;Colonial | DT2;Colonial | | DT2;Colonial | | | |
| Quality of Construction | Q3 | Q3 | | Q3 | | | |
| Actual Age | 10 | 39 | 0 | 38 | 0 | | |
| Condition | C3 | C3 | | C3 | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | 0 | Total Bdrms. Baths | 0 | Total Bdrms. Baths | |
| Room Count | 11 4 2.1 | 10 4 2.1 | | 11 4 3.1 | -8,000 | | |
| Gross Living Area | 3,818 sq.ft. | 3,236 sq.ft. | +13,968 | 4,189 sq.ft. | -8,904 | sq.ft. | |
| Basement & Finished | 1816sf1544sfin | 1568sf900sfwo | +800 | 1854sf400sfwo | +4,800 | | |
| Rooms Below Grade | 1rr1br0.0ba1o | 1rr0br0.1ba0o | -2,000 | 1rr0br1.0ba0o | -4,000 | | |
| Functional Utility | Average | Average | | Average | | | |
| Heating/Cooling | FWA/CA | FWA/CA | | FWA/CA | | | |
| Energy Efficient Items | NoneNoted | NoneNoted | | NoneNoted | | | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | | |
| Porch/Patio/Deck | UnPorLUdkLupt | CovPorLrgUndk | -500 | CporUpatLrUdk | -1,000 | | |
| Exterior Materials | VinBrickStone | BrickStucWood | 0 | BrckStucConbrd | 0 | | |
| Extra Amenities In/Out | 2FirplacFence | 2FireplacePool | -5,000 | 3FireplacePool | -5,000 | | |
| Updates/Dated/Upgrades | NoneNoted | NoneNoted | | Dated | +23,250 | | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -18,732 | ☐ + ☒ - | $ -1,854 | ☐ + ☐ - | $ |
| Adjusted Sale Price of Comparables | | Net Adj. 3.7 % Gross Adj. 9.6 % | $ 484,268 | Net Adj. 0.4 % Gross Adj. 12.5 % | $ 463,146 | Net Adj. % Gross Adj. % | $ |

Summary of Sales Comparison Approach

\* OVERFLOW - SEE "ADDITIONAL FIELD TEXT ADDENDA" \*

| ITEM | SUBJECT | COMPARABLE SALE #4 | COMPARABLE SALE #5 | COMPARABLE SALE #6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 11/09/2020 | 07/12/1993 | 03/03/2011 | |
| Price of Prior Sale/Transfer | $442,000 | $0 | $0 | |
| Data Source(s) | WarrenCountyAuditorWeb | WarrenCountyAuditorWeb | WarrenCountyAuditorWeb | |
| Effective Date of Data Source(s) | 05/14/2022 | 05/14/2022 | 05/14/2022 | |

Analysis of prior sale or transfer history of the subject property and comparable sales

20221031140104

ADDITIONAL FIELD TEXT

File # USB-220506-02084-1

| Borrower/Client | DIANA DAVOLI-TURNER | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code 45066 |
| Lender | U.S. Bank, N.A. | | | | | |

COMMENT SALES COMPARE COMPS 4-6

Comps 4 and 5 are used due to an extreme lack of more similar sales that sold within the past year, where 2 comps over a year were used, I added two other sales, not as similar as those two, but sold in the past year. Comp4 is weighted 4th and used for lack of updates, but not weighted heavier due to much larger lot size and much smaller GLA. Comp5 is used for bracketing of subject's GLA and lack of more similar sales that bracket subject's GLA. It is weighted last due to dated,interior wallpaper, bathrooms and kitchen.

ALL ADJUSTMENTS AND LACK OF ADJUSTMENTS ARE BASED ON RESULTS FROM A PAIRED SALES (DATA) ANALYSIS, IN WHICH I COMPARED SIMILAR SALES WITH THEIR DIFFERENT OR SIMILAR ATTRIBUTES, EXTRAPOLATING CONTRIBUTORY VALUE,OR LACK OF CONTRIBUTORY VALUE. AFTER THESE EXTRAPOLATIONS, I APPLIED MY ESTIMATED RESULTS TO THE SALES COMPARISON GRID. I HAVE REPORTED ADJUSTMENTS TO THE COMPARABLE SALES THAT REFLECT THE MARKET'S REACTION TO THE DIFFERENCES BETWEEN THE SUBJECT PROPERTY AND COMPARABLE SALES. THE LOGIC AND REASONING WAS DERIVED FROM THIS METHOD, SUPPORTED AND USED BY MY APPRAISER PEERS. THE FOLLOWING NARRATION IS A BRIEF SUMMARY OF HOW THE ADJUSTMENTS WERE DERIVED.

A 5% adjustment is supported for 5% appreciation, when this market appreciated at this rate from 10/20-04/21, since has remained stable. There is no value difference for lot sizes that have less than a 5,000 sq ft difference. A lot size adjustment is warranted at about $1000 for every 5,000 sq ft, estimated, up to 2 acres. A CDS or wooded lot is valued at about $6000 more than typical lots and a lot on a CDS and with woods, contributes $12,000. There is no value difference for style differences. No age adjustments are supported once dwellings are over 10 yrs old or within 10 yrs of each other, over 5 yrs old. There is no value difference for differences in room counts. There is no value difference for bedrooms once 3 bedrooms are accounted for. A full bath and 1/2 bath contribute about $8000 and $4000 to market value, above grade and respectively. GLA was supported at about $24.00 per square foot, in relation to sales of Q3 quality, over 3000 sf of GLA. There is no value difference noted for different sizes of basements, but finished area contributes about $8.00 per sq ft of finished area, up to 1000 sf. No value difference not for different types of rooms below grade, except bathrooms. A bathroom and 1/2 bathroom, below grade, contributes $4000 and $2000 to market value, respectively. A walk-out basement doesn't contribute to market value in this neighborhood. There is no value difference for driveway count difference. Covered porches, covered patios, covered decks or larger porches,patios and decks contribute $2000 to market value. Open porches, decks and patios contribute $1000. No siding adjustments are warranted. Fences and fireplaces do not contribute to market value. An upgraded kitchen contributes about $12000 to market value; updated kitchens contribute about $6000; upgraded bathrooms contribute $6000 and updated bathrooms contribute $4000. A dated property is valued about 5% less than a property that is not dated. There is no value for properties being from different PUDs or for having different HOA fees or ammenities. Typically, fees are higher for more ammenties and less for less ammenties.

2022103114010 4

TEXT ADDENDUM

File # USB-220506-02084-1

| | |
|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER |
| Property Address | 265 Woodstream Dr |
| City Springboro | County Warren State OH Zip Code 45066 |
| Lender | U.S. Bank, N.A. |

Supplemental Addendum [Multi-page]
Henley Appraisals


In accordance with your request, we have appraised this property. The report of that appraisal follows.

The purpose of this appraisal is to estimate the fair market value of the property described in this appraisal report,

as improved, in unencumbered fee simple title of ownership.


This report is based on a physical inspection and analysis of the site and improvements, a locational analysis of the

neighborhood and city, and an economical analysis of the market for properties such as the subject. The appraisal

was developed and the report was prepared in accordance with the Uniform Standards of Professional Appraisal

Practice.


The value conclusions reported are as of the effective date stated in the body of the report and contingent upon the

certification and limiting conditions attached.

It has been a pleasure to assist you. Please do not hesitate to contact me or any of my associates if we can be of any

additional service to you.


Sincerely,



Kevin Henley

Supplemental Addendum [Multi-page]
The appraiser certifies and agrees that this appraisal was prepared in accordance with the requirements of Title XI of the Financial Institutions, Reform, Recovery, and Enforcement Act (FIRREA) of 1989, as amended (12 U.S.C. 3331 et seq.), and any applicable implementing regulations in effect at the time the appraiser signs the appraisal certification.

 The Sixth Edition of The Dictionary of Real Estate Appraisal by the Appraisal Institute defines highest and best use as: The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible and that results in the highest value. The subject is a legally permissible use based on its current zoning. Also, the lot size, shape and land-to-building ratio allow the present structure and indicate a good utilization of the improvements. Based on current market conditions, the existing structure as a single family residence is its financially feasible and maximally productive use. The highest and best use, as if vacant, would be to construct a single family residence.Highest and best use of property is as it is being used and how it is legally zoned, conforming to other similar properties in its neighborhood.

 All public utilities and appliances were on at the time of the site visit and  appear to be operational.  The garage was observed with the same consistency as the dwelling and no issues noted..

  UAD DESCRIPTIONS ARE USED IN ALL OF IMPROVEMENTS AREA, AS EXPECTED PER UAD PROTOCOL. WITHIN UAD DIRECTIVES, THERE IS NO DIRECTION ON USING AVERAGE, GOOD, FAIR, BELOW AVERAGE, POOR, TYPICAL, NEUTRAL, GOOD+, -AVERAGE, ETC. THERE IS, HOWEVER, DIRECTIVES TO USE C1-C6, AND THIS IS NOT EXCLUSIVE TO OVERALL CONDITION. SIMPLY STATED, THE UAD PROTOCOL, WITH REGARDS TO IMPROVEMENTS SECTION, ONLY REFERS TO THE C1-C6 RATINGS.

In addition to providing an estimate of value, the appraisal provides an examination of the property for any visible, obvious and/or apparent deficiencies that may affect the livability of the property in terms of basic needs, health and safety of the occupants. This information is not warranted.Buyers/borrowers must determine for themselves that the condition of the property is acceptable.

This appraiser has made a "complete" interior and exterior site visit of the subject property. This means that the appraiser has walked around the exterior of the subject property at ground level. An interior walk through of all habitable area has been made. No personal property was moved and the inspection is considered non-invasive.

Even though a reader or user of this appraisal may consider broad streets, RR tracks, creeks or rivers, as neighborhood dividers, the neighborhood boundaries are, as defined, on the first page of the URAR. The boundaries are discussed within this report. Properties located on any side of large artery roads or across creeks or other, large man-mad structures does not change market value or marketability, as long as located within the neighborhood boundaries defined on the URAR, or if discussed here, or anywhere within the report.

Verification source was my drive by, verifying comps exist and matches MLS, as well as any sales agents I called who viewed the interior of comparable sales, but were not involved in their respective transactions. This list is provided by the listing agent, who keeps records of agents who "showed" the properties.

Exposure time is always presumed to precede the effective date of the appraisal. It is the estimated length of time the property would have been offered on the market, prior to the hypothetical sale, at the appraised value, on the effective date of the appraisal. It is a retrospective estimate based on an analysis of past events assuming a competitive and open market. This includes not only adequate, sufficient and reasonable time, but adequate, sufficient and reasonable effort. It is often expressed as a range and is based on the following:
1. Statistical information about days on the market, most commonly obtained from the local Multiple Listing Service.
2. Information gathered through sales verification.
3. Interviews with market participants.

Exposure time of 60 DAYS is based on the analyses of current market trends in the general area and takes into account the size, condition and price range of the subject property and surrounding area. It presupposes that the listed price would be at or near the appraised value. It also assumes aggressive professional marketing by reputable local real estate offices . Exposure time can vary widely for a number of variables in this particular market.

There is a difference in adjusted price ranges due to the differences in comparable sales that are larger or more different with regards to their differences when being compared to the subject, individually. Comparables are compared to the subject within the Sales Comparison Approach, not compared to each other. These sales most represent the subject in most regards, but some are better, larger, have more amenities than the subject, but much more than they have from each other.  The subject, overall, falls somewhere between the low and high values, but weighted as discussed.

***CONTINUED ON NEXT PAGE***

20221031140104

TEXT ADDENDUM

File # USB-220506-02084-1

| | |
|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER |
| Property Address | 265 Woodstream Dr |
| City | Springboro     County   Warren     State   OH     Zip Code   45066 |
| Lender | U.S. Bank, N.A. |

Sales are used if they have one or two items similar to the subject, or bracket certain line items, such as GLA. This practice leads to larger differences in adjusted sales price, as well.
THERE ARE NO LAWS, GUIDELINES, REGULATIONS FOR THE SUBJECT, PERTAINING TO SMOKE OR CARBON MONOXIDE DETECTORS.
FEMA HAS DECLARED THE SUBJECT'S MARKET , AS WELL AS THE ENTIRE US, A DISASTER AREA DUE TO COVID 19, AS OF
03/31/2020. THIS DOES NOT APPEAR TO HAVE AN AFFECT ON MARKET  VALUE OR MARKETABILITY.
I USE ANSI MEASUREMENTS AND GUIDELINES WHEN CALCULATING THE GLA AND LIVING AREA.
I WAS ASKED TO ADDRESS SALES DUE TO THE FOLLOWING REASONING: An online source did reveal some closed sales with less than a mile
from the subject.  That being said, there are at least 40 other sales that sold in the past year, within a mile from subject. There was no other
reasoning given for me to address the following sales:30 willow Grove Dr 45 Willow Grove Dr, and 285 Wood stream Dr.

30 Willow Grove only has 3052 sf of GLA, too small to use
45 Willow Grove only has 2949 sf of GLA, too small to use
285 Wood Stream only has 2696 sf of GLA, too small to use.

The GLA of all of the preceding sales is available on the Warren County Auditor site.

As reported on my appraisal, ".....My search included all 2story dwellings,3218-4418 sf of GLA, 2-40 yrs old,  C2-C4 condition and similar quality......"

20221031140104

# INVOICE

File No. _____ USB-220506-02084-1

Invoice #    USB-220506-02084-1

Invoice Date   05/16/2022

Fee      400.00

Due Date    _____

Lender or Client: _____

Borrower:   DIANA DAVOLI-TURNER

265 Woodstream Dr

Springboro     OH    45066

| Item | Cost |
|------|------|
| FULL APPRAISAL WITH LENDER REQUIREMENTS | 400.00 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| **Total Amount Due** | 400.00 |

Terms

Please remit payment to:   KEVIN HENLEY

HENLEY APPRAISALS

529 RAMSGATE DR

DAYTON      OH    45430

**Thank you**

20221031140104
2022103114010#

## USPAP COMPLIANCE ADDENDUM

File No.   USB-220506-02084-1

| SUBJECT |
|---|

Borrower   DIANA DAVOLI-TURNER

Property Address   265 Woodstream Dr

City   Springboro          County   Warren          State   OH          Zip Code   45066

Lender/Client   U.S. Bank, N.A.

| PURPOSE OF THE APPRAISAL |
|---|

As reported

| SCOPE OF-THE APPRAISAL |
|---|

As noted and complying with Appraisal reporting requirements within standards 2-2.(a) and client requirements.

| REPORT OF THE PRIOR YEAR SALES HISTORY FOR THE SUBJECT PROPERTY |
|---|

Is the subject property currently listed?          ☐ Yes   ☒ No          List Price $ _____

Has the property sold during the prior year?          ☐ Yes   ☒ No          If yes, describe below:

| MARKETING TIME |
|---|

What is your estimate of marketing time for the subject property?   60 days          Describe below the basis (rationale) for your estimate:

Based on other similar sales in the market.

| NON-REAL PROPERTY TRANSFERS |
|---|

Does the transaction involve the transfer of personal property, fixtures, or intangibles that are not real property?          ☐ Yes   ☒ No

If yes, provide description and valuation below:

| ADDITIONAL LIMITING CONDITIONS OR ADDITIONAL COMMENTS |
|---|

None added.

| ADDITIONAL CERTIFICATION STATEMENTS OR ADDITIONAL COMMENTS |
|---|

I have not performed any services on the subject property in the past three years.

DO DUE LENDER BRACKETING RULES OR GUIDELINES, THERE IS A CHANCE  COMPARABLE SALES USED ARE LESS LIKE THE SUBJECT THAN OTHER POSSIBLE SALES NOT USED JUST TO BRACKET ONE OR MORE BRACKETING ITEMS.  IF THIS IS THE CASE, I WILL TYPICALLY ADD A STATEMENT THAT THE COMP WAS USED FOR THAT PURPOSE.

Date:   05/18/2022          Appraiser(s):

Kevin Henley

Date: _____          Review Appraiser(s):

20221031140104

## APPRAISER DISCLOSURE STATEMENT
### In Compliance with Ohio Revised Code Section 4763.12 (C)

File No.   USB-220506-

**Name of Appraiser:**    Kevin Henley

**Class of Certification/Licensure:**   
- _____ Certified General
- **YES** Certified Residential
- _____ Licensed Residential
- _____ Temporary _____ General **YES** Licensed

**Certification/Licensure Number:**    2008004175

**Scope:**   **This Report**   **YES**   is within the scope of my Certification or License.

  _____ is not within the scope of my Certification or License.

**Service Provided by:**   **YES**   Disinterested & Unbiased Third Party

  _____ Interested & Biased Third Party

  _____ Interested Third Party on Contingent Fee Basis

**Signature of person preparing and reporting the Appraisal:**

This form must be included in conjunction with all appraisal assignments or specialized services performed by a state-certified or state-licensed real estate appraiser

**State of Ohio**
**Department of Commerce**
**Division of Real Estate Appraiser Section**
**Cleveland (216) 787-3100**

20221031140104

# USPAP ADDENDUM

20221031140104

File No. USB-220506-02084-1

| | |
|---|---|
| Borrower | DIANA DAVOLI-TURNER |
| Property Address | 265 Woodstream Dr |
| City Springboro | County Warren | State OH | Zip Code 45066 |
| Lender | U.S. Bank, N.A. |

**This report was prepared under the following USPAP reporting option:**

☒ **Appraisal Report**  This report was prepared in accordance with USPAP Standards Rule 2-2(a).

☐ **Restricted Appraisal Report**  This report was prepared in accordance with USPAP Standards Rule 2-2(b).

**Reasonable Exposure Time**

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is: 60 Days

**Additional Certifications**

I certify that, to the best of my knowledge and belief:

☒ I have **NOT** performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

☐ I **HAVE** performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

— The statements of fact contained in this report are true and correct.
— The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
— Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
— I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
— My engagement in this assignment was not contingent upon developing or reporting predetermined results.
— My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
— My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
— Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
— Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

**Additional Comments**

**APPRAISER:**

Signature:
Name: Kevin Henley
Date Signed: 05/18/2022
State Certification #: 2008004175
or State License #:
or Other (describe) _____ State # _____
State: OH
Expiration Date of Certification or License: 06/01/2023
Effective Date of Appraisal: 05/14/2022

**SUPERVISORY APPRAISER: (only if required)**

Signature:
Name:
Date Signed:
State Certification #:
or State License #:
State:
Expiration Date of Certification or License:
Supervisory Appraiser Inspection of Subject Property:
☐ Did Not  ☐ Exterior-only from Street  ☐ Interior and Exterior

USPAP 2014                                                  AI Ready

2022103114d0104
2022103114d0104
File # USB-220506-02084-

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
### (Source: UAD Appendix D: UAD Field-Specific Standardization Requirements)

## Condition Ratings and Definitions

### C1
The improvements have been very recently constructed and have not previously been occupied. The entire structure and all components are new and the dwelling features no physical depreciation.*

*Note: Newly constructed improvements that feature recycled materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100% new foundation and the recycled materials and the recycled components have been rehabilitated/re-manufactured into like-new condition. Recently constructed improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (i.e., newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).*

### C2
The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

### C3
The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

### C4
The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

### C5
The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminish d due to condition, but the dwelling remains useable and functional as a residence.

### C6
The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

## Quality Ratings and Definitions

### Q1
Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinement s and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

### Q2
Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

### Q3
Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

### Q4
Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

### Q5
Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available and basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

### Q6
Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure.

## Definitions of Not Updated, Updated, and Remodeled

### Not Updated
**Little or no updating or modernization. This description includes, but is not limited to, new homes.**
Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical /functional deterioration.

### Updated
**The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.**
An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure .

### Remodeled
**Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/ or expansion.**
A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

## Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases. Quarter baths (baths that feature only a toilet) are not included in the bathroom count. The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

AI Ready

## Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Appropriate Fields |
|---|---|---|
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| A | Adverse | Location & View |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| B | Beneficial | Location & View |
| Cash | Cash | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| Comm | Commercial Influence | Location |
| c | Contracted Date | Date of Sale/Time |
| Conv | Conventional | Sale or Financing Concessions |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| DOM | Days On Market | Data Sources |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| Ind | Industrial | Location & View |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| Listing | Listing | Sale or Financing Concessions |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| BsyRd | Busy Road | Location |
| o | Other | Basement & Finished Rooms Below Grade |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA –Rural Housing | Sale or Financing Concessions |
| s | Settlement Date | Date of Sale/Time |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| WtrFr | Water Frontage | Location |
| Wtr | Water View | View |
| Woods | Woods View | View |

## Other Appraiser-Defined Abbreviations

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

## SUBJECT PHOTOGRAPH ADDENDUM

File #   USB-220506-02084-1

| | |
|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER |
| Property Address | 265 Woodstream Dr |

City   Springboro   County   Warren   State   OH   Zip Code   45066

Lender   U.S. Bank, N.A.



**FRONT OF SUBJECT PROPERTY**

Subject Front

265 Woodstream Dr



**REAR OF SUBJECT PROPERTY**

Subject Rear

265 Woodstream Dr



**STREET SCENE**

Subject Street

265 Woodstream Dr

20221031140104

## ADDITIONAL PHOTOGRAPH ADDENDUM

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER | | | | File # | USB-220506-02084-1 |
| Property Address | 265 Woodstream Dr | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code 45066 |
| Lender | U.S. Bank, N.A. | | | | | |



Bedroom



Sitting Room



Office

20221031140104

## ADDITIONAL PHOTOGRAPH ADDENDUM

| | | | | |
|---|---|---|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER | | | File # USB-220506-02084-1 |
| Property Address | 265 Woodstream Dr | | | |
| City | Springboro | County Warren | State OH | Zip Code 45066 |
| Lender | U.S. Bank, N.A. | | | |



Landing



Mud Room



Laundry closet

## ADDITIONAL PHOTOGRAPH ADDENDUM

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER | | | | File # | USB-220506-02084-1 |
| Property Address | 265 Woodstream Dr | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | U.S. Bank, N.A. | | | | | |



Half Bathroom



Bathroom 1



Bathroom 2

## ADDITIONAL PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER |
| Property Address | 265 Woodstream Dr |
| City | Springboro County Warren State OH Zip Code 45066 |
| Lender | U.S. Bank, N.A. |

File # USB-220506-02084-1



Bedroom



Bedroom



Bedroom

## ADDITIONAL PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER | File # USB-220506-02084-1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | U.S. Bank, N.A. | | | | | | |



Basement

rec-room



Basement

bedroom



basement

media room

## ADDITIONAL PHOTOGRAPH ADDENDUM

File # USB-220506-02084-1

| | |
|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER |
| Property Address | 265 Woodstream Dr |
| City Springboro | County Warren State OH Zip Code 45066 |
| Lender | U.S. Bank, N.A. |



garage



opposite street view



Left side

20221031140104

## ADDITIONAL PHOTOGRAPH ADDENDUM

| | | | File # | USB-220506-02084-1 |
|---|---|---|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER | | | |
| Property Address | 265 Woodstream Dr | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | U.S. Bank, N.A. | | | |



Right side



Living room



Family Room

20221031140104

## ADDITIONAL PHOTOGRAPH ADDENDUM

| | | | | | File # | USB-220506-02084-1 |
|---|---|---|---|---|---|---|

| Borrower/Client | DIANA DAVOLI-TURNER | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code 45066 |
| Lender | U.S. Bank, N.A. | | | | | |



Dining Room



Kitchen

20221031140104

## COMPARABLES PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER |
| Property Address | 265 Woodstream Dr |
| City | Springboro |
| County | Warren |
| State | OH |
| Zip Code | 45066 |
| Lender | U.S. Bank, N.A. |

File # USB-220506-02084-1



**Comparable Sale 1**

21 Stanton Dr

Springboro          OH     45066

Date of Sale:  s10/21;c08/21

Sale Price:    495,000

Sq. Ft.:       3,615

$  / Sq. Ft.:  136.93



**Comparable Sale 2**

190 Stanton Dr

Springboro          OH     45066

Date of Sale:  s05/21;c03/21

Sale Price:    450,000

Sq. Ft.:       3,400

$  / Sq. Ft.:  132.35



**Comparable Sale 3**

266 Woodstream Dr

Springboro          OH     45066

Date of Sale:  s10/20;c09/20

Sale Price:    427,000

Sq. Ft.:       3,663

$  / Sq. Ft.:  116.57

## COMPARABLES PHOTOGRAPH ADDENDUM

20221031140104

| | |
|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER |
| Property Address | 265 Woodstream Dr |
| City | Springboro |

County Warren  State OH  Zip Code 45066

Lender U.S. Bank, N.A.

File # USB-220506-02084-1



**Comparable Sale 4**

8835 Winton Hills Ct

Springboro  OH  45066

Date of Sale: s10/21;c08/21

Sale Price: 503,000

Sq. Ft.: 3,236

$ / Sq. Ft.: 155.44



**Comparable Sale 5**

8837 Glen Abby Ct

Springboro  OH  45066

Date of Sale: s08/21;c07/21

Sale Price: 465,000

Sq. Ft.: 4,189

$ / Sq. Ft.: 111.01

**Comparable Sale 6**

Date of Sale:

Sale Price:

Sq. Ft.:

$ / Sq. Ft.:

20221031140104

## LOCATION MAP ADDENDUM

| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER | | | | File # USB-220506-02084-1 |
| Property Address | 265 Woodstream Dr | | | | |
| City Springboro | | County Warren | State OH | Zip Code 45066 | |
| Lender U.S. Bank, N.A. | | | | | |



20221031140104

**SKETCH ADDENDUM**

File # USB-220506-02084-1

| | |
|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER |
| Property Address | 265 Woodstream Dr |
| City Springboro | County Warren State OH Zip Code 45066 |
| Lender | U.S. Bank, N.A. |

| Living Area | Calculation Details | |
|---|---|---|
| FirstFloor | 1815.75 Sq ft | $0.5 \times 2.5 \times 2.5 = 3.12$ |
| | | $0.5 \times 2.5 \times 2.5 = 3.12$ |
| | | $15 \times 2.5 = 37.5$ |
| | | $46 \times 32 = 1472$ |
| | | $25 \times 12 = 300$ |
| SecondFloor | 2001.75 Sq ft | $0.5 \times 2.5 \times 2.5 = 3.12$ |
| | | $0.5 \times 2.5 \times 2.5 = 3.12$ |
| | | $15 \times 2.5 = 37.5$ |
| | | $46 \times 36 = 1656$ |
| | | $10 \times 11 = 110$ |
| | | $10 \times 8 = 80$ |
| | | $14 \times 8 = 112$ |
| **Total Living Area (Rounded):** | **3818 Sq ft** | |
| **Non-living Area** | | |
| 2CarAttGarage | 442 Sq ft | $21 \times 20 = 420$ |
| | | $11 \times 2 = 22$ |
| UncPorch | 18 Sq ft | $6 \times 3 = 18$ |
| LargeUncDck | 567.38 Sq ft | $21.5 \times 22 = 473$ |
| | | $2.5 \times 2.5 = 6.25$ |
| | | $0.5 \times 2.5 \times 2.5 = 3.12$ |
| | | $5 \times 15 = 75$ |
| | | $0.5 \times 5 \times 4 = 10$ |
| LargeUncPatio | 400 Sq ft | $20 \times 20 = 400$ |
| Basement | 1815.75 Sq ft | $0.5 \times 2.5 \times 2.5 = 3.12$ |
| | | $0.5 \times 2.5 \times 2.5 = 3.12$ |
| | | $15 \times 2.5 = 37.5$ |
| | | $46 \times 32 = 1472$ |
| | | $25 \times 12 = 300$ |

20221031140104

SKETCH ADDENDUM

| Borrower/Client | DIANA DAVOLI-TURNER | | | File # | USB-220506-02084-1 |
|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | U.S. Bank, N.A. | | | | |



TOTAL Sketch by a la mode, inc.

20221031140104

PLAT MAP ADDENDUM

File # USB-220506-02084-1

| | |
|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER |
| Property Address | 265 Woodstream Dr |
| City Springboro | County Warren State OH Zip Code 45066 |
| Lender | U.S. Bank, N.A. |



20221031140104

Aerial Map

| | | |
|---|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER | File # USB-220506-02084-1 |
| Property Address | 265 Woodstream Dr | |
| City | Springboro | County Warren | State OH | Zip Code 45066 |
| Lender | U.S. Bank, N.A. | |



SUBJECT
265 Woodstream Dr

| | |
|---|---|
| Borrower/Client | DIANA DAVOLI-TURNER |
| Property Address | 265 Woodstream Dr |
| City Springboro | County Warren State OH Zip Code 45066 |
| Lender | U.S. Bank, N.A. |



AN APPRAISER LICENSE/CERTIFICATE
has been issued under ORC Chapter 4763 to:

NAME:
Kevin Daniel Henley

LIC/CERT NUMBER:
2008004175

LIC LEVEL:
Certified Residential Real Estate Appraiser

CURRENT ISSUE DATE:
05/01/2022

EXPIRATION DATE:
06/01/2023

USPAP DUE DATE:
06/01/2023

Ohio Department of Commerce
Division of Real Estate & Professional Licensing

20221031140104

E AND O 2022 2023

File # USB-220506-02084-1

| Borrower/Client | DIANA DAVOLI-TURNER | | | | |
|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender | U.S. Bank, N.A. | | | | |



**HUDSON INSURANCE COMPANY**
100 William Street, 5th Floor
New York, NY 10038

## REAL ESTATE APPRAISERS ERRORS AND OMISSIONS INSURANCE POLICY DECLARATIONS

**NOTICE: THIS IS A "CLAIMS MADE AND REPORTED" POLICY. THIS POLICY REQUIRES THAT A CLAIM BE MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR AUTOMATIC EXTENDED REPORTING PERIOD.**

**THIS POLICY MAY CONTAIN PROVISIONS WHICH LIMIT THE AMOUNT OF CLAIM EXPENSES THE INSURER IS RESPONSIBLE TO PAY IN CONNECTION WITH CLAIMS. CLAIM EXPENSES SHALL BE SUBJECT TO ANY DEDUCTIBLE AMOUNT. THE PAYMENT OF CLAIM EXPENSES WILL REDUCE THE LIMITS OF LIABILITY STATED IN ITEM 4. OF THE DECLARATIONS. PLEASE READ YOUR POLICY CAREFULLY.**

### PLEASE READ THIS POLICY CAREFULLY.

**Policy Number:** PRA-2AX-1008976 **Renewal of:** PRA-2AX-1001490

1. **Named Insured:** Kevin D Henley

2. **Address:** 529 Ramsgate Drive
Dayton, OH 45430

3. **Policy Period:** **From:** April 8, 2022 **To:** April 8, 2023

12:01 A.M. Standard Time at the address of the **Named Insured** as stated in Number 2 above

4. **Limit of Liability** Each **Claim** Policy Aggregate

**Damages** Limit of Liability **A.** $1,000,000 **B.** $2,000,000
**Claims Expense** Limit of
Liability **C.** $1,000,000 **D.** $2,000,000

5. **Deductible** (Inclusive of **Claims** Expenses):

**5A.** $ 500 Each **Claim** **5B.** $ 1,000 Aggregate

6. **Policy Premium:** $560.00 **State Taxes/Surcharges:** $0.00

7. **Retroactive Date:** April 8, 2002

8. **Notice to Company:** Notice of a **Claim** or Potential **Claim** should be sent to:
Hudson Insurance Group

100 William Street, 5th Floor
New York, NY 10038

Fax: 646-216-3786
Email: hudsonclaims300@hudsoninsgroup.com

9. **A. Program Administrator:** Riverton Insurance Agency Corp.
**B. Agent/Broker:** OREP Insurance Services, LLC
(888) 347-5273

*IN WITNESS WHEREOF, We have caused this policy to be executed by our President and our Corporate Secretary at New York, New York*

President Secretary

PRA100 (01/20) P a g e | 1

20221031140104

AI Ready PDF Generated on 05/18/2022 8:10:53 AM

**EXHIBIT #4 – The Whitewashed Appraisal**

Davis Appraisal Group (937) 859-6273



# INVOICE

| INVOICE NUMBER |
| --- |
| 2305007 |
| **DATE** |
| 05/08/2023 |

**TO:**

Diana Turner
265 Woodstream Dr
Springboro, OH 45066

| Telephone Number: | Fax Number: |
| --- | --- |
| Alternate Number: | E-Mail: turner.cd15@gmail.com |

| REFERENCE | |
| --- | --- |
| Internal Order #: | 2305007 |
| Lender Case #: | |
| Client File #: | |
| Main File # on form: | 2305007 |
| Other File # on form: | |
| Federal Tax ID: | 31-1738403 |
| Employer ID: | |

## DESCRIPTION

| | | |
| --- | --- | --- |
| Lender: Diana Turner | Client: Diana Turner | |
| Purchaser/Borrower: n/a | | |
| Property Address: 265 Woodstream Dr | | |
| City: Springboro | | |
| County: Warren | State: OH | Zip: 45066 |
| Legal Description: Springs 3 Lot: 88 0.228 acres | | |

## FEES | AMOUNT

| | AMOUNT |
| --- | --- |
| Residential Appraisal | 550.00 |
| **SUBTOTAL** | 550.00 |

## PAYMENTS | AMOUNT

| | | | | AMOUNT |
| --- | --- | --- | --- | --- |
| Check #: | Date: | Description: | paid in full...Thank you | 550.00 |
| Check #: | Date: | Description: | | |
| Check #: | Date: | Description: | | |
| | | | **SUBTOTAL** | 550.00 |

| Payable Upon Inspection | **TOTAL DUE** | $ 0 |
| --- | --- | --- |

---

*Please Return This Portion With Your Payment*

**FROM:**

Diana Turner
265 Woodstream Dr
Springboro, OH 45066

| Telephone Number: | Fax Number: |
| --- | --- |
| Alternate Number: | E-Mail: turner.cd15@gmail.com |

**TO:**

Davis Appraisal Group
Davis Appraisal Group
PO Box 506
Miamisburg, OH 45343-0506

| AMOUNT DUE: | $ | 0 |
| --- | --- | --- |
| AMOUNT ENCLOSED: | $ | |

| INVOICE NUMBER |
| --- |
| 2305007 |
| **DATE** |
| 05/08/2023 |

| REFERENCE | |
| --- | --- |
| Internal Order #: | 2305007 |
| Lender Case #: | |
| Client File #: | |
| Main File # on form: | 2305007 |
| Other File # on form: | |
| Federal Tax ID: | 31-1738403 |
| Employer ID: | |



# Appraisal Report

## 265 Woodstream Dr
## Springboro, OH 45066

Davis Appraisal Group
(937) 859-6273
www.davisappraisalgroup.com

| Appraised Value as of: | 05/08/2023 |
|---|---|
| $ | 655,000 |

**FEATURES**

| | | | |
|---|---|---|---|
| Style/Design: | **colonial** | Lot Size: | **9,932 Sq.Ft.** |
| Living Area (Sq.Ft.): | **3,966** | Neighborhood: | **Clearcreek Township** |
| Total Bedrooms: | **4** | Total Baths: | **2.1** |
| Year Built: | **2012** | Effective Age: | **5** |
| Condition: | **above average** | Date of Report: | **05/09/2023** |

**PREPARED FOR**

| | |
|---|---|
| Client: | **Diana Turner** |
| Address: | **265 Woodstream Dr** |
| City: | **Springboro** State: **OH** Zip: **45066** |
| Phone: | Fax: |
| E-mail: | **turner.cd15@gmail.com** |

**PREPARED BY**

*Clark Davis*

Appraiser's Signature

| | |
|---|---|
| Name: | **Clark A Davis** |
| Designation: | |
| Certification or License #: | **2004004362** |
| Expiration Date: | **04/06/2024** ST: **OH** |
| E-mail: | **buckiappraiser@gmail.com** |

**FILING**

Client File #:    Appraiser File #: 2305007

The value opinion expressed above is only valid in conjunction with the attached appraisal report. This value opinion may be subject to Hypothetical Conditions and/or Extraordinary Assumptions as indicated in the body of the report. A true and complete copy of this Summary Appraisal Report contains 17 pages.

GP CONSUMER SF    Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPCSF LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE    10/2007

# RESIDENTIAL APPRAISAL REPORT
## SUBJECT PROPERTY IDENTIFICATION

Property Address: 265 Woodstream Dr          City: Springboro

State: OH     Zip Code: 45066     County: Warren

Legal Description of Real Property: Springs 3 Lot: 88 0.228 acres

Tax Assessor's Parcel #: 0403173004     R.E. Taxes: $ 6,458.30     Tax Year: 2022

Special Assessments: $ 0     Current Owner of Record: Davoli-Turner, Diana

Occupancy: ☒ Owner   ☐ Tenant   ☐ Vacant   Current Occupant (if occupied): Davoli-Turner, Diana

Project Type (if applicable): ☒ Planned Unit Development   ☐ Condominium   ☐ Cooperative   ☐

Home Owners' Association Membership Fees (if applicable): $ 800   ☒ per year   ☐ per month

Market Area Name: Clearcreek Township     Map Reference: 17140     Census Tract: 0309.01

## ASSIGNMENT

The purpose of this appraisal is to develop a Current opinion of Market Value (as defined elsewhere in this report).

Property Rights Appraised: ☒ Fee Simple   ☐ Leasehold   ☐ Leased Fee   ☐ Other (describe)

Intended Use: determine current market value

Intended User(s) (by name or type): Client/Owner

Client: Diana Turner     Address: 265 Woodstream Dr, Springboro, OH 45066

Appraiser: Clark A Davis     Address: PO Box 506, Miamisburg, OH 45343-0506

## MARKET AREA DESCRIPTION

Location: ☐ Urban  ☒ Suburban  ☐ Rural     Built Up: ☒ Over 75%  ☐ 25-75%  ☐ Under 25%

Growth Rate: ☐ Rapid  ☒ Stable  ☐ Slow     Property Values: ☐ Increasing  ☒ Stable  ☐ Declining

Demand/Supply: ☒ Shortage  ☐ In Balance  ☐ Over Supply     Marketing Time: ☒ Under 3 Mos.  ☐ 3-6 Mos.  ☐ Over 6 Mos.

Typical One-Unit Housing Ranges:
Price: ($) Low 225,000   High 2,500,000   Predominant 450,000
Age: (yrs.) Low 0   High 150   Predominant 30

Present Land Use: One-Unit: 75%   2-4 Unit: 5%   Multi-Unit: 5%   Comm'l: 15%   _____ %

Change in Land Use: ☒ Not Likely  ☐ Likely *  ☐ Is Changing *   * To: _____

Market Area Comments:

The subject property is located in the City of tSpringboro, Warren,, Ohio. The subject neighborhood is an average mix of single and multi family dwellings. There is ease of access to employment,

shopping, schools and community support services. The general market conditions within the subject market area are considered to be stable at this time. Demand is outpacing Supply  with list price

trends remaining stable over the most recent six month period. Predominate financing consists of conventional and government loans at market rates and terms.  The neighborhood boundaries are:

Austin Road to the north, State Route 48 Street to the east, State Route 73 to the south, and I-75 to the west.

## SALE / TRANSFER / LISTING HISTORY OF SUBJECT PROPERTY

My research: ☒ Did  ☐ Did not   reveal any prior sales or transfers of the subject property for the three years prior to the Effective Date of this

appraisal. Data Source(s): Warren County Auditor, Dabr / Cabr MLS, Realist.com

|  | 1st Prior Sale / Transfer | 2nd Prior Sale / Transfer | 3nd Prior Sale / Transfer |
|---|---|---|---|
| Date of Prior Sale / Transfer: | 11/09/2020 | | |
| Price of Prior Sale / Transfer: | $442,000 | | |
| Source(s) of Prior Sale / Transfer Data: | Realist/Auditor's website | | |

Analysis of sale / transfer history, any current agreements of sale or listing, and listing history (if relevent):

Sales activity for the previous thirty-six months is documented above all data is gathered from public record and believed to be

accurate but is NOT warranted.

Client: Diana Turner          Client File No.:          Appraiser File No.: 2305007

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPCSF LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE     10/2007

GP CONSUMERSF

# RESIDENTIAL APPRAISAL REPORT
## SITE DESCRIPTION

Dimensions: 77 x 153 x 54 x 149    Site Area: 9,932 Sq.Ft.

Zoning Classification: R-2    Zoning Description: single family residential

Zoning Compliance: ☒ Legal   ☐ Legal Non-Conforming (Grandfathered)   ☐ Illegal   ☐ No Zoning Regulations

Deed Restrictions: Are Covenants, Conditions, & Restrictions (CC&Rs) applicable?   ☐ Yes   ☐ No   ☒ Unknown

Have the documents been reviewed?   ☐ Yes   ☐ No   ☐ N/A   Ground Rent (if applicable)   $               /

Comments:

Highest & Best Use, as improved, is the:   ☒ Present use, or   ☐ Other use (explain)

the subject property is located in a suburban residential neighborhood, highest and best use is single family residential.

Characteristics:
| | | |
|---|---|---|
| Topography: | generally level | Size: typical for market area |
| Shape: | mostly rectangular | Drainage: appears adequate |
| View: | similar residential | Landscaping: typical for market |

Other features:   ☒ Inside Lot   ☐ Corner Lot   ☐ Cul de Sac   ☒ Underground Utilities   ☐

| Utilities: | Public | Other | Provider/Description | Off-site Improvements: | Type | Public | Private |
|---|---|---|---|---|---|---|---|
| Electricity: | ☒ | ☐ | on & operable | Street: | asphalt | ☒ | ☐ |
| Gas: | ☒ | ☐ | on & operable | Curb/Gutter: | concrete | ☒ | ☐ |
| Water: | ☒ | ☐ | on & operable | Sidewalk: | concrete | ☒ | ☐ |
| Sanitary Sewer: | ☒ | ☐ | public / operable | Alley: | none | ☐ | ☐ |

Is the property or the improvements located in a FEMA Special Flood Hazard Area?   ☐ Yes   ☒ No

FEMA Flood Zone: X    FEMA Map # 39165C0030E    FEMA Map Date: 12/17/2010

Site Comments:
No apparent adverse easements or encroachments noted at the time of inspection.   The flood information provided in this appraisal report is believed to be accurate but is NOT warranted.

## DESCRIPTION OF THE IMPROVEMENTS

General Description: # of Units: 1   ☐ + Accessory Unit   # of Stories: 2   Design (Style): colonial

Type:   ☒ Detached   ☐ Attached   ☐   Status:   ☒ Existing   ☐ Proposed   ☐ Under Construction

Actual Age (years): 11   Effective Age (years): 5   Year Built: 2012

Exterior Description:
| | | |
|---|---|---|
| Foundation: | concrete/avg | Exterior Walls: brick/hrdbrd/avg |
| Roof Surface: | composite/avg | Gutters & Downspouts: aluminum/avg |
| Window Type(s): | thermal/avg | Storm / Screens: yes/avg |

Heating System: forced air    Cooling System: central air

Car Storage:   ☐ None   ☒ Garage   ☐ Carport   ☒ Driveway (Surface: concrete   )   Total # of Cars: 4

Livable area above grade contains:   9 Rooms,   4 Bedrooms,   2.1 Bath(s), and   3,966 Sq.Ft. of GLA

Describe Additional Features and Improvements:
The property is in above average condition and has been well maintained by the current owner.  No repairs were needed at the time of inspection.  Condition is generally average to above average for the neighborhood when compared to other properties in this age bracket and design.

Client: Diana Turner    Client File No.:    Appraiser File No.: 2305007

**GP CONSUMERSF**   Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPCSF LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE    10/2007

# RESIDENTIAL APPRAISAL REPORT

## SALES COMPARISON APPROACH TO VALUE

For the Sales Comparison Approach, the appraiser selects comparable sales that they consider the best matches to the subject in terms of physical characteristics, physical proximity, and time of sale. The appraiser then makes adjustments to the known sale price of each comparable sale to account for differences that are recognized by the market. For example, if the subject has a single bathroom but a comparable has 2, the comparable's sale price would be reduced by the attributable value given to the extra bathroom based on the market's reaction. Likewise, if a comparable sale has a smaller square footage than the subject, its sale price would be adjusted upward in the same manner. By weighting and reconciling these adjusted sales prices together, an opinion of value for the subject can be determined.

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | +(−) $ Adjust. | COMPARABLE SALE # 2 | +(−) $ Adjust. | COMPARABLE SALE # 3 | +(−) $ Adjust. |
|---|---|---|---|---|---|---|---|
| Address | 265 Woodstream Dr Springboro, OH 45066 | 165 Wellspring Dr Springboro, OH 45066 | | 477 Stolle Dr Springboro, OH 45066 | | 10934 Ruston Glen Ct Dayton, OH 45458 | |
| Proximity to Subject | | 0.06 miles S | | 0.28 miles W | | 2.29 miles E | |
| Sale Price | $ | $ 661,000 | | $ 660,000 | | $ 612,000 | |
| Sale Price / GLA | $ /Sq.Ft. | $ 207.60/Sq.Ft. | | $ 196.20/Sq.Ft. | | $ 156.68/Sq.Ft. | |
| Data Source(s) | inspection/auditor | DabrMLS#880103 DOM 52 | | DabrMLS#881214 DOM 31 | | DabrMLS#880954 DOM 34 | |
| ADJUSTMENT ITEMS | DESCRIPTION | DESCRIPTION | +(−) $ Adjust. | DESCRIPTION | +(−) $ Adjust. | DESCRIPTION | +(−) $ Adjust. |
| Sales or Financing Concessions | | ArmLth none noted | 0 | ArmLth Conv;0 | 0 | ArmLth Conv;0 | 0 |
| Date of Sale / Time | | 02/2023 | 0 | 03/2023 | 0 | 03/2023 | 0 |
| Rights Appraised | fee simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Location | suburban | suburban | | suburban | | suburban | |
| Site | 9,932 Sq.Ft. | 14,854 sf | 0 | 15,856 sf | 0 | 15,673 sf | 0 |
| View | similar residential | similar residential | | similar residential | | similar residential | |
| Design (Style) | Colonial/2 story | Colonial/spl lvl | 0 | Colonial/2 story | | Colonial/2 story | |
| Quality of Construction | above average | above average | | above average | | above average | |
| Age | 11 | 3 | 0 | 7 | 0 | 8 | 0 |
| Condition | above average | above average | | above average | | above average | |
| Above Grade Room Count | Total 9 Bdrms 4 Baths 2.1 | Total 8 Bdrms 4 Baths 3.1 | -30,000 | Total 11 Bdrms 4 Baths 2.1 | 0 | Total 11 Bdrms 4 Baths 2.1 | 0 |
| Gross Living Area | 3,966 Sq.Ft. | 3,184 Sq.Ft. | +40,700 | 3,364 Sq.Ft. | +29,500 | 3,906 Sq.Ft. | 0 |
| Basement Total Area | full | partial | +10,000 | full | | full | |
| Basement Finish Area | 85% finish | unfinished | +30,000 | finished/bath | -15,000 | unfinished | +30,000 |
| Functional Utility | average/4bdrm | average/4bdrm | | average/4bdrm | | average/4bdrm | |
| Heating / Cooling | fa/ca | fa/ca | | fa/ca | | fa/ca | |
| Energy Efficient Items | thrml windows | thrml windows | | thrml windows | | thrml windows | |
| Garage / Carport | 2gbi2dw | 2gbi2dw | | 3gbi3dw | -20,000 | 3gbi3dw | -20,000 |
| Porch / Patio / Deck | stoop/deck | stoop/deck | | stoop/patio | | stoop/deck | |
| Additional Features | fireplace | fireplace | | fireplace | | fireplace | |
| Net Adjustment (Total) | | ☒+ ☐− $ | 50,700 | ☐+ ☒− $ | -5,500 | ☒+ ☐− $ | 10,000 |
| Adjusted Sale Price of Comparables | | $ | 711,700 | $ | 654,500 | $ | 622,000 |

Comments on the Sales Comparison Approach:

All three comparables are closed sales from the subject market area and are reflective of value in the area. All three comparables were given consideration. Adjustments have been made to the comparables for such characteristics as gross living area, age, basement appeal, garage utility and other amenities based on market observation and analysis. Condition adjustments are based on MLS interior photos and descriptions. Adjustment amounts are derived from paired sales, sensitivity analysis, market surveys, and market reaction. All three sales are located in competing market areas and are impacted by similar external and socio economic forces. A factor of 25% was calculated on the price per square foot of each comparable and this amount was utilized for the GLA adjustment of each comparable. Therefore, due to the size and sales price differences adjustments for each comparable will calculate differently. Current market data does not support gla adjustments for differences of 200 square feet in the subject market segment.

| Appraiser's Indicated Value by the Sales Comparison Approach: | $ | 655,000 |
|---|---|---|

Client: Diana Turner     Client File No.:     Appraiser File No.: 2305007

**GP CONSUMER SF**

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPCSF LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

10/2007

# RESIDENTIAL APPRAISAL REPORT
## RECONCILIATION

Final Reconciliation of the Approaches to Value:

In developing this appraisal, the appraiser has incorporated only the Sales Comparison approach. The appraiser has excluded the Cost and Income approaches. The appraiser has determined that this appraisal process is not so limited that the results of the assignment are no longer credible.

This appraisal is made ☒ "as is"; ☐ subject to completion per plans and specifications on the basis of a Hypothetical Condition that the improvements have been completed; ☐ subject to the following repairs or alterations on the basis of a Hypothetical Condition that the repairs or alterations have been completed; ☐ subject to the following required inspection(s) based on the Extraordinary Assumption that the following condition or deficiency does not require alteration or repair:

☐ This report is also subject to other Hypothetical Conditions or Extraordinary Assumptions as specified elsewhere in this report.

## ATTACHMENTS

A true and complete copy of this report contains ___17___ pages, including all exhibits which are considered an integral part of the report. This appraisal report may not be properly understood without reference to the information contained in the complete report.

Attached Exhibits:

☒ Scope of Work          ☒ Limiting Cond./Certification     ☐ Narrative Addendum          ☒ Photograph Addenda
☒ Sketch Addendum        ☒ Map Addenda                      ☐ Cost Addendum               ☐ Flood Addendum
☐ Additional Sales       ☐ Additional Rentals               ☐ Income/Expense Analysis     ☐ Hypothetical Conditions
☐ Extraordinary Assumptions   ☐                             ☐                             ☐

## OPINION OF VALUE

This Opinion of Value may be subject to other Hypothetical Conditions and / or Extraordinary Assumptions, if so indicated above. Based on the degree of inspection of the subject property as indicated below; the defined Scope of Work for this appraisal assignment; the attached Statement of Assumptions and Limiting Conditions; and the attached Appraiser's Certifications, my (our) Current Opinion of the Market Value (or value range), as defined elsewhere in this report, of the real property that is the subject of this report is: $ 655,000 , as of: 05/08/2023 , which is both the Inspection Date and the Effective Date of this appraisal.

## SIGNATURES

APPRAISER

SUPERVISORY APPRAISER (if required)
or CO-APPRAISER (if applicable)

Appraiser Name:   Clark A Davis

Company:   Davis Appraisal Group

Phone:  (937) 859-6273          Fax:

E-mail:  buckiappraiser@gmail.com

Date of Report (Signature):  05/09/2023

License or Certification #:  2004004362          State: OH

Designation:

Expiration Date of License or Certification:   04/06/2024

Inspection of Subject: ☒ Interior & Exterior ☐ Exterior Only ☐ None

Date of Inspection:  05/08/2023

Supervisory or
Co-Appraiser Name:

Company:

Phone:                          Fax:

E-mail:

Date of Report (Signature):

License or Certification #:          State:

Designation:

Expiration Date of License or Certification:

Inspection of Subject: ☐ Interior & Exterior ☐ Exterior Only ☐ None

Date of Inspection:

Client:   Diana Turner          Client File No.:

Appraiser File No.:   2305007

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPCSF LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE
10/2007

**GP CONSUMERSF**

## Assumptions, Limiting Conditions & Scope of Work

| | File No.: | 2305007 |
|---|---|---|

| Property Address: | 265 Woodstream Dr | City: | Springboro | State: | OH | Zip Code: | 45066 |
|---|---|---|---|---|---|---|---|
| Client: | Diana Turner | Address: | 265 Woodstream Dr, Springboro, OH 45066 | | | | |
| Appraiser: | Clark A Davis | Address: | PO Box 506, Miamisburg, OH 45343-0506 | | | | |

**STATEMENT OF ASSUMPTIONS & LIMITING CONDITIONS**

- The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

- The appraiser may have provided a sketch in the appraisal report to show approximate dimensions of the improvements, and any such sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size. Unless otherwise indicated, a Land Survey was not performed.

- If so indicated, the appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

- The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

- If the cost approach is included in this appraisal, the appraiser has estimated the value of the land in the cost approach at its highest and best use, and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used. Unless otherwise specifically indicated, the cost approach value is not an insurance value, and should not be used as such.

- The appraiser has noted in the appraisal report any adverse conditions (including, but not limited to, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property, or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property, or adverse environmental conditions (including, but not limited to, the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

- The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

- The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice, and any applicable federal, state or local laws.

- If this appraisal is indicated as subject to satisfactory completion, repairs, or alterations, the appraiser has based his or her appraisal report and valuation conclusion on the assumption that completion of the improvements will be performed in a workmanlike manner.

- An appraiser's client is the party (or parties) who engage an appraiser in a specific assignment. Any other party acquiring this report from the client does not become a party to the appraiser-client relationship. Any persons receiving this appraisal report because of disclosure requirements applicable to the appraiser's client do not become intended users of this report unless specifically identified by the client at the time of the assignment.

- The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public, through advertising, public relations, news, sales, or by means of any other media, or by its inclusion in a private or public database.

- An appraisal of real property is not a 'home inspection' and should not be construed as such. As part of the valuation process, the appraiser performs a non-invasive visual inventory that is not intended to reveal defects or detrimental conditions that are not readily apparent. The presence of such conditions or defects could adversely affect the appraiser's opinion of value. Clients with concerns about such potential negative factors are encouraged to engage the appropriate type of expert to investigate.

**The Scope of Work** is the type and extent of research and analyses performed in an appraisal assignment that is required to produce credible assignment results, given the nature of the appraisal problem, the specific requirements of the intended user(s) and the intended use of the appraisal report. Reliance upon this report, regardless of how acquired, by any party or for any use, other than those specified in this report by the Appraiser, is prohibited. The Opinion of Value that is the conclusion of this report is credible only within the context of the Scope of Work, Effective Date, the Date of Report, the Intended User(s), the Intended Use, the stated Assumptions and Limiting Conditions, any Hypothetical Conditions and/or Extraordinary Assumptions, and the Type of Value, as defined herein. The appraiser, appraisal firm, and related parties assume no obligation, liability, or accountability, and will not be responsible for any unauthorized use of this report or its conclusions.

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

Form GPRES2AD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE          3/2007

## Certifications

File No.: 2305007

| | |
|---|---|
| Property Address: | 265 Woodstream Dr | City: Springboro | State: OH | Zip Code: 45066 |
| Client: | Diana Turner | Address: 265 Woodstream Dr, Springboro, OH 45066 |
| Appraiser: | Clark A Davis | Address: PO Box 506, Miamisburg, OH 45343-0506 |

### APPRAISER'S CERTIFICATION

**I certify that, to the best of my knowledge and belief:**
- The statements of fact contained in this report are true and correct.
- The credibility of this report, for the stated use by the stated user(s), of the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- I did not base, either partially or completely, my analysis and/or the opinion of value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property, or of the present owners or occupants of the properties in the vicinity of the subject property.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification.

### DEFINITION OF MARKET VALUE *:

Market value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised and acting in what they consider their own best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.
* This definition is from regulations published by federal regulatory agencies pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989 between July 5, 1990, and August 24, 1990, by the Federal Reserve System (FRS), National Credit Union Administration (NCUA), Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS), and the Office of Comptroller of the Currency (OCC). This definition is also referenced in regulations jointly published by the OCC, OTS, FRS, and FDIC on June 7, 1994, and in the Interagency Appraisal and Evaluation Guidelines, dated October 27, 1994.

| | |
|---|---|
| Client Contact: | Client Name: Diana Turner |
| E-Mail: | Address: 265 Woodstream Dr, Springboro, OH 45066 |

**APPRAISER**

*[signature: Clark Davis]*

Appraiser Name: Clark A Davis
Company: Davis Appraisal Group
Phone: (937) 859-6273  Fax:
E-Mail: buckiappraiser@gmail.com
Date Report Signed: 05/09/2023
License or Certification #: 2004004362  State: OH
Designation:
Expiration Date of License or Certification: 04/06/2024
Inspection of Subject: ☒ Interior & Exterior  ☐ Exterior Only  ☐ None
Date of Inspection: 05/08/2023

**SUPERVISORY APPRAISER (if required) or CO-APPRAISER (if applicable)**

Supervisory or Co-Appraiser Name:
Company:
Phone:  Fax:
E-Mail:
Date Report Signed:
License or Certification #:  State:
Designation:
Expiration Date of License or Certification:
Inspection of Subject: ☐ Interior & Exterior  ☐ Exterior Only  ☐ None
Date of Inspection:

SIGNATURES

GP RESIDENTIAL

Copyright 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

Form GPRES2AD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

3/2007

# Aerial Map

| Borrower | n/a | | | |
|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | |
| City | Springboro | County Warren | State OH | Zip Code 45066 |
| Lender/Client | Diana Turner | | | |



## Location Map

| Borrower | n/a | | | | |
|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | |
| City | Springboro | County Warren | | State OH | Zip Code 45066 |
| Lender/Client | Diana Turner | | | | |



## Building Sketch (Page - 1)

| Borrower | n/a | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code 45066 |
| Lender/Client | Diana Turner | | | | | |



TOTAL Sketch by a la mode, inc.

**Area Calculations Summary**

**Non-living Area**

Basement — 1886 Sq ft

| | | |
|---|---|---|
| 0.5 × 4 × 2 | = | 4 |
| 0.5 × 2 × 2 | = | 2 |
| 15 × 2 | = | 30 |
| 33 × 22 | = | 726 |
| 25 × 44 | = | 1100 |
| 1 × 23 | = | 23 |
| 0.5 × 1 × 2 | = | 1 |

## Building Sketch (Page - 2)

| Borrower | n/a | | | |
|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | |
| City | Springboro | County Warren | State OH | Zip Code 45066 |
| Lender/Client | Diana Turner | | | |



TOTAL Sketch by a la mode, inc.

**Area Calculations Summary**

| Living Area | | Calculation Details | |
|---|---|---|---|
| First Floor | 1886 Sq ft | 0.5 × 4 × 2 = | 4 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 15 × 2 = | 30 |
| | | 33 × 22 = | 726 |
| | | 25 × 44 = | 1100 |
| | | 1 × 23 = | 23 |
| | | 0.5 × 1 × 2 = | 1 |
| **Total Living Area (Rounded):** | **1886 Sq ft** | | |
| **Non-living Area** | | | |
| 2 Car Built-In | 442 Sq ft | 21 × 20 = | 420 |
| | | 11 × 2 = | 22 |
| Uncvrd Stp | 22 Sq ft | 11 × 2 = | 22 |
| Wood Deck | 647 Sq ft | 24 × 22 = | 528 |
| | | 2 × 2 = | 4 |
| | | 0.5 × 2 × 4 = | 4 |
| | | 6 × 15 = | 90 |
| | | 0.5 × 6 × 7 = | 21 |

Form SKT.BLDSKI - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Building Sketch (Page - 3)

| Borrower | n/a | | | | |
|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | |
| City | Springboro | County Warren | | State OH | Zip Code 45066 |
| Lender/Client | Diana Turner | | | | |



**Second Floor**

TOTAL Sketch by a la mode, inc.

### Area Calculations Summary

| Living Area | | Calculation Details | |
|---|---|---|---|
| Second Floor | 2080 Sq ft | 0.5 × 4 × 2 = | 4 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 15 × 2 = | 30 |
| | | 11 × 2 = | 22 |
| | | 21 × 8 = | 168 |
| | | 15 × 8 = | 120 |
| | | 46 × 4 = | 184 |
| | | 33 × 45 = | 1485 |
| | | 2 × 32 = | 64 |
| | | 0.5 × 2 × 1 = | 1 |
| Open to Below | -80 Sq ft | 8 × 10 = | 80 |
| **Total Living Area (Rounded):** | **2080 Sq ft** | | |

Form SKT.BLDSKI - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Subject Photo Page

| Borrower | n/a | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | | State | OH | Zip Code | 45066 |
| Lender/Client | Diana Turner | | | | | | |



**Subject Front**

265 Woodstream Dr



**Subject Rear**



**Subject Street**

## Photograph Addendum

| Borrower | n/a | | | | |
|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | |
| City | Springboro | County Warren | | State OH | Zip Code 45066 |
| Lender/Client | Diana Turner | | | | |

  

**Street**　　　　　　　**Side**　　　　　　　**Side**

  

**Entry**　　　　　　　**Living room**　　　　　　　**Dining room**

  

**1/2 bath**　　　　　　　**Breakfast area**　　　　　　　**Kitchen 1**

  

**Kitchen 2**　　　　　　　**Family room**　　　　　　　**Garage interior**

Form PIC12 LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

# Photograph Addendum

| Borrower | n/a | | | | |
|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | |
| City | Springboro | County Warren | | State OH | Zip Code 45066 |
| Lender/Client | Diana Turner | | | | |



**Den**



**HVAC**



**Basement media room**



**Basement family room**



**Basement den**



**Foyer**



**Bedroom**



**Bath**



**Bedroom**



**Bedroom**



**Bedroom**



**Den**

Form PIC12 LT - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Photograph Addendum

| Borrower | n/a | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code 45066 |
| Lender/Client | Diana Turner | | | | | |

  

**Bath**    **Laundry room**



**Comparable Photo Page**

| Borrower | n/a | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 265 Woodstream Dr | | | | | | |
| City | Springboro | County | Warren | State | OH | Zip Code | 45066 |
| Lender/Client | Diana Turner | | | | | | |



**Comparable 1**

165 Wellspring Dr

MLS photo



**Comparable 2**

477 Stolle Dr

MLS photo



**Comparable 3**

10934 Ruston Glen Ct

**EXHIBIT #5 – U.S. Bank HELOC Documents**

**LINDA ODA**
**WARREN COUNTY RECORDER**
**2022-020006**

**MTG**
**06/15/2022 10:49:43 AM**
**REC FEE: 82.00 PGS: 8**
**PIN:**

by EO 8pgs

**Return To:** Radian Settlement Services Inc.
1000 GSK Drive, Suite 210
Coraopolis, PA 15108

# Open-End Mortgage

## With Future Advance Clause

The date of this Mortgage (*"Security Instrument"*) is June 9, 2022.

| **Mortgagor** | **Lender** |
|---|---|
| DIANA DAVOLI-TURNER AND CARLOS TURNER, MARRIED TO EACH OTHER | U.S. BANK NATIONAL ASSOCIATION |
| 265 WOODSTREAM DR | Organized and existing under the laws of the United States |
| SPRINGBORO, OH 45066 | 425 WALNUT STREET |
| | CINCINNATI, OH 45202 |

**1. Conveyance.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, upon the statutory condition, and to secure the Secured Debt (defined below) and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, conveys and mortgages to Lender, with mortgage covenants, the following described property:

SITUATED IN SECTION 3, TOWN 2, RANGE 5 BTM, CLEARCREEK TOWNSHIP, CITY OF SPRINGBORO, COUNTY OF WARREN, STATE OF OHIO AND BEING LOT NUMBERED 88 THE SPRINGS SECTION THREE, AS RECORDED IN PLAT BOOK 77, PAGES 49-51, OF THE PLAT RECORDS OF SAID COUNTY.

Parcel ID Number: 0403173004   EO

The property is located in WARREN County at 265 WOODSTREAM DRIVE, SPRINGBORO, Ohio 45066.

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as *"Property"*).

**2. Maximum Obligation Limit.** The total principal amount secured by this Security Instrument at any one time shall not exceed $34,363.00. This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

Mortgage Open End-OH
© 2020 Wolters Kluwer Financial Services, Inc.
All rights reserved.
2022060822.1.0.4068-J20210124Y
12/2020
Page 1 of 8



*USB-220419-00880-1*

**3. Secured Debt and Future Advances.** The term *"Secured Debt"* is defined as follows:

(A) Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions.

The credit agreement signed by DIANA DAVOLI-TURNER (the *"Borrower"*) and dated the same date as this Security Instrument (the *"Note"*). Under the Note, the Lender agrees, subject to certain terms, conditions and limitations, to make advances to the Borrower in a principal amount outstanding not to exceed Thirty four thousand three hundred sixty-three and 00/100 Dollars (U.S. $34,363.00). Borrower has promised to pay this debt with interest in regular periodic payments and to pay the debt in full not later than June 15, 2052.

(B) All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt executed by Mortgagor in favor of Lender after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Mortgagor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

(C) All other obligations Mortgagor owes to Lender, which may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.

(D) All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Mortgagor's principal dwelling that is created by this Security Instrument.

This Security Instrument will not secure any other debt if Lender fails, with respect to that other debt, to fulfill any necessary requirements or to conform to any limitations of Regulation Z and X that are required for loans secured by the Property.

**4. Mortgage Covenants.** Mortgagor agrees that the covenants in this section are material obligations under the Secured Debt and this Security Instrument. If Mortgagor breaches any covenant in this section, Lender may refuse to make additional extensions of credit and reduce the credit limit. By not exercising either remedy on Mortgagor's breach, Lender does not waive Lender's right to later consider the event a breach if it happens again.

**Payments.** Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

**Prior Security Interests.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees to make all payments when due and to perform or comply with all covenants. Mortgagor also agrees not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written approval.

**Claims Against Title.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property. Lender is authorized to do all things provided to be done by a mortgagee under section 1311.14 of the *Ohio Revised Code*.

---

**Property Condition, Alterations and Inspection.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims and actions against Mortgagor, and of any loss or damage to the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

**Authority to Perform.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument.

**Assignment of Leases and Rents.** Mortgagor irrevocably grants, bargains, conveys and mortgages to Lender as additional security all the right, title and interest in and to any and all existing or future leases, subleases, and any other written or verbal agreements for the use and occupancy of any portion of the Property, including any extensions, renewals, modifications or substitutions of such agreements (all referred to as *"Leases"*) and rents, issues and profits (all referred to as *"Rents"*). In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement. Mortgagor will promptly provide Lender with true and correct copies of all existing and future Leases. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default under the terms of this Security Instrument.

Mortgagor agrees that this assignment is immediately effective between the parties to this assignment and effective as to third parties on Mortgagor's default when Lender takes actual possession of the Property, when a receiver is appointed, when Lender commences a foreclosure on the Property or as the law otherwise provides, and this assignment will remain effective during any redemption period until the Secured Debt is satisfied. Mortgagor agrees that Lender may take actual possession of the Property without the necessity of commencing any legal action or proceeding and Mortgagor agrees that actual possession of the Property is deemed to occur when Lender notifies Mortgagor of the default and demands that Mortgagor and Mortgagor's tenants pay all Rents due and to become due directly to Lender. On receiving notice of default, Mortgagor will endorse and deliver to Lender any payment of Rents in Mortgagor's possession and will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Any amounts collected will be applied as provided in this Security Instrument. Mortgagor warrants that no default exists under the Leases or any applicable landlord/tenant law. Mortgagor also agrees to maintain and require any tenant to comply with the terms of the Leases and applicable law.

**Leaseholds; Condominiums; Planned Unit Developments.** Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

**Condemnation.** Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

Mortgage Open End-OH
© 2020 Wolters Kluwer Financial Services, Inc.                                                                      12/2020
All rights reserved.                          2022060822.1.0.4068-                     Page 3 of 8
                                                    J20210124Y

WARREN COUNTY                    2022-020006                  PAGE 3 OF 8

**Insurance.** Mortgagor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause". Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

**Financial Reports and Additional Documents.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

**5. Due on Sale.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, a transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law, as applicable.

**6. Warranties and Representations.** Mortgagor has the right and authority to enter into this Security Instrument. The execution and delivery of this Security Instrument will not violate any agreement governing Mortgagor or to which Mortgagor is a party.

**7. Default.** Mortgagor will be in default if any of the following occur:

**Fraud.** Any Borrower engages in fraud or material misrepresentation in connection with the Secured Debt that is an open end home equity plan.

**Payments.** Any Borrower on any Secured Debt that is an open end home equity plan fails to make a payment when due.

**Property.** Any action or inaction by Borrower or Mortgagor occurs that adversely affects the Property or Lender's rights in the Property. This includes, but is not limited to, the following: (a) Mortgagor fails to maintain required insurance on the Property; (b) Mortgagor transfers the Property; (c) Mortgagor commits waste or otherwise destructively uses or fails to maintain the Property such that the action or inaction adversely affects Lender's security; (d) Mortgagor fails to pay taxes on the Property or otherwise fails to act and thereby causes a lien to be filed against the Property that is senior to the lien of this Security Instrument; (e) a sole Mortgagor dies; (f) if more than one Mortgagor, any Mortgagor dies and Lender's security is adversely affected; (g) the Property is taken through eminent domain; (h) a judgment is filed against Mortgagor and subjects Mortgagor and the Property to action that adversely affects Lender's interest; or (i) a prior lienholder forecloses on the Property and as a result, Lender's interest is adversely affected.

**Executive Officers.** Any Borrower is an executive officer of Lender or an affiliate and such Borrower becomes indebted to Lender or another lender in an aggregate amount greater than the amount permitted under federal laws and regulations.

---

Mortgage Open End-OH
© 2020 Wolters Kluwer Financial Services, Inc.
All rights reserved.
2022060822.1.0.4068-
J20210124Y
12/2020
Page 4 of 8

WARREN COUNTY          2022-020006          PAGE 4 OF 8

**8. Remedies on Default.** In addition to any other remedy available under the terms of this Security Instrument, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default. In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions.

At the option of the Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it happens again.

**9. Expenses; Advances on Covenants; Attorneys' Fees; Collection Costs.** If Mortgagor breaches any covenant in this Security Instrument, Mortgagor agrees to pay all expenses Lender incurs in performing such covenants or protecting its security interest in the Property. Such expenses include, but are not limited to, fees incurred for inspecting, preserving, or otherwise protecting the Property and Lender's security interest. These expenses are payable on demand and will bear interest from the date of payment until paid in full at the highest rate of interest in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. To the extent permitted by the *United States Bankruptcy Code*, Mortgagor agrees to pay the reasonable attorneys' fees Lender incurs to collect the Secured Debt as awarded by any court exercising jurisdiction under the Bankruptcy Code. This Security Instrument shall remain in effect until released. Mortgagor agrees to pay for any recordation costs of such release.

**10. Environmental Laws and Hazardous Substances.** As used in this section, (1) *"Environmental Law"* means, without limitation, the *Comprehensive Environmental Response, Compensation and Liability Act* (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) *"Hazardous Substance"* means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

(A) Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

(B) Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

(C) Mortgagor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor shall take all necessary remedial action in accordance with any Environmental Law.

(D) Mortgagor shall immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

**11. Escrow for Taxes and Insurance.** Mortgagor will pay to Lender amounts for (a) yearly taxes and assessments on the Property which under the law may be superior to this Security Instrument, (b) yearly leasehold payments or ground rents (if any), (c) yearly premiums for hazard or property insurance, (d) yearly premiums for flood insurance (if any), and (e) yearly premiums for mortgage

insurance (if any). Mortgagor will pay those amounts to Lender unless Lender tells Mortgagor, in writing, that Mortgagor does not have to do so, or unless the law requires otherwise. Mortgagor will make those payments at the times required by Lender.

Lender will estimate from time to time Mortgagor's yearly taxes, assessments, leasehold payments or ground rents and insurance premiums, which will be called the *"Escrow Items"*. Lender will use existing assessments and bills and reasonable estimates of future assessments and bills. The amounts that Mortgagor pays to Lender for Escrow Items under this section will be called the *"Funds"*. Lender will collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Mortgagor's escrow account under the federal *Real Estate Settlement Procedures Act of 1974* (as amended), unless another law that applies to the Funds sets a lesser amount. If so, Lender will collect and hold Funds in the lesser amount.

Lender will keep the Funds in a savings or banking institution which has its deposits or accounts insured or guaranteed by a federal or state agency. If Lender is such an institution, Lender may hold the Funds. Lender will use the Funds to pay the Escrow Items. Lender will give Mortgagor, without charge, an annual accounting of the Funds. That accounting must show all additions to and deductions from the Funds and the reason for each deduction.

Lender may not charge Mortgagor for holding or keeping the Funds, for using the Funds to pay Escrow Items, for analyzing Mortgagor's payments of Funds, or for receiving, verifying and totaling assessments and bills. However, Lender may charge Mortgagor for these services if Lender pays Mortgagor interest on the Funds and if the law permits Lender to make such a charge. Lender may require Mortgagor to pay a one-time charge for an independent real estate tax reporting service used by Lender in accordance with the Secured Debts, unless applicable law provides otherwise. Lender will not be required to pay Mortgagor any interest or earnings on the Funds unless either (i) Lender and Mortgagor agree in writing, at the time Mortgagor signed this Security Instrument, that Lender will pay interest on the Funds; or (ii) the law requires Lender to pay interest on the Funds.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender will account to borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may notify borrower in writing, and, in such case, borrower will pay to Lender the amount necessary to make up the shortage or deficiency. Borrower shall make up the shortage or deficiency as Lender directs, subject to the requirements of applicable law.

If, by reason of any default under this Security Instrument, Lender declares all Secured Debts due and payable, Lender may then apply any Funds against the Secured Debts.

When Mortgagor has paid all of the sums secured, Lender will promptly refund to Mortgagor any Funds that are then being held by Lender.

**12. Joint and Individual Liability; Co-Signers; Successors and Assigns Bound.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

**13. Severability; Interpretation.** This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

**14. Notice.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address in this Security Instrument, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

**15. Waivers.** Except to the extent prohibited by law, Mortgagor waives all rights of appraisement, marshalling of liens and assets, and homestead exemption rights relating to the Property. Mortgagor does hereby remise, release, and forever quitclaim all their right and title of dower in the Property to Lender.

**16. Line of Credit.** The Secured Debt includes a revolving line of credit. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

**17. Applicable Law.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located.

**18. Riders.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument.

[Check all applicable boxes]

☐ Assignment of Leases and Rents   ☐ Other: _____

**19.** ☐ **Additional Terms.** _____

**Signatures**

By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated in this Security Instrument.

**Mortgagor**

_Diana Davoli Turner_   _6/9/2022_
DIANA DAVOLI-TURNER                 Date

_Carlos Turner_   _6/9/2022_
CARLOS TURNER                       Date

**Acknowledgment**

State of Ohio

County of WARREN

No oath or affirmation was administered to the signer with regard to this acknowledgment.

This instrument was acknowledged before me on ___06/09/2022___ by DIANA DAVOLI-TURNER .

_Melissa B_
*Notary Public*

_Melissa Buhiru_
*(Print Name)*

My commission expires: ___08/16/2025___

**Acknowledgment**

State of Ohio

County of WARREN

No oath or affirmation was administered to the signer with regard to this acknowledgment.
This instrument was acknowledged before me on _06/09/2022_ by CARLOS TURNER.

_Notary Public_

_Melissa Buhin_
_(Print Name)_
My commission expires: _08/16/2025_

This instrument was prepared by: Meghan M Joyce
425 Walnut Street
Cincinnati, OH 45202

Mortgage Open End-OH
© 2020 Wolters Kluwer Financial Services, Inc.
All rights reserved.                2022060822.1.0.4068-
                                    J20210124Y
                                                                        12/2020
                                                                        Page 8 of 8

WARREN COUNTY            2022-020006            PAGE 8 OF 8